# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

*IN RE* UNITED STATES OF AMERICA, *ET AL.*,
*Petitioners*.

———————————

UNITED STATES OF AMERICA; DONALD J. TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; and ELAINE C. DUKE, Acting Secretary of Homeland Security,
*Petitioners-Defendants*.

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,
*Respondent*,

REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET NAPOLITANO, President of the University of California; STATE OF CALIFORNIA; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; CITY OF SAN JOSE; DULCE GARCIA; MIRIAM GONZALEZ AVILA; SAUL JIMENEZ SUAREZ; VIRIDIANA CHABOLLA MENDOZA; NORMA RAMIREZ; and JIRAYUT LATTHIVONGSKORN; COUNTY OF SANTA CLARA; SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521,
*Real Parties in Interest-Plaintiffs*,

———————————

## ANSWER TO PETITION FOR A WRIT OF MANDAMUS AND EMERGENCY MOTION FOR STAY

———————————

XAVIER BECERRA
Attorney General of California
Edward C. DuMont
Solicitor General
Michael J. Mongan
Deputy Solicitor General
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA  94102-3660
(415) 703-2548
michael.mongan@doj.ca.gov
*Attorneys for Plaintiff State of California*

GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr.
333 South Grand Avenue
Los Angeles, CA  90071-3197
(213) 229-7000
*Attorneys for Plaintiffs Dulce Garcia, et al.*

COVINGTON & BURLING LLP
Jeffrey M. Davidson
One Front Street, 35th Floor
San Francisco, CA  94111-5356
(415) 591-6000
*Attorneys for Plaintiffs The Regents of the University of California, et al.*

COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
*Attorneys for Plaintiff City of San José*

*(Additional counsel listed on signature page)*

October 24, 2017

# TABLE OF CONTENTS

Introduction ................................................................................... 1

Background ................................................................................... 2

  A. The establishment of the DACA program ............................. 2

  B. Defendants' abrupt rescission of DACA ............................... 3

  C. The district court proceedings ............................................ 5

Legal Standard ............................................................................ 9

Argument ................................................................................... 10

I. Defendants are not entitled to mandamus ............................. 10

  A. Defendants have not identified any "clear and indisputable"
     legal error by the district court ........................................ 11

    1. The district court's rulings regarding the administrative
      record are correct ...................................................... 11

    2. The district court's analysis of defendants' privilege claims
      provides no basis for mandamus relief ........................ 19

  B. Defendants' remaining legal arguments are premature .................... 25

    1. Defendants have not yet presented their "threshold"
      jurisdictional arguments to the district court ................ 25

    2. The district court has not yet ruled on any disputes related to
      depositions ................................................................. 28

    3. Discovery on discriminatory motive is permitted on
      plaintiffs' constitutional claims. ................................. 29

II. Defendants are not entitled to a stay ...................................... 32

Conclusion ................................................................................. 36

# TABLE OF AUTHORITIES

**Page**

C ASES

*Am. Beverage Ass'n v. City & Cty. of San Francisco*
871 F.3d 884 (9th Cir. 2017) .................................................. 35

*Bar MK Ranches v. Yuetter*
994 F.2d 735 (10th Cir. 1993) ................................................ 12

*Bauman v. District Court*
557 F.2d 650 (9th Cir. 1977) ............................................. 10, 31

*Bogan v. City of Boston*
489 F.3d 417 (1st Cir. 2007) .................................................. 29

*Cheney v. District Court*
542 U.S. 367 (2004) ..................................................... 9, 10, 16

*Chevron Corp. v. Pennzoil Co.*
974 F.2d 1156 (9th Cir. 1992) ........................................... 21, 22

*Citizens to Preserve Overton Park, Inc. v. Volpe*
401 U.S. 402 (1971) ......................................................... 12, 14

*Cook Inletkeeper v. EPA*
400 F. App'x 239 (9th Cir. Oct. 21, 2010) ........................... 18

*Coyotl v. Kelly*
2017 WL 2889681 (N.D. Ga. June 12, 2017) ........................ 27

*Crawford-El v. Britton*
523 U.S. 574 (1998) ............................................................. 30

*Crawford-El v. Britton*
951 F.2d 1314 (D.C. Cir. 1991) ............................................ 30

*Ctr. for Food Safety v. Vilsack*
2017 WL 1709318 (N.D. Cal. May 3, 2017) ......................... 17

# TABLE OF AUTHORITIES
## (continued)

Page

*EEOC v. BDO USA, L.L.P.*
856 F.3d 356 (5th Cir. 2017) .................................................................. 19

*FCC v. Fox Television Stations, Inc.*
556 U.S. 502 (2009).................................................................................. 17

*FTC v. Warner Communications Inc.*
742 F.2d 1156 (9th Cir. 1984) .......................................................... 23, 24

*Gonzalez Torres v. U.S. Dep't of Homeland Sec.*
2017 WL 4340385 (S.D. Cal. Sept. 29, 2017) ...................................... 27

*Harlow v. Fitzgerald*
457 U.S. 800 (1982).................................................................................. 30

*Hernandez v. Tanninen*
604 F.3d 1095 (9th Cir. 2010) ................................................................ 22

*In re Anonymous Online Speakers*
661 F.3d 1168 (9th Cir. 2011) .......................................................... 11, 31

*In re Cheney*
544 F.3d 311 (D.C. Cir. 2008).................................................................. 28

*In re County of Orange*
784 F.3d 520 (9th Cir. 2015) .................................................................... 9

*In re Kessler*
100 F.3d 1015 (D.C. Cir. 1996)................................................................ 29

*In re Perez*
749 F.3d 849 (9th Cir. 2014) ............................................................ 10, 11

*In re Sealed Case*
121 F.3d 729 (D.C. Cir. 1997).................................................................. 25

*In re Swift Transp. Co. Inc.*
830 F.3d 913 (9th Cir. 2016) ............................................. 18, 32

*In re United States*
624 F.3d 1368 (11th Cir. 2010) ....................................... 28, 29

*In re United States*
791 F.3d 945 (9th Cir. 2015) ................................................. 10

*Inst. for Fisheries Res. v. Burwell*
2017 WL 89003 (N.D. Cal. Jan. 10, 2017)............................. 17

*Judicial Watch, Inc. v. Dep't of Justice*
365 F.3d 1108 (D.C. Cir. 2004)............................................. 25

*Kerr v. District Court*
511 F.2d 192 (9th Cir. 1975) ................................................. 19

*Kwai Fun Wong v. United States*
373 F.3d 952 (9th Cir. 2004) .......................................... 26, 27

*Kyle Eng'g Co. v. Kleppe*
600 F.2d 226 (9th Cir. 1979) ................................................. 28

*Landry v. FDIC*
204 F.3d 1125 (D.C. Cir. 2000)............................................. 19

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of the Fed.*
*Highway Admin.*
2010 WL 3259866 (E.D. Mich. Aug. 18, 2010) ................... 15

*Leyva v. Certified Grocers of Cal., Ltd.*
593 F.2d 857 (9th Cir. 1979) ................................................. 34

*Miami Nation of Indians of Indiana v. Babbitt*
979 F.Supp. 771 (N.D. Ind. 1996)......................................... 15

# TABLE OF AUTHORITIES
## (continued)

Page

*Mickelsen Farms, LLC v. Animal & Plant Health Inspection
Serv.*
2017 WL 2172436 (D. Idaho May 17, 2017).........................18

*Mohawk Indus., Inc. v. Carpenter*
558 U.S. 100 (2009)..............................................33, 34

*Nat'l Council of La Raza v. Dep't of Justice*
411 F.3d 350 (2d Cir. 2005) ...................................22

*Nken v. Holder*
556 U.S. 418 (2009)..............................................32, 33

*Oceana, Inc. v. Pritzker*
2017 WL 2670733 (N.D. Cal. Jun. 21, 2017) ........................15

*Portland Audubon Soc'y v. Endangered Species Comm.*
984 F.2d 1534 (9th Cir. 1993) .............................12, 13, 16

*Renegotiation Bd. v. Bannercraft Clothing Co.*
415 U.S. 1 (1974)................................................34

*Reno v. Am.-Arab Anti-Discrimination Comm.*
525 U.S. 471 (1999)..............................................26, 30, 31

*Texas v. United States*
809 F.3d 134 (5th Cir. 2015) ...................................27

*Thompson v. United States Dep't of Labor*
885 F.2d 551 (9th Cir. 1989) .............................12, 13, 14

*United States v. Armstrong*
517 U.S. 456 (1996)..............................................30

*United States v. Guerrero*
693 F.3d 990 (9th Cir. 2012) ...................................31

*United States v. Nixon*
  418 U.S. 683 (1974)..................................................................... 24

*Univ. of Penn. v. EEOC*
  493 U.S. 182 ............................................................................... 24

*Walters v. Reno*
  145 F.3d 1032 (9th Cir. 1998) ................................................... 27

*Weil v. Inv./Indicators, Research & Mgt., Inc.*
  647 F.2d 18 (9th Cir. 1981) ....................................................... 21

**STATUTES**

5 U.S.C. § 556(e) ........................................................................... 13

5 U.S.C. § 706 ............................................................................... 11

8 U.S.C. § 1252(g) ................................................................... 26, 27

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. V .................................................................... 5

**OTHER AUTHORITIES**

U.S. Dep't of Justice, Env't and Nat. Res. Div., Guidance to
  Federal Agencies on Compiling the Administrative Record
  (Jan. 1999) .............................................................. 14, 15, 18

# INTRODUCTION

Defendants' mandamus petition seeks to intrude on the district court's reasonable efforts to manage an important case under stringent time constraints that the government itself created by selecting an arbitrary date to terminate the Deferred Action for Childhood Arrivals (DACA) program. On September 5, 2017, the Acting Secretary of the Department of Homeland Security (DHS) announced the decision to terminate DACA effective March 5, 2018. Plaintiffs in these five related cases sued, claiming that the decision violated the Administrative Procedure Act and the Constitution, among other theories. At the initial case management conference, the defendants agreed to an expedited case management plan under which they would produce the administrative record on October 6, followed by cross-motions for summary judgment on November 1. The purpose of this plan was to allow a final judgment in the district court, followed by an appeal, before the March 5, 2018 deadline. After the district court held that defendants' administrative record was deficient, however, they sought emergency mandamus relief from this Court, seeking to stay all discovery so defendants can "mov[e] to dismiss on threshold grounds." Pet. 15.

There is no basis for the extraordinary relief defendants seek here. Defendants made the strategic decision not to file an early motion to dismiss advancing "threshold" issues (*see* Pet. 15-16), and thus those issues have never

been presented to the district court. Similarly, defendants did not file any motion

with the district court raising their concerns about depositions of senior officials

(Pet. 21-22 & n.3) or discovery related to plaintiffs' constitutional claims (Pet. 24-

25) before filing their mandamus petition. The only issues raised in the petition on

which the district court *did* rule pertain to the proper scope of the administrative

record and defendants' privilege claims regarding 35 documents that the district

court reviewed *in camera* and ordered included in that record. But defendants did

not properly assert their privilege claims below, and they fail to show that any of

the district court's rulings were incorrect—let alone that the rulings were clear

legal error warranting extraordinary appellate intervention.

## BACKGROUND

### A. The Establishment of the DACA Program

DHS established DACA in June 2012. Dkt. 64-1 at 1-3.[1] Under DACA,

individuals brought to the United States as young children who met specific

criteria could request deferred action for a renewable two-year period. *Id.* In

exchange, DACA applicants were required to provide the government with highly

sensitive personal information, pass a rigorous background check, and pay a

considerable fee. *Id.* The government launched an extensive outreach campaign to

---

[1] "Dkt." citations are to the district court's docket; unless otherwise indicated, citations are to the docket in No. 17-cv-5211. "Pet. Add." is the addendum to the petition. "Ans. Add." is the addendum to this answer.

promote DACA, emphasizing that DACA recipients could renew their status and that the information they provided to the government would not be used in immigration enforcement proceedings absent special circumstances.  No. 17-cv-5380 Dkt. 1 ¶¶ 33-47.

DACA provides law enforcement, public safety, and economic benefits to both DACA recipients and society at large.  As the government has recognized, DACA enables hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."  *Id.* ¶ 32.

### B.  Defendants' Abrupt Rescission of DACA

In early 2017, then-Secretary John Kelly rescinded all prior DHS memoranda that conflicted with the new administration's immigration policy, but expressly did not disturb DACA.  Dkt. 64-1 at 229-234.  On September 4, 2017, however, Attorney General Sessions wrote to Acting DHS Secretary Elaine Duke that "DACA was effectuated by the previous administration through executive action, without proper statutory authority," and that DACA "was an unconstitutional exercise of authority by the Executive Branch."  Dkt. 64-1 at 251.  The next day, the Attorney General announced the government's decision to end DACA, asserting that DACA "is vulnerable to the same legal and constitutional

3

challenges that the courts recognized with respect to the [Deferred Action for Parents of Americans and Lawful Permanent Residents ('DAPA')] program." No. 17-cv-5380 Dkt. 1 ¶ 119. Those comments contradict prior public statements by the Department of Justice (DOJ) and DHS concluding that DACA is lawful. *Id.* ¶ 120.

On the same date as the Attorney General's announcement, the Acting Secretary issued a memorandum formally rescinding DACA (the "Rescission Memorandum"), along with a statement that "DACA was fundamentally a lie." Dkt. 1 ¶ 122; Dkt. 64-1 at 252-256. The Rescission Memorandum provides no reasoned evaluation of the legality or merits of DACA. Instead, it states that the threat of litigation by several state attorneys general provoked the decision to terminate the program. *Id.* at 253-254. Under the Rescission Memorandum, the government continued to process DACA applications received by September 5, 2017 and issued renewals for recipients whose permits expire before March 5, 2018, provided they applied for renewal by October 5, 2017. *Id.* at 255. The government has also reduced the protection of sensitive personal information applicants provided with their DACA requests. No. 17-cv-5380 Dkt. 1 ¶ 117-136.

The Rescission Memorandum does not consider the benefits of DACA or the widespread harm that will result from its termination. Rescission will severely injure those who rely on DACA's protections: the individual plaintiffs and

hundreds of thousands of young people who will be stripped of essential benefits, including the ability to work, and will face the prospect of removal and separation from family, friends, and colleagues. It will also harm the governmental plaintiffs who rely on DACA recipients as students, teachers, employees, and contributing members of their communities. And, as a result of defendants' changes to policies concerning protecting the sensitive information that DACA recipients provided to the government, these individuals now face the possibility that their information could be used against them for deportation. *Id.* ¶ 129. Terminating DACA will also cause widespread economic harm, removing hundreds of thousands of skilled workers from the labor force. *Id.* ¶ 126-136.

### C. The District Court Proceedings

Shortly after DHS issued the Rescission Memorandum, plaintiffs sued defendants in the Northern District of California in five related actions. Plaintiffs have asserted constitutional, statutory, and equitable claims—including claims under the Administrative Procedure Act (APA) and the Due Process Clause and the equal protection component of the Fifth Amendment—challenging the rescission of DACA and the use of sensitive personal information provided by DACA applicants. Plaintiffs seek to enjoin rescission of DACA and to prevent the government from breaking its promises regarding the use of this information for immigration enforcement purposes.

On September 22, 2017, the district court held a case management conference where the court and the parties agreed to an accelerated dispositive motion and trial schedule that will allow resolution of the claims on a comprehensive factual record before the March 5 rescission deadline. The Deputy Assistant Attorney General for the Federal Programs Branch represented to the court that "[w]e think your suggestion to get to final judgment quickly makes a lot of sense in this case. We're prepared to brief this case quickly." Ans. Add. 19. He clarified that "we are comfortable with the suggestion that we do cross-motions for summary judgment" rather than first litigating the sufficiency of the complaints, reiterating defendants' belief that "the Court could get to final judgment very quickly." *Id.* at 24; *see also id.* at 48. Defendants agreed to produce the administrative record in early October (*id.* at 18), before those motions would be filed. Although defendants suggested that discovery would be premature (*id.* at 23), they ultimately proposed limits on the number of written discovery requests "[i]n the interests of streamlining the discovery process, as well as ensuring that there's equality on all sides, including for any affirmative discovery that the Government might serve." *Id.* at 56.

Later that day, the district court issued a case management order. Dkt. 49. Under the agreed schedule, defendants were required to file and serve the administrative record by October 6, 2017; dispositive motions by all parties are due

November 1, followed by oppositions, replies, a hearing, and, if necessary, a bench trial on February 5, 2018. Dkt. 49 at 2-4. The court also limited discovery, at defendants' request, to 20 interrogatories and 20 requests for production, "all narrowly directed," along with "a reasonable number of depositions." Dkt. 49 at ¶ 3.

Pursuant to the case management order, plaintiffs have sought discovery on their non-APA claims. While defendants now ask this Court for relief from their discovery obligations, defendants did not move for a protective order in the district court before seeking mandamus relief; other than the order to complete the administrative record, defendants are not subject to any order compelling discovery. Instead, defendants have repeatedly delayed discovery efforts by instructing witnesses not to answer based on privilege objections that cannot be squared with the district court's rulings.

The testimony officials have given, however, reveals that dozens of government officials were involved in the decision to rescind DACA. For example, Acting Director of USCIS James McCament testified that he attended a meeting with at least a dozen others at DHS headquarters on August 21, 2017 regarding rescinding DACA. *Id.* at 162-163, 165. McCament further testified that a "tentative decision" was made about rescinding DACA at an August 24, 2017

meeting at the White House attended by at least fourteen officials.  *Id.* at 156-157, 159.

The testimony has also revealed some indications that the publicly stated reasons for the rescission decision are pretextual.  For example, although the government has asserted that the rescission was based on "litigation risk" associated with a threatened suit by certain state attorneys general, the author of the Rescission Memorandum testified that a policy of reacting to litigation threats would be "craz[y]" because "you could never do anything if you were always worried about being sued."  Ans. Add. 180.

On October 6, defendants filed a 256-page administrative record consisting of just fourteen documents, each of which was already in the public record, and no privilege log.  It excluded all documents that were not personally reviewed by Acting Secretary Duke.  For example, no documents considered by her staff were included, nor were any documents associated with the administration's decision six months earlier to leave DACA in place.  Plaintiffs promptly moved for an order directing defendants to complete the administrative record.  Dkt. 65.  The district court shortened the briefing schedule and ordered defendants to file a privilege log and to bring to the hearing a hard copy of "all emails, internal memoranda, and communications with the Justice Department on the subject of rescinding DACA." Pet. Add. 1.  On October 12, defendants filed their opposition and a privilege log

reflecting 84 documents in the Acting Secretary's possession and considered by her, but not produced.  *Id.* at 25.

After the hearing, the district court granted plaintiffs' motion in part and ordered that a set of materials considered by Acting Secretary Duke, her advisors, and former Secretary Kelly be made part of the record.  In addition, after reviewing *in camera* the documents over which defendants claimed privilege, the court ordered that 35 documents should be made part of the record, in whole or in part. The district court noted that any additional materials asserted to be privileged would "each" be reviewed *in camera*.  Pet. Add. 27.  After the district court denied defendants' subsequent motion to stay all proceedings and discovery, defendants filed this petition for a writ of mandamus and an emergency motion for an administrative stay.

## LEGAL STANDARD

Mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'"  *Cheney v. District Court*, 542 U.S. 367, 380 (2004).  Only "exceptional circumstances amounting to a judicial usurpation of power, or a clear abuse of discretion, will justify the invocation of" mandamus.  *Ibid.* (internal quotation marks and citations omitted).  A party seeking mandamus "carries the high burden of establishing that" its "'right to issuance of the writ is clear and indisputable,'" *In re County of Orange*, 784 F.3d 520, 526 (9th Cir. 2015), and that

it has "no other adequate means to attain the relief," *Cheney*, 542 U.S. at 380, 381;

*see also Bauman v. District Court*, 557 F.2d 650, 654-655 (9th Cir. 1977)

(establishing five guidelines to determine whether mandamus is appropriate).[2]

Even if the party makes the required showing, a reviewing court retains discretion

to deny mandamus if it is not "satisfied that the writ is appropriate under the

circumstances." *Id.* at 381. This Court is "particularly reluctant" to grant

mandamus relief in a way that "interfere[s] with a district court's day-to-day

management of its cases." *In re Perez*, 749 F.3d 849, 854 (9th Cir. 2014).

## ARGUMENT

## I. DEFENDANTS ARE NOT ENTITLED TO MANDAMUS

At the outset of this case, defendants agreed to an approach for case

management involving the expedited preparation of the administrative record and

cross-motions for summary judgment by November 1. But now defendants accuse

the district court of acting "improper[ly]" by ruling on issues related to their

deficient administrative record "before briefing on the government's threshold

---

[2] The five *Bauman* factors are: "(1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. . . . (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression." *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015); *see id.* at 955 n.7 (*Bauman* factors consistent with *Cheney*).

arguments that the challenged action is non-reviewable." Pet. 1. Defendants

identify no valid basis for mandamus. They fail to show that any of the district

court's rulings on the administrative record was clear error, "a necessary

prerequisite for" mandamus. *In re Perez*, 749 F.3d at 855. And the balance of

their legal arguments deal with issues they did not present to the district court, and

on which the district court has not ruled.

### A. Defendants Have Not Identified Any "Clear and Indisputable" Legal Error by the District Court

The most important factor governing the issuance of mandamus relief is

whether the petitioner has carried its burden of establishing clear and indisputable

legal error. *See, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th

Cir. 2011). Such error is found only when "'the reviewing court is left with a

"definite and firm conviction that a mistake has been committed."'" *Id.* Here, the

district court followed an appropriate course in managing these important,

complex, and time-sensitive cases. The court's rulings in its order regarding the

administrative record were correct—and certainly do not amount to clear legal

error.

### 1. The district court's rulings regarding the administrative record are correct

*a. The scope of the administrative record.* The APA requires courts to

review agency action on the basis of "the whole record," 5 U.S.C. § 706, consisting

of "everything that was before the agency pertaining to the merits of its decision."

*Portland Audubon Soc'y v. Endangered Species Comm.* 984 F.2d 1534, 1548 (9th Cir. 1993). A complete record is necessary so that the court can conduct the "thorough, probing, in-depth review" of the agency's reasoning called for by the APA. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). In contrast, "[a]n incomplete record must be viewed as a 'fictional account of the actual decisionmaking process.'" *Portland Audubon*, 984 F.2d at 1548.

Defendants argue that the district court was required to accept the administrative record compiled *post hoc* and provided by the agency—however incomplete it may be—and review the agency's decision only on the basis of that record. Pet. 15. Defendants' argument would improperly make agencies, not the courts, the final arbiter of the legality of administrative actions. That is inconsistent with established precedent. When "it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate." *Portland Audubon*, 984 F.2d at 1548; *see Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) (presumption that administrative record is complete can be overcome "with clear evidence to the contrary").

Defendants concede that judicial review requires production of the "full administrative record *before the agency* when it made its decision." Pet. 17 (quoting *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555-556 (9th Cir. 1989)) (emphasis added). Nonetheless, they continue to argue that a document

should be included in the administrative record only if it was "actually considered by the Acting Secretary." Pet. 10-11.[3] This argument is inconsistent with the standard adopted by this Court and was properly rejected by the district court.

As this Court has repeatedly explained, the "whole record" "is not necessarily those documents that the agency has compiled and submitted as the administrative record" but rather "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.2d at 555-556 (internal quotation marks omitted); *see also Portland Audubon*, 984 F.2d at 1548 (the record includes "everything that was before the agency pertaining to the merits of its decision"). Defendants ignore the "indirect" component of the standard, which exists for good reason. To review only documents placed in front of the agency head would allow agencies to "contrive a record that suppresses information actually considered by decision-makers and by those making recommendations to the decision-makers." Pet. Add. 22. This would place courts in the untenable position of reviewing administrative decisions based on a "fictional account" of the decisionmaking process. *Portland Audubon*, 984 F.2d at 1548.

_____

[3] Defendants' observation that the APA provides that the administrative record comprises "exclusive[ly]" of materials "filed in [formal administrative] proceeding[s]" is irrelevant here, because no formal administrative procedures were used in the rescission of DACA. Pet. 17 (citing 5 U.S.C. § 556(e)).

Defendants argue that the district court is allowing an impermissible examination of the "mental process" of the decision-maker. Pet. 19-21. But the district court's order does no such thing. It simply requires defendants to complete the documentary record so that the district court can determine whether the record supports the articulated basis for the decision to rescind. *Overton Park*, 401 U.S. at 415. Compiling a complete documentary record does not impinge on the mental processes of an agency head; it enables review of the agency's decision based on the relevant information.

Defendants take issue with the district court's application of *Thompson*, arguing that materials considered by the Acting Secretary's subordinates, DOJ employees, and White House employees who provided her with verbal or written advice do not constitute part of the record. Pet. 18-19, 26. But those materials were "before the agency" and were at least "indirectly considered" by Duke in her decision. *Thompson*, 885 F.2d at 555, 556. Internal DOJ guidance materials regarding the appropriate contents of an administrative record direct that "documents and materials prepared, reviewed, or received by agency personnel" should be included in the administrative record "even though the final decision-maker did not actually review or know about the documents and materials."[4]

---

[4] *See* U.S. Dep't of Justice, Env't and Nat. Res. Div., Guidance to Federal Agencies on Compiling the Administrative Record (Jan. 1999),

(continued…)

DOJ's guidance also requires inclusion of "communications" from "other agencies" in the administrative record. *See* Guidance to Federal Agencies at 3. And if another agency's advice or recommendation is considered directly, then the material underlying that advice is considered indirectly.

Defendants' argument that an agency head herself must review a document to warrant its inclusion in the administrative record is inconsistent with *Thompson*'s "before the agency" test and has been rejected by other courts. *See, e.g.*, *Miami Nation of Indians of Indiana v. Babbitt*, 979 F.Supp. 771, 777 (N.D. Ind. 1996) ("'a document need not literally pass before the eyes of the final agency decision maker to be considered part of the administrative record'").[5] Defendants' approach would allow agency heads to insulate their decisions from effective judicial review by delegating debate and consideration to staff members, and then basing final decisions on staff recommendations without directly reviewing a single document.

_____

(…continued)
http://environment.transportation.org/pdf/programs/usdoj_guidance_re_admin_record_prep.pdf ("Guidance to Federal Agencies"). DOJ's guidance represents "best practices" for compilation of an administrative record. *Latin Americans for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 2010 WL 3259866, at *3 (E.D. Mich. Aug. 18, 2010).

[5] The government has conceded in other cases that documents relied upon by subordinates should be part of the administrative record. *See, e.g.*, *Oceana, Inc. v. Pritzker*, 2017 WL 2670733, at *4 (N.D. Cal. Jun. 21, 2017) ("Defendants acknowledge . . . that a decision-maker can be deemed to have 'constructively considered' materials that, for example, were relied upon by subordinates or materials upon which a report that was considered rely heavily.").

With regard to the White House, defendants claim that *Cheney*, 542 U.S. 367, bars the inclusion in the record of White House communications to DHS, but that case is inapposite. The plaintiffs in *Cheney* directly sued White House officials and sought documents regarding the inner workings of a Presidential advisory committee established "to give advice and make policy recommendations to the President." *Id.* at 372. The Vice President himself was a party to the action and a subject of the discovery order (*id.* at 381), and the order included requests that were "anything but appropriate," (*id.* at 388), and "ask[ed] for everything under the sky" (*id.* at 387). On the unique facts of that case, the Supreme Court held that the Vice President did not have to assert executive privilege in the district court as a precondition to raising separation-of-powers arguments in mandamus proceedings, but did not rule on the underlying assertion of privilege. *Id.* at 390-391. *Cheney* does not support a categorical exemption for any material that originates in the White House. Indeed, this Court ordered such materials included in the administrative record in *Portland Audubon*, 984 F.2d at 1548-1549 (ordering any ex parte communications from White House added to the record).

b. *Materials pre-dating the agency's most recent decision.* The district court's decision that certain materials pre-dating the agency's most recent decision must be included in the administrative record is also correct. The decision-making process that ultimately resulted in the rescission of DACA included a February 20,

16

2017 decision to leave DACA in place. *See* Dkt. No. 64-1 at 229 (memorandum from then-Secretary Kelly). As the district court correctly noted, "[r]easoned agency decision-making ordinarily 'demands that the agency display awareness that it is changing position and show that there are good reasons for the new policy.'" Pet. Add. 21 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). It was entirely appropriate for the district court to conclude that the record must include materials related to the decision by the DHS in February 2017—only months prior to DACA's rescission—to leave DACA in place.

　*c. Privilege log requirement.* Defendants do not cite any controlling authority supporting their assertion (at Pet. 19) that it was clear error for the district court to require the production of a privilege log. And they concede that "several rulings in the Northern District of California have involved submission of a privilege log." Pet. 14.[6] Production of a privilege log enables a court to assess whether the government has appropriately asserted privilege. That requirement does not impose on defendants any burdens beyond those that they typically face in other litigation contexts.

---

[6] *See, e.g.*, *Inst. for Fisheries Res. v. Burwell*, 2017 WL 89003, at *1 (N.D. Cal. Jan. 10, 2017) ("If a privilege applies, the proper strategy isn't pretending the protected material wasn't considered, but withholding or redacting the protected material and then logging the privilege."); *Ctr. for Food Safety v. Vilsack*, 2017 WL 1709318, at *5 (N.D. Cal. May 3, 2017).

These principles are reflected in DOJ's own guidance to other federal agencies regarding administrative records, and have been followed by courts outside of the Northern District of California. *See* Guidance to Federal Agencies at 4 ("If documents and materials are determined to be privileged or protected, the index of record must identify the documents and materials, reflect that they are being withheld, and state on what basis they are being withheld."); *Mickelsen Farms, LLC v. Animal & Plant Health Inspection Serv.*, 2017 WL 2172436, at *4 (D. Idaho May 17, 2017) (requiring production of privilege log or submission of documents to court for in camera review in APA case). The out-of-circuit decisions cited by defendants (Pet. 20-21) do not establish that it was clearly erroneous for a district court in *this* circuit to require production of a privilege log. *See In re Swift Transp. Co. Inc.*, 830 F.3d 913, 916-917 (9th Cir. 2016) ("If 'no prior Ninth Circuit authority prohibited the course taken by the district court, its ruling is not clearly erroneous.'").[7]

---

[7] Before the district court, defendants cited *Cook Inletkeeper v. EPA*, 400 F. App'x 239, 240 (9th Cir. Oct. 21, 2010) for the proposition that agencies need not supply a privilege log with the administrative record. Dkt. 71 at 26. *Cook* merely held that the petitioner failed to show that supplementation of the record was appropriate. *Cook*, 400 F. App'x at 240. Having made that threshold finding, the Court denied the petitioner's motion to provide a privilege log with the supplemental documents. *Id.*

### 2. The district court's analysis of defendants' privilege claims provides no basis for mandamus relief

Defendants also fail to establish that the district court clearly erred in ruling on their claims under the attorney-client, deliberative process, and presidential communications privileges. Pet. 22-24.

*a. Defendants' failure to properly assert privilege claims.* Before withholding documents under the deliberative process privilege, the government is normally required to advance "a formal claim of privilege by the 'head of the department' having control over the requested information" and an "assertion of the privilege based on actual personal consideration by that official," along with "a detailed specification of the information for which the privilege is claimed" and "an explanation of why it properly falls within the scope of the privilege." *Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000); *cf. Kerr v. District Court*, 511 F.2d 192, 198 (9th Cir. 1975). Similar requirements apply to other claims of privilege, and are contained in a supplemental order entered by the district court in this case. *See* Dkt. No. 23 at 4-5; *EEOC v. BDO USA, L.L.P.*, 856 F.3d 356, 363 (5th Cir. 2017), as revised (May 8, 2017) (privilege log "must provide sufficient information to permit courts and other parties to 'test[] the merits of' the privilege claim").

The privilege log submitted by defendants here provided no meaningful opportunity for plaintiffs to challenge the privilege assertions, and offers no basis

for this Court to overrule the district court's rejection of privilege claims with respect to certain documents. *See* Dkt. 71-2. It provides a limited amount of document metadata, such as the author and recipient (but only sometimes). It does not include a description of the basis for the privilege assertion, a formal assertion of privilege by an empowered government official, or sufficient factual information to evaluated the asserted privileges. Under these circumstances, defendants have not made a sufficient showing to justify mandamus. In any event, they have not carried their high burden of showing that the district court's privilege rulings were clearly erroneous.

   *b. Attorney-client privilege.* The district court held that defendants waived the attorney-client privilege with respect to materials bearing on "whether or not DACA was an unlawful exercise of executive power." Pet. Add. 24. Defendants contend that the "court based its extraordinary ruling on the fact that the Acting Secretary Duke's decision followed consideration of litigation risk and the legality of the DACA policy," and warn that this rationale "jeopardizes attorney-client privilege" with respect to all manner of agency actions. Pet. 23. But the court's waiver analysis actually turned on the unique circumstances of this case, including that the agency's sole stated reason for ending the DACA program was litigation risk (*see* Dkt. 64-1 at 253-256; Dkt 71 at 2; Dkt. 78-1 at 37), and that the decision was preceded by a public letter and announcement by Attorney General Sessions

disputing the legality of DACA (*see* Dkt. 64-1 at 251). This came after repeated public statements by DOJ that DACA *was* legal.[8] While defendants suggest that this is standard agency practice, they offer no examples of similar situations in which an agency has taken action with such wide-ranging consequences, based solely on public statements about the legal advice of its counsel, which are directly at odds with past DOJ statements on the same subject.

Moreover, defendants ignore the legal reasoning underlying the district court's finding of waiver. The attorney-client privilege is strictly construed. *Weil v. Inv./Indicators, Research & Mgt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981). The party asserting the privilege bears the burden of proving both that it applies and that it has not been waived. *Id.* at 25. As the district court recognized, the "privilege which protects attorney-client communications may not be used both as a sword and a shield," and "[w]here a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992); *see* Pet. Add. 23. The same principle can constrain the ability of an administrative agency to rely on the attorney-client privilege, in appropriate circumstances. *See,*

---

[8] *See* Dkt. 64-1 at 21 n.8 (prior OLC guidance); Br. of United States as Amicus Curiae at 22-28, *Ariz. Dream Act Coal. v. Brewer*, No. 15-15307, Dkt. 62 (9th Cir. Aug. 28, 2015 (asserting legality of DACA).

*e.g.*, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 361 (2d Cir. 2005) (DOJ cannot make repeated public references to internal OLC legal analysis "when it serves the Department's ends but claim the attorney-client privilege when it does not").  It was not clear error for the district court to apply this principle here, where defendants have defended their rescission of DACA based solely on the legal guidance they say they received from their attorneys.

Defendants do not address any of the cases on which the district court relied, and the lone case they cite concerning the attorney-client privilege, *Hernandez v. Tanninen*, 604 F.3d 1095 (9th Cir. 2010), provides further support for the district court's ruling.  *Hernandez* recognized that "raising a claim that requires disclosure of a protected communication results in waiver as to all other communications on the same subject."  604 F.3d at 1100 (citing *Chevron Corp.*, 974 F.2d at 1162).  It held that a "blanket waiver" was inappropriate because, on the facts of that case, "Hernandez only waived privilege with respect to [certain] communications."  *Id.* at 1101.  Unlike *Hernandez*, the district court's order here was limited to the specific subject matter for which it found the privilege waived:  "materials that bore on whether or not DACA was an unlawful exercise of executive power and therefore should be rescinded."  Pet. Add. 24.

*c.  Deliberative process privilege.*  The district court overruled defendants' claims of deliberative process privilege for certain documents it reviewed *in*

*camera*. Pet. Add. 24-25. In doing so, it applied this Court's decision in *FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984), describing the framework for analyzing privilege claims regarding documents that are deliberative and pre-decisional. *See* Pet. Add. 24-25. *Warner* instructed that the deliberative process privilege "is a qualified one," which may be overcome in appropriate circumstances where a litigant's need for deliberative "materials and the need for accurate fact-finding override the government's interest in non-disclosure." 742 F.2d at 1161 (identifying four factors to be considered). After applying the factors outlined in *Warner*, the district court held that 49 of the documents for which defendants assert deliberative process privilege should not be disclosed; that 2 documents were partially protected by the privilege; and that 33 documents were not protected by the privilege. Pet. Add. 25 n.7, 27; *see* Dkt. 71-2 (privilege log).

Although defendants shoulder the burden of showing that the district court's conclusions were clearly and indisputably wrong as a matter of law, they do not discuss *Warner*—or any other legal authority on the deliberative process privilege. *See* Pet. 22-23. Instead, defendants briefly describe just two of the 35 documents ordered disclosed by the district court, purportedly containing written notes from Acting Secretary Duke, which they assert are "plainly deliberative." Pet. 23. Even if those two documents are pre-decisional and deliberative, however, defendants do

not make any attempt to explain why the district court clearly erred in concluding that access to these documents was appropriate in light of the factors outlined in *Warner* and the particular circumstances of this case.

Finally, defendants complain that the district court did not explain its reasoning with respect to each of the 84 documents it reviewed.  *See* Pet. 22.  Especially in the context of a fast-moving case such as this one, it is not unreasonable for a district court to make privilege rulings without explaining its thinking on a document-by-document basis.  If defendants desired a more detailed explanation about a particular document, the proper course would have been to ask the district court to clarify or reconsider its ruling, not to file an emergency mandamus petition with this Court.

*d.  Presidential communications privilege.*  Similarly, defendants do not support their argument that the district court clearly erred in applying the presidential communications privilege to four documents that it ordered released.  Pet. 24; *see* Pet. Add. 25 n.7.  They contend that the court was "plainly wrong" because it ordered that "a White House memorandum" should be disclosed.  Pet. 24.  But defendants misunderstand the scope of this privilege, which is a "qualified privilege," protecting "the confidentiality of *Presidential* communications."  *Univ. of Penn. v. EEOC*, 493 U.S. 182, 194, 195 (quoting *United States v. Nixon*, 418 U.S. 683, 705-706 (1974)) (emphasis added).  The privilege does not shield from

discovery every document in the White House complex.  Rather, it protects only "communications directly involving and documents actually viewed by the President," and "documents 'solicited and received' by the President or his immediate White House advisers who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'"  *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004); *see also In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (communications by immediate presidential advisers "in the course of preparing advice for the President").  Defendants have made no showing that the four documents ordered disclosed were viewed by President Trump, or were solicited and received by his immediate advisers in the course of preparing advice for him.

## B.   Defendants' Remaining Legal Arguments Are Premature

Defendants' remaining legal arguments relate to issues that have not been directly ruled on by the district court, and therefore cannot support mandamus relief.  In any event, each of those arguments lacks merit.

### 1.   Defendants have not yet presented their "threshold" jurisdictional arguments to the district court

Defendants' argument that the district court erred by failing to consider their so-called "threshold" jurisdictional arguments (Pet. 15) is unsupported.  There was nothing preventing defendants from moving to dismiss this case on those grounds after the complaints were filed.  Indeed, the district court indicated it might

entertain such a motion if filed "quickly."  Ans. Add. 24.  Instead, defendants

agreed to cross-file dispositive motions on November 1, knowing that the district

court would allow a period of discovery preceding the initial filings.

Even if this Court overlooked that defendants have not yet raised their

jurisdictional arguments in the court below, their claim that 8 U.S.C. § 1252(g)

bars judicial review still fails.  Section 1252(g) is "narrowly construed" and

"'applies only to three discrete actions . . . to *commence* proceedings, *adjudicate*

cases, or *execute* removal orders.'"  *Kwai Fun Wong v. United States*, 373 F.3d

952, 963-64 (9th Cir. 2004) (quoting *Reno v. Am.-Arab Anti-Discrimination

Comm.*, 525 U.S. 471, 482 (1999) ("*AADC*")).  Here, plaintiffs are not challenging

any of the discrete actions specifically enumerated in § 1252(g).  Defendants rely

on *AADC* (Pet. 16), but in that case, unlike this one, the respondents were in

deportation proceedings, and the Court specifically held that the "challenge to the

Attorney General's decision to 'commence proceedings' against them" was within

the ambit of § 1252(g).  525 U.S. at 487.

Defendants' assertion that § 1252(g) "specifically applies to decisions

concerning the denial of deferred action" (Pet. 16) is inapposite.  Plaintiffs are not

challenging any "denial" of deferred action, but rather the government's unlawful

and unconstitutional decision to terminate the DACA program.  This Court has

consistently held that § 1252(g) does not preclude judicial review of claims

challenging nondiscretionary actions or raising constitutional issues that are related to, but nonetheless separate from, the three specific actions enumerated in the statute. *See, e.g.*, *Wong*, 373 F.3d at 965; *Walters v. Reno*, 145 F.3d 1032, 1052 (9th Cir. 1998). And two district courts have recently recognized that § 1252(g) does not circumvent judicial review of decisions related to DACA.[9]

Defendants' claim that "the decision to rescind DACA is an unreviewable exercise of prosecutorial discretion" similarly misses the mark. Pet. 16. The Rescission Memo does not purport to rescind DACA as an exercise of prosecutorial discretion. The termination of DACA was instead a broad-brush order purportedly based on illegality. Indeed, defendants necessarily acknowledged that DACA was subject to judicial review when Attorney General Sessions cited "potentially imminent litigation" as the reason to rescind DACA in his September 4, 2017 letter to Acting Secretary Duke. Dkt. 64-1 at 251. They offer no explanation why a court may review the legality of DACA's implementation but not the legality of its rescission.

---

[9] *See Gonzalez Torres v. U.S. Dep't of Homeland Sec.*, 2017 WL 4340385, at *4 (S.D. Cal. Sept. 29, 2017) (holding government "misconstrue[d]" § 1252(g), which "applies only to three discrete actions"); *Coyotl v. Kelly*, 2017 WL 2889681, at *9 (N.D. Ga. June 12, 2017) (§ 1252(g) did not eliminate jurisdiction to review whether defendants complied with their own procedures in revoking plaintiff's DACA status); *cf. Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015) (rejecting § 1252(g) argument with respect to DAPA).

## 2. The district court has not yet ruled on any disputes related to depositions

Defendants devote substantial passages of their brief to arguing that it is inappropriate for plaintiffs to seek the deposition of "high-ranking officials," including Acting Secretary Duke. Pet. 21; *see id* at 21-22 & fn. 3, 29. This Court should reject the invitation to decide those issues in the first instance. Defendants had "not yet formally raised" the issues in the district court when they filed their mandamus petition, and the district court has not yet ruled on them. Pet. Add. 30. Defendants note that the district court indicated from the bench that it would be inclined to allow a deposition of the Acting Secretary (Pet. 21, 29; see Ans. Add. 102-103); they omit, however, that the court then informed the parties that "this is, in the first instance, up to the magistrate judge" (Ans. Add. 104).

In any event, defendants' suggestion that depositions of high-ranking officials are categorically impermissible is without merit. In appropriate circumstances, courts limit the ability of litigants to depose heads of government agencies, owing to a concern about interrupting their official duties with "judicial demands for information that could be obtained elsewhere." *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008); *see Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979). But such depositions may proceed when there is a special need, including if the official possesses knowledge of relevant facts that cannot be practicably obtained through other means. *See, e.g.*, *In re United States*, 624 F.3d 1368, 1372-1374

(11th Cir. 2010); *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *cf. In re Kessler*, 100 F.3d 1015 (D.C. Cir. 1996) (denying mandamus with respect to deposition of FDA Commissioner).

Under the unique circumstances of this case—which include the compressed timeframe arising from defendants' abrupt decision to rescind DACA, defendants' repeated assertions that Duke was the sole decisionmaker (*see, e.g.*, Dkt. 71 at 17), defendants' efforts to prevent and delay reasonable discovery, and plaintiffs' diligent efforts to pursue other means of discovery before the deadline for summary judgment motions—a focused deposition of Duke would be appropriate.[10] But that question must be formally resolved by the magistrate judge and the district court in the first instance.

### 3. Discovery on discriminatory motive is permitted on plaintiffs' constitutional claims.

Defendants argue that discovery limitations "have particular force" when plaintiffs allege discriminatory motive. Pet. 24. But that has nothing to do with the district court's order to complete the administrative record, which turned on the court's finding "that the record defendants produced is missing documents that were considered, directly or indirectly, by DHS in deciding the rescind DACA." Dkt. 79 at 5. Moreover, defendants overstate the limitations on discovery when a

---

[10] The parties raised the matter of the Acting Secretary's deposition with the magistrate judge in a joint letter filed October 23.

plaintiff alleges a discriminatory motive. Courts "allow inquiry into motive where a bad one could transform an official's otherwise reasonable conduct into a constitutional tort." *Crawford-El v. Britton*, 951 F.2d 1314, 1317 (D.C. Cir. 1991). For instance, even in the different context of constitutional claims seeking damages, in which courts litigate questions of qualified immunity, the Supreme Court has not suggested that discovery into motive is categorically inappropriate. *Crawford-El v. Britton*, 523 U.S. 574, 593 n. 14 (1998) ("Discovery involving public officials is indeed one of the evils that *Harlow* aimed to address, but neither that opinion nor subsequent decisions create an immunity from all discovery." [discussing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)]). Instead, "the trial court must exercise its discretion so that officials are not subjected to *unnecessary* and burdensome discovery." *Id.* at 598 (emphasis added). In this case, focused discovery into motive is necessary and appropriate in light of the nature of plaintiffs' constitutional and equitable claims. [11]

---

[11] The cases defendants cite on selective prosecution (Pet. 24-25) are inapposite. In *United States v. Armstrong*, 517 U.S. 456, 461 (1996), the Supreme Court discussed the threshold showing that must be made before a criminal defendant is entitled to discovery to support a selective prosecution defense to an individual criminal prosecution. That case reflects the Court's concern about diverting prosecutorial resources by requiring discovery in a multitude of individual defendants' challenges, 517 U.S. at 468—a concern with little applicability to a civil case, like this, that challenges an announced policy with nationwide application, not a series of individual enforcement decisions. Similarly, *AADC* involved a challenge to deportation actions taken against particular individuals—
(continued…)

*      *      *

Because defendants have not established clear legal error, this Court need not reach the remaining factors related to mandamus relief outlined in *Bauman*. *See, e.g.*, *United States v. Guerrero*, 693 F.3d 990, 1004 (9th Cir. 2012); *Online Speakers*, 661 F.3d at 1177-1178. In any event, those factors do not support mandamus. Most of the legal arguments defendants now raise are ones that they could have presented in the district court but did not. Others, such as the proper scope of the administrative record when reviewing claims under the Administrative Procedure Act, can be raised on direct appeal. *See Bauman*, 557 F.2d at 654 (asking whether party has "other adequate means" to attain relief). Any legitimate concerns about any truly sensitive document ordered to be produced could be mitigated without mandamus relief, through routine mechanisms such as a protective order or a partial sealing of the record. *See id.* at 654 (asking whether party "will be damaged or prejudiced in a way not correctable on appeal"). Finally, the contested orders do not involve any novel question of law or "oft-repeated error." *Id.* The district court simply applied settled legal standards

---

(…continued)

not a nationwide policy. 525 U.S. at 473-474 (describing respondents' "allegation that the INS was selectively enforcing immigration laws *against them* in violation of their First and Fifth Amendment right" (emphasis added)).

regarding the scope of the administrative record and the various privileges asserted by defendants to the particular facts and circumstances of this case.[12]

## II. DEFENDANTS ARE NOT ENTITLED TO A STAY

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citation omitted).  Defendants created the need for this compressed schedule by setting the March 5, 2018 deadline for rescinding DACA, and agreeing to an expedited schedule in order to complete this litigation before that deadline.  They have not carried their burden of establishing that they are entitled to a stay of those proceedings.

As an initial matter, defendants' reliance on the Second Circuit's stay in *In re Duke*, No. 17-3345, Dkt. 23 (2d Cir. Oct. 20, 2017), is misguided.  Unlike here, the mandamus petition in the Second Circuit directly challenged the district court's order permitting discovery, so the overall scope of discovery was squarely at issue.  *See id.* Dkt. 33.  In contrast, this mandamus proceeding concerns only the district court order regarding the administrative record.  *See* Pet. 1, 6.  Furthermore, the

---

[12] Requiring a privilege log in an APA case, a common approach that this Court has never held to be improper, cannot constitute "oft-repeated error."  *See, e.g.*, *In re Swift*, 830 F.3d at 917 ("Given the lack of precedent, we cannot say that the alleged error is 'oft-repeated.'").

deadline for discovery and dispositive motions in *Duke* is not until December 15, 2017—more than six weeks after the deadline defendants agreed to here. *See id.* Dkt. 1-2 at Add. 12.

Under the circumstances of this case, defendants have not carried their burden to justify a stay. *First*, for the reasons explained above, defendants have failed to make "'a strong showing that [they are] likely to succeed on the merits.'" *Nken*, 556 U.S. at 426. This is not a case where "a disclosure order amount[s] to a judicial usurpation of power or a clear abuse of discretion, or otherwise works a manifest injustice." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (internal quotation marks omitted).

*Second*, defendants fail to show that they "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 426 (internal quotations marks omitted). While defendants argue that "[a] stay is required to prevent the government from being forced to publicly disclose privileged communications . . . by October 27" (Pet. 28), the relief they seek is far broader than that. Defendants' request for a stay of all discovery—even discovery not related to the administrative record—is not supported by their arguments about the district court's rulings on what documents should be a part of the administrative record. With respect to supposedly privileged materials ordered produced by the district court, defendants could seek permission to produce sealed or redacted versions of such documents to plaintiffs'

counsel while this Court considers and resolves this mandamus petition.  As to any new materials over which defendants may claim privilege, the district court has stated that it will review any documents for which privilege is claimed "in camera, and withhold from public view those that require withholding."  Pet. Add. 31; *see also Mohawk Indus.*, 558 U.S. at 109 ("[a]ppellate courts can remedy the improper disclosure of privileged material" ordered by district courts).

Nor does defendants' burden of responding to discovery "strongly militate[] in favor of a stay."  Pet. 28.  Mere "litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."  *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).  Moreover, the discovery burdens about which defendants complain involve responding to discovery obligations in different cases in New York and to discovery related to the *non*-APA claims in this case.  *See* Pet. 28.

*Third*, as the district court found, a stay would cause "substantial and irreparable harm" to plaintiffs and "people who are currently enrolled in DACA."  Pet. Add. 30.  If the district court (and this Court) cannot adjudicate plaintiffs' claims by March 5, it will be too late for thousands of DACA beneficiaries who will lose their work authorization and become subject to removal beginning on that date.  *See Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979) ("A stay should not be granted unless it appears likely the other proceedings

will be concluded within a reasonable time in relation to the urgency of the claims presented to the court.").

Defendants' attempt to provide assurance that "[t]he briefing schedule for dispositive motions will not be affected" rings hollow. Pet. 29. With a November 1, 2017 deadline for dispositive motions—just one week away—even a short stay would jeopardize the ability of the district court (and this Court) to properly adjudicate plaintiffs' claims before March 5. As the district court noted, "[a] stay risks allowing this deadline to pass without a decision on the merits, and therefore poses a substantial threat to our plaintiffs and to DACA enrollees." Pet. Add. 31.

*Fourth*, the public interest is best served by allowing the district court to reach a decision on the merits on a complete record and with enough time for appellate review by March 5. DACA's rescission imperils hundreds of thousands of individuals who have relied on DACA's promises, and plaintiffs brought these actions to obtain swift judicial resolution of their claims that the rescission was unlawful and unconstitutional. As this Court recently observed, "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 871 F.3d 884, 898 (9th Cir. 2017).

# CONCLUSION

The Court should deny defendants' emergency motion for a stay and deny the petition for a writ of mandamus.

Respectfully submitted,

Dated: October 24, 2017

COVINGTON & BURLING LLP

Jeffrey M. Davidson
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com

Lanny A. Breuer
Mark H. Lynch
Alexander A. Berengaut
Megan A. Crowley
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: lbreuer@cov.com,
mlynch@cov.com,
aberengaut@cov.com,
mcrowley@cov.com
*Attorneys for Real Parties in Interest-Plaintiffs The Regents of the University of California, et al.*

XAVIER BECERRA
Attorney General of California
Edward C. DuMont
Solicitor General

*/s Michael J. Mongan*
Michael J. Mongan
Deputy Solicitor General
Michael L. Newman
Supervising Deputy Attorney General
James F. Zahradka II
Christine Chuang
Rebekah A. Fretz
Ronald H. Lee
Kathleen Vermazen Radez
Shubhara Shivpuri
Deputy Attorneys General
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-3660
(415) 703-2548
Email: michael.mongan@doj.ca.gov
*Attorneys for Plaintiff State of California*

LORI SWANSON
Attorney General
Julianna F. Passe
Assistant Attorney General
State of Minnesota
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us
*Attorneys for Plaintiff State of
Minnesota*

JANET T. MILLS
Attorney General of Maine
Susan P. Herman
Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8814
Email: susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
Steven M. Sullivan
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
Email: ssullivan@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Mónica Ramírez Almadani
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: mralmadani@cov.com

Charles F. Robinson
Margaret Wu
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: (510) 987-9800
Facsimile: (510) 987-9757
Email: charles.robinson@ucop.edu
*Attorneys for Plaintiffs The Regents of
the University of California and Janet
Napolitano, in her official capacity as
President of the University of California*

COTCHETT, PITRE & MCCARTHY, LLP
Nancy L. Fineman
nfineman@cpmlegal.com
Brian Danitz
bdanitz@cpmlegal.com
Tamarah P. Prevost
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Richard Doyle
Nora Frimann
Office of the City Attorney
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email: cao.main@sanJoséca.gov

*Attorneys for Plaintiff City of San José*

GIBSON, DUNN & CRUTCHER LLP

Theodore J. Boutrous, Jr.
tboutrous@gibsondunn.com
Kirsten Galler
kgaller@gibsondunn.com
Jesse S. Gabriel
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Ethan D. Dettmer
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
*Attorneys for Plaintiffs Dulce Garcia, et al.*

PUBLIC COUNSEL
Mark D. Rosenbaum
mrosenbaum@publiccounsel.org
Judy London
jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

BARRERA LEGAL GROUP, PLLC
Luis Cortes Romero
lcortes@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

James R. Williams, County Counsel
Greta S. Hansen
Laura S. Trice
laura.trice@cco.sccgov.org
Marcelo Quiñones
marcelo.quinones@cco.sccgov.org
Office of the County Counsel
County of Santa Clara
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
*Attorneys for County of Santa Clara*

ALTSHULER BERZON LLP
Jonathan Weissglass
jweissglass@altber.com
Stacey M. Leyton
sleyton@altber.com
Eric P. Brown
ebrown@altber.com
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
*Attorneys for County of Santa Clara*
*and SEIU Local 521*

Laurence H. Tribe
larry@tribelaw.com
Harvard Law School*
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

Erwin Chemerinsky
echemerinsky@law.berkeley.edu
University of California, Berkeley
School of Law*
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

Leah M. Litman
llitman@law.uci.edu
University of California, Irvine School
of Law*
401 East Peltason Drive
Irvine, CA 92697
Telephone: (949) 824-7722

*Attorneys for Plaintiffs Dulce Garcia,*
*Miriam Gonzalez Avila, Saul Jimenez*
*Suarez, Viridiana Chabolla Mendoza,*
*Norma Ramirez, and Jirayut*
*Latthivongskorn*

*Affiliation for identification purposes
only

## STATEMENT OF RELATED CASES

Real parties in interest are not aware of any cases pending in this Court that are related to this case as defined in Circuit Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Ninth Circuit Rules 21-2(c) and 32-3, and the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), because it is proportionately spaced serif font, has a typeface of 14 points, and contains fewer than 8,400 words.

Dated:  October 24, 2017

*s/ Michael J. Mongan*

# CERTIFICATE OF SERVICE

I certify that on October 24, 2017, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: October 24, 2017

*s/ Michael J. Mongan*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

September 21, 2017 Transcript of Proceedings, Dkt. No. 52 ...........................Add. 1

October 16, 2017 Transcript of Proceedings, Dkt. No. 78 .............................Add. 70

Declaration of Ethan D. Dettmer in Opposition

to Defendants' Petition for Writ of Mandamus .....................................Add. 135

Exhibit A. Defendants' Initial Disclosures ........................................Add. 137

Exhibit B. Excerpts of Deposition of James McCament ....................Add. 144

Exhibit C. Excerpts of Deposition of Gene Hamilton ......................Add. 169

**SEPTEMBER 21, 2017 TRANSCRIPT OF PROCEEDINGS, DKT. NO. 52**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Before The Honorable William H. Alsup, Judge

THE REGENTS OF THE UNIVERSITY )
OF CALIFORNIA and JANET )
NAPOLITANO in her official )
capacity as President of the )
University of California, )
)
       Plaintiffs, )
)
  VS. )    **NO. C 17-05211 WHA**
)
U.S. DEPARTMENT OF HOMELAND )
SECURITY and ELAINE DUKE in her)
official capacity as Acting )
Secretary of the Department of )
Homeland Security, )
)
       Defendants. )
_____)
STATE OF CALIFORNIA, STATE OF )
MAINE, STATE OF MARYLAND, and )
STATE OF MINNESOTA, )
)
       PlaintiffS, )
)
  VS. )    **NO. C 17-05235 WHA**
)
U.S. DEPARTMENT OF HOMELAND )
SECURITY, ELAINE C. DUKE in her)
official capacity as Acting )
Secretary of the Department of )
Homeland Security; and UNITED )
STATES OF AMERICA, )
)
       Defendants. )
_____)

San Francisco, California
Thursday, September 21, 2017

**TRANSCRIPT OF PROCEEDINGS**
**(CAPTION AND APPEARANCES CONTINUED ON NEXT PAGE)**

Reported By:    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                Official Reporter

Before The Honorable William H. Alsup, Judge

```
CITY OF SAN JOSE, a municipal  )
corporation,                   )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. C 17-05329 WHA
                               )
DONALD J. TRUMP, President of  )
the United States in his       )
official capacity; ELAINE C.   )
DUKE in her official capacity; )
and the UNITED STATES OF       )
AMERICA,                       )
                               )
          Defendants.          )
_____ )
DULCE GARCIA, MIRIAM GONZALEZ  )
AVILA, SAUL JIMENEZ SUAREZ,    )
VIRIDIANA CHABOLLA MENDOZA,    )
NORMA RAMIREZ and JIRAYUT      )
LATTHIVONGSKORN,               )
                               )
          Plaintiffs,          )
                               )
  VS.                          )      NO. C 17-05380 WHA
                               )
UNITED STATES OF AMERICA;      )
DONALD J. TRUMP in his official)
capacity as PRESIDENT of the   )
United States; and ELAINE C.   )
DUKE in her official capacity  )
as Acting Secretary of the     )
Department of Homeland         )
Security,                      )
                               )
          Defendants.          )
_____ )
```

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:

For the Plaintiffs in case C 17-05211 WHA:
                        COVINGTON & BURLING LLP
                        One Front Street - 35th Floor
                        San Francisco, California 94111
                   BY:  **JEFFREY M. DAVIDSON, ATTORNEY AT LAW**


                        COVINGTON & BURLING LLP
                        One City Center
                        850 Tenth Street, N.W.
                        Washington, D.C.  20001
                   BY:  **MARK H. LYNCH, ATTORNEY AT LAW**
                        **ALEXANDER A. BERENGAUT, ATTORNEY AT LAW**

For the Plaintiffs in case C 17-05235 WHA:
                        OFFICE OF THE ATTORNEY GENERAL
                        State of California
                        1515 Clay Street - Suite 2000
                        Oakland, California  94612
                   BY:  **JAMES ZAHRADKA, DEPUTY ATTORNEY GENERAL**

For the Plaintiff in case C 17-05329 WHA:
                        COTCHETT, PITRE & MCCARTHY LLP
                        San Francisco Airport Office Center
                        840 Malcolm Road
                        Burlingame, California  94010
                   BY:  **NANCY L. FINEMAN, ATTORNEY AT LAW**

For the Plaintiffs in case C 17-05380 WHA:
                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, California  94105
                   BY:  **ETHAN DETTMER, ATTORNEY AT LAW**

For the Plaintiffs in case C 17-05380 WHA:
                        PUBLIC COUNSEL
                        610 S. Ardmore Avenue
                        Los Angeles, California  90005
                   BY:  **MARK ROSENBAUM, ATTORNEY AT LAW**

For the Defendants:
                        U.S. DEPARTMENT OF JUSTICE
                          Civil Division
                        United States Attorney's Office
                        450 Golden Gate Avenue - 9th Floor
                        San Francisco, California  94102
                   BY:  **SARA WINSLOW, ASSISTANT U.S. ATTORNEY**

```
 1   **APPEARANCES**:  (CONTINUED)

 2   For the Defendants:
                             U.S. DEPARTMENT OF JUSTICE
 3                             CIVIL DIVISION
                             Federal Programs Branch
 4                           950 Pennsylvania Avenue, N.W.
                             Washington, D.C.  20530
 5                   BY:   **BRETT A. SHUMATE**
                           **DEPUTY ASSISTANT ATTORNEY GENERAL**
 6
                             U.S. DEPARTMENT OF JUSTICE
 7                             CIVIL DIVISION
                             Federal Programs Branch
 8                           20 Massachusetts Avenue, N.W.
                             Washington, D.C.  20001
 9                   BY:   **BRAD P. ROSENBERG, SENIOR TRIAL COUNSEL**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>**Thursday - September 21, 2017**</u>                    <u>**10:28 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Calling Civil Case Number 17-5211, |
| 5 | 17-5235, and 17-5329, Regents of the University of California |
| 6 | versus U.S. Department of Homeland Security, State of |
| 7 | California versus U.S. Department of Homeland Security, and the |
| 8 | City of San Jose versus Donald Trump. |
| 9 | Will counsel please step forward and state your |
| 10 | appearances for the record? |
| 11 | **MR. DETTMER:**  Your Honor, if I may interrupt, we |
| 12 | represent the Garcia plaintiffs, which is another case that was |
| 13 | related yesterday.  Ethan Dettmer from Gibson Dunn on behalf of |
| 14 | the Garcia plaintiffs. |
| 15 | **THE COURT:**  That's case 17-5380; right? |
| 16 | **MR. DETTMER:**  Yes, I believe that's correct. |
| 17 | **THE COURT:**  Okay.  Well, then we call that case too. |
| 18 | **MR. DETTMER:**  Thank you. |
| 19 | **THE COURT:**  Appearances, please. |
| 20 | **MR. DAVIDSON:**  Good morning, Your Honor.  Jeffrey |
| 21 | Davidson, Covington & Burling, on behalf of the University of |
| 22 | California. |
| 23 | **THE COURT:**  Okay.  Welcome to you. |
| 24 | **MR. ZAHRADKA:**  Good morning, Your Honor.  James |
| 25 | Zahradka with the California Attorney General's Office.  I'm |

1    appearing today on behalf of the State of California as well as

2    the states of Maine, Maryland, and Minnesota.

3              **THE COURT:**  Great.  Welcome to you.

4              **MR. ZAHRADKA:**  Thank you.

5              **MS. FINEMAN:**  Good morning, Your Honor.  Nancy Fineman

6    of Cotchett, Pitre & McCarthy for the City of San Jose.

7              **THE COURT:**  All right.  Welcome again.

8              **MR. LYNCH:**  Good morning, Your Honor.  Mark Lynch from

9    Covington & Burling for the Board of Regents of the University

10   of California.

11             **THE COURT:**  Thank you.  Welcome.

12             **MR. LYNCH:**  Thank you.

13             **MR. BERENGAUT:**  Good morning, Your Honor.  Alex

14   Berengaut with Covington also for the Regents, Your Honor.

15             **MR. DETTMER:**  And, Your Honor, I introduced myself,

16   Ethan Dettmer from Gibson Dunn on behalf of the individual

17   plaintiffs in the Garcia case.

18             **THE COURT:**  Again, welcome.

19             **MR. ROSENBAUM:**  And good morning, Your Honor.  Mark

20   Rosenbaum from Public Counsel on behalf of the Garcia

21   plaintiffs.

22             **THE COURT:**  Okay.  Thank you.

23        And over here?

24             **MS. WINSLOW:**  And, Your Honor, Sara Winslow from the

25   U.S. Attorney's Office, and I have with me Brett Shumate, who's

1   the Deputy Assistant Attorney General, and Brad Rosenberg,

2   who's the Senior Trial Counsel, both with the Federal Programs

3   Branch at the Department of Justice's Civil Division, for the

4   defendants.

5           **THE COURT:**  Okay.  Welcome to all of you.  Thank you.

6   Everybody have a seat.

7           And we need to come up with a plan to manage the cases so

8   that we get the decisions that you need done and also that they

9   are done with such a record that the Court of Appeals can

10  appreciate and all in time for -- to be done before, I believe,

11  March 5th.  Is that the date that the DACA program expires?  Is

12  that it?

13          **MR. SHUMATE:**  Yes, Your Honor.

14          **THE COURT:**  Okay.  So we're working against a clock.

15  That's why I called you in so quickly.  Normally we wouldn't

16  even have had this conference until sometime in December.

17          So I have some thoughts of my own, but before I even --

18  maybe they're not any good, so I want to hear from you first,

19  and then we will -- I want to hear, you know, from lawyers in

20  all four cases.

21          Now, are you-all on the same case?

22          **MR. ZAHRADKA:**  No.

23          **THE COURT:**  Okay.

24          **MR. ZAHRADKA:**  One at a time?

25          **THE COURT:**  Who's going to go first?  Who represents

1  the Regents?

2  **MR. DAVIDSON:**  I represent the Regents, Your Honor.

3  **THE COURT:**  Okay.  You get to go first.  And then

4  after I hear from you, I want to hear from the Government, and

5  then we're going to go kind of back and forth and see what the

6  various ideas are for managing the case.

7  Okay.  The Regents get to go first.

8  **MR. DAVIDSON:**  Thank you, Your Honor.

9  There's an initial issue that may need to be the subject

10 of TRO practice, which would be more rapid than the rest of the

11 schedule, and that is the following --

12 **THE COURT:**  Well, wait.  Don't say TRO.  Say

13 preliminary injunction.  TROs are too fast for something this

14 important, but maybe -- I can't rule it out, but preliminary

15 injunction provisional relief I recognize is a possibility

16 but -- okay.  But what is that?  What is it that's so urgent

17 that needs a TRO?

18 **MR. DAVIDSON:**  So that issue is the following:

19 The federal government has said that it will not accept

20 DACA renewal applications beginning October 5th.  The problem

21 is the individual DACA recipients have been receiving letters

22 in the ordinary course telling them that they have 120 to 150

23 days to renew.  That information that they've been getting by

24 letter is not correct according to the policy, and so that may

25 be an issue that needs relief prior to October 5th.

1      The Government has --

2      **THE COURT:** These are -- help me out here. These

3 would be DACA people who have signed up already, they're on the

4 books of the DHS --

5      **MR. DAVIDSON:** Correct.

6      **THE COURT:** -- but their -- is it two years or three

7 years?

8      **MR. DAVIDSON:** Two years.

9      **THE COURT:** -- their two years have run out. So they

10 would in the normal course re-up --

11      **MR. DAVIDSON:** Correct.

12      **THE COURT:** -- for another two or three -- is it two

13 or three years? I can't remember.

14      **MR. DAVIDSON:** Two years.

15      **THE COURT:** Two years. All right.

16    So then they re-up for another two years, sign up more

17 paperwork, and so forth. And so that process is being

18 interrupted by what? Tell me again.

19      **MR. DAVIDSON:** The announcement rescinding DACA said

20 the renewal applications would no longer be processed after

21 October 5th. So it's possible that someone could receive a

22 letter yesterday saying, "As in the ordinary course, you have

23 120 days to renew," but they don't have 120 days to renew

24 according to the policy. They've got 15 days to renew.

25      **THE COURT:** All right. So just hold that thought.

1  I'm going to come right -- I don't want to interrupt for more

2  than a minute, but is that correct, that on October 5 renewal

3  applications will no longer be entertained?  You need to come

4  to the microphone here and say your name again.

5          **MR. SHUMATE:**  Sure.  Brett Shumate from the Department

6  of Justice, Your Honor.

7      I want to be very precise about what the policy says.

8  October 5th is a deadline for filing renewal applications for

9  individuals whose DACA benefits expire between September 5th

10 and March 5th.  So this is what DHS precisely said in the --

11         **THE COURT:**  Hold on.  You're going too fast.

12         **MR. SHUMATE:**  Sorry.

13         **THE COURT:**  Say that -- there's too many dates in

14 there.  Please say it again slowly.

15         **MR. SHUMATE:**  If I can read from the policy

16 memorandum.

17         **THE COURT:**  All right, but slowly.

18         **MR. SHUMATE:**  (reading)

19          "DHS will adjudicate on an individual case-by-case

20      basis properly filed pending DACA renewal requests and

21      associated applications for employment authorization

22      documents from current beneficiaries that have been

23      accepted by the Department as of the date of this

24      memorandum and from current beneficiaries whose benefits

25      will expire between the date of this memorandum and

1    March 5th, 2018, that have been accepted by the Department

2    as of October 5th, 2017."

3    So that is the October 5th deadline that plaintiffs'

4    counsel has referred to.

5    **THE COURT:**  I'm just not quite -- it doesn't quite

6    seem like you're both -- you're referring to the same thing.

7    Explain to me again what the Regents -- explain to me

8    what's about to expire, please.

9    **MR. DAVIDSON:**  I think an example may be helpful.  So

10   suppose there's a DACA recipient whose status would expire in

11   the ordinary course as of November 1.  They have received a

12   notice from the United States Government sometime ago saying

13   "You have 120 days to renew" aimed at that November 1 date.

14   Under current policy, as articulated, if they actually

15   file their renewal on November 1, the Government will reject

16   that application because of this new deadline they've created,

17   which is October 5th.

18   **THE COURT:**  All right.  Let's just pause.

19   Is that correct?

20   **MR. SHUMATE:**  That's correct.

21   **THE COURT:**  Okay.  Well, then, that's a concrete

22   example of possibly an imminent problem.

23   All right.  You can have a seat and let me continue

24   hearing from the Regents, and then we're going to come back to

25   you.

1        **MR. SHUMATE:**  May I address one other thing on the

2   October 5th deadline, Your Honor?

3        **THE COURT:**  All right.  Please.

4        **MR. SHUMATE:**  We have another case in the

5   Eastern District of New York, and the plaintiffs in that case

6   had asked that the Government consider extending that

7   October 5th deadline in light of the hurricanes that had

8   impacted Texas and Florida.  And I represented to the Court in

9   that case that DHS is actively considering whether to extend

10  that deadline, and DHS continues to consider how to handle

11  applications from individuals who are affected by the

12  hurricane.

13      So I just wanted to make sure the Court has the most

14  up-to-date information.

15       **THE COURT:**  Well, that's good to know, but that would

16  only affect the hurricane victims.  There might be people in

17  California who would be affected that wouldn't have anything to

18  do with those hurricanes.

19       **MR. SHUMATE:**  Right, Your Honor.  We discussed this

20  with plaintiffs' counsel this morning, and they raised the

21  concern about these individuals who received these notices, and

22  we assured them that we would take this issue back to DHS for

23  their consideration.

24       **THE COURT:**  Well, good, but you see their problem.

25  Their problem is that if DHS is considering it in good faith

1    but they haven't made a decision, at some point they've got to

2    say, "We've got to go to the judge and ask for an order."  And

3    then it will all be on a hurry-up basis.  So can you give us an

4    idea of when you're going to decide?

5         MR. SHUMATE:  I can't give the Court an idea when DHS

6    may decide.

7         I would like to point out, though, that DHS made this

8    decision on September 5th.  It was not immediately effective.

9    DHS effectively granted the six-month stay to wind down DACA in

10   an orderly manner.  And so DHS committed to continuing to

11   adjudicate applications for renewal that were already on file

12   and set a reasonable deadline of October 5th, which was 30 days

13   after September 5th, to require individuals to file renewal

14   applications for the subset of individuals whose DACA benefits

15   expire between September 5th and March 5th.

16        So as of now, the deadline currently stands, but --

17        THE COURT:  That could be a large group.  That could

18   be -- I don't know, I'm guessing -- 20,000 people.  So that

19   could be a large number.

20        Okay.  You have a seat.

21        All right.  So let's put on the mental list the

22   possibility of dealing with the October 5 problem.

23        Okay.  What else is on your agenda?

24        MR. DAVIDSON:  So our overall view of the most

25   efficient way to get to a ruling and some appeals from that

1 ruling is that we would file a motion for preliminary

2 injunction.

3      The -- in order to --

4          THE COURT:  Why would you do that rather than just get

5 this adjudicated so that it can go to the Court of Appeals on a

6 final record as opposed to a preliminary -- you know,

7 preliminary injunction record, it goes up to the Court of

8 Appeals on a much looser standard.  Why can't we get it

9 adjudicated in time to have your -- you would then be up in the

10 Court of Appeals before March 5th.

11          MR. DAVIDSON:  There's a few reasons, Your Honor.

12 First is that, as we all read in the newspapers, there's the

13 potential for a legislative process that nobody in -- that

14 nobody wants to interfere with, and so we --

15          THE COURT:  Nobody wants to interfere with the what?

16          MR. DAVIDSON:  If there's going to be a

17 congressional -- if there's going to be an act of Congress

18 signed by the President that resolves on a permanent basis the

19 immigration status of DACA recipients, that would be preferable

20 for all concerned.

21          THE COURT:  Of course.

22          MR. DAVIDSON:  And we would like to have breathing --

23          THE COURT:  Of course.  But how does that translate to

24 a preliminary injunction?  Just the politics of it, I even saw

25 on TV the President himself wants the DACA thing to be enacted

1   by Congress; right?

2        **MR. DAVIDSON:**  Yes, he says that.

3        **THE COURT:**  The leadership in Congress says that's

4   what they want, and I think the world is hoping that happens,

5   but we have seen snafus before in Congress so it might not

6   happen.

7        **MR. DAVIDSON:**  Indeed.

8        **THE COURT:**  And somebody could say, "Well, yeah, we

9   all want DACA, but we also want a big wall," and then they

10  can't agree on that and then nothing gets passed.  That is a

11  live possibility.

12       So I think in the meantime we've got to do this according

13  to the rules that govern us, meaning the courts.  I am not a

14  politician.  I am a judge.  I've got to go according to the

15  law, and I think we can have a decision on the merits and have

16  you in the Court of Appeals in time so that the Court of

17  Appeals has a good record before March 5.  That's my view.  I

18  think we could do it.

19       Now, it's conceivable that we would have to do some of

20  this on preliminary injunction.  I understand that possibility,

21  but --

22       **MR. DAVIDSON:**  Yes.

23       **THE COURT:**  See, if you were to win a preliminary

24  injunction, then you never want a trial and they want a trial.

25  On the other hand, if you lose the preliminary injunction, then

1  you want a trial immediately and they don't.  I've seen -- you

2  know, I've been on the job a long time.  That's always the way

3  it works on preliminary injunction; whoever wins does not want

4  to go -- they want to just rest on that.

5      So I think we can decide it on the merits, can't we?  Do

6  we need -- let me ask this:  Do we need discovery in this case?

7      **MR. DAVIDSON:**  Your Honor, there is -- some of our

8  claims are Administrative Procedure Act claims.  In order to

9  adjudicate those, it's going to be necessary to have an

10  administrative record prepared.

11      On the timing of that, we've discussed that with the

12  Government, they anticipate they can produce the administrative

13  record by October 13th.  We've had discussions about it being

14  even earlier, October 6th, but they were not in a position to

15  commit to that this morning.

16      Assuming that that administrative record is full and

17  satisfactory and there's not a dispute about its contents --

18  and one can always hope -- that may largely alleviate the need

19  for document discovery from the Government, although there may

20  be need for other types of discovery.  But from our

21  perspective, once we see what's in the administrative record

22  and that's settled, we'll be in a much better position to know

23  how much more discovery may be required.

24      **THE COURT:**  All right.  That's a very good point.

25  Let's hold that thought.

1      Let's hear from the Government on the administrative

2  record point.  What do you say to that?

3          MR. SHUMATE:  We agree with what the plaintiff --

4  plaintiffs' counsel has represented, that we will make every

5  effort to have the administrative record finished by

6  October 13th.  We'll go as quick as we can.

7      I just want to reiterate --

8          THE COURT:  October 13th?  I mean, we've got a

9  deadline of March 5.

10         MR. SHUMATE:  Your Honor, we are --

11         THE COURT:  Why can't you do it sooner than that?

12         MR. SHUMATE:  We can certainly take that back to our

13  clients and push them along and ask them.

14         THE COURT:  How about if I order it?

15         MR. SHUMATE:  Then we will meet with the Court's

16  order.

17         THE COURT:  I think October 6th sounds like it ought

18  to be done.  Now, e-mails and everything.

19     You know, I used to work in the Justice Department years

20  ago, and I learned one thing about administrative records.  The

21  Government always puts in there what helps them and they leave

22  out what hurts them, like memos -- in those days it was memos.

23  They didn't have e-mails.

24     But if there's an e-mail that hurts your case, it's got to

25  go in there.  It's got to be in the administrative record.  It

1  can't just be the select stuff that supports your side.  So

2  you've got to do a good job on it, but it can be done.

3      You know, you're the one -- the Government is the one that

4  has created the urgency by putting a deadline, and we've got to

5  take that and I respect your deadline, but at the same time

6  you've got to respect the fact that I've got to get the case

7  done.  So October 6 is when you ought to give everybody the

8  administrative record.

9      **MR. SHUMATE:**  Yes, Your Honor.  We think your

10  suggestion to get to final judgment quickly makes a lot of

11  sense in this case.  We're prepared to brief this case quickly.

12      If I could throw out a suggested briefing schedule.

13      **THE COURT:**  No, no, no, not yet.  Not yet.

14      **MR. SHUMATE:**  Okay.

15      **THE COURT:**  Because I'm going to give you that chance.

16      **MR. SHUMATE:**  Okay.

17      **THE COURT:**  But October 6th is going to be --

18  October 6th, administrative record.

19      All right.  So now let's go back.  So let's say we get the

20  administrative record on October 6.  Then what?  Then what do

21  we do?

22      **MR. DAVIDSON:**  May I make one more suggestion on the

23  administrative record?

24      **THE COURT:**  Sure.

25      **MR. DAVIDSON:**  In order to avoid a dispute about the

1　contents of the administrative record, which can slow things

2　down, which we don't want to do, our request would be that we

3　be permitted to serve a targeted set of requests for production

4　which would set out what we as the plaintiffs think ought to be

5　in the administrative record and set the parameters for that

6　discussion.

7　　　　　　　　**THE COURT:**　Here, give me a couple of examples.

8　　　　　　　　**MR. DAVIDSON:**　So, for example, there may be a

9　question as to whether -- General Kelly, when he was the

10　Secretary of Homeland Security, he issued a memorandum

11　rescinding a number of other deferred action programs but

12　leaving DACA in place.

13　　　　　Our view is that the decision-making around that decision

14　ought to be part of the administrative record, and so we would

15　serve document requests that would say "Produce all records in

16　connection with the decision whether or not to rescind DACA

17　beginning from inauguration day forward," so that we would all

18　have something to look at and the Government --

19　　　　　　　　**THE COURT:**　You mean if they referred to DACA or

20　whether it just referred to deferred action of any type?

21　　　　　　　　**MR. DAVIDSON:**　We would have to think about what a

22　reasonable scope would be.　There's a number of deferred action

23　programs, you know, for example, dealing with widows and

24　widowers, you know, that wouldn't be related to this decision.

25　　　　　　　　**THE COURT:**　But they got terminated?

1      **MR. DAVIDSON:**  A number of them did.  There may be

2  some that are still in place.

3      **THE COURT:**  Well, conceivably that's an excellent idea

4  to take some discovery.  I think at the end here I was going to

5  give both sides a chance to take some discovery and reduce by

6  half the time.

7      But here's the thing:  If you do what big firms do, which

8  is a bone-crushing set of document requests with huge number of

9  instructions followed by huge number of definitions and then

10  subparts galore, you know it's going to be a problem.  You need

11  to be very reasonable and directed at the discovery that you

12  take or you ask for.

13      **MR. DAVIDSON:**  Yes.

14      **THE COURT:**  All right.  So let's say that -- all

15  right.  So let's say we get the administrative record and we've

16  got some problems with it but they are manageable problems.

17  And then what do we do?

18      **MR. DAVIDSON:**  So our proposal -- and this is a view

19  shared by at least the City of San Jose plaintiffs and the

20  Garcia plaintiffs -- is that we would aim as quickly as we get

21  the administrative record to start preparing our preliminary

22  injunction papers.  We'd start the legal part today but --

23      **THE COURT:**  Why couldn't it be a summary judgment

24  motion?  If you have the -- you know, in all the other cases

25  that I get with the Government, they got the administrative

1   record, they both cross-move for summary judgment.

2        **MR. DAVIDSON:**  It's possible it could take that form,

3   Your Honor.  There are other claims other than APA claims that

4   are constitutional claims as well, and so I don't think we're

5   all the way down the road as far as, you know, figuring out

6   whether all of the facts are undisputed.

7        So our thought process had been that we'd file --

8        **THE COURT:**  I think you should -- I think -- maybe it

9   should be in the alternative, but I'm -- in other words,

10  summary judgment and/or preliminary injunction in case there

11  are fact issues.  I can see posing it in that fashion.  That

12  would be a cautious thing to do.

13       But if it turns out that there are no fact issues, I don't

14  see the point in doing a preliminary injunction if the Court

15  could grant summary judgment based on an undisputed record, and

16  then it could go to the Court of Appeals.

17       **MR. DAVIDSON:**  Your Honor, that is very helpful, and

18  there may be pure legal issues that are very amenable to

19  summary judgment, and I think we would give a lot of

20  consideration to including those merits summary judgment issues

21  in a paper.  We've been thinking about it as a preliminary

22  injunction motion, but that's helpful.

23       **THE COURT:**  All right.  Let's hold your thought.

24       Now, let's hear from the Government on your view of what

25  I've heard so far.

1      **MR. SHUMATE:**  Thank you, Your Honor.

2      We understand the plaintiffs have concerns about what will

3 go in the administrative record, but we think discovery at this

4 point would be premature and unnecessary and really

5 inappropriate.

6      The Government should have an opportunity to prepare the

7 administrative record, and we're willing to receive any

8 suggestions from the plaintiffs about what specifically they

9 think should go --

10     **THE COURT:**  Let me interrupt you on that.  If we had

11 all day and all year -- okay? -- I'd agree with you; but I

12 think you should respond to their discovery requests if they're

13 reasonable even if it's not going to be in the administrative

14 record.

15     **MR. SHUMATE:**  Our concern, Your Honor, is that it will

16 likely be a fishing expedition; and if we start going down the

17 road of discovery, we're going to take this litigation sideways

18 and the Court won't be in a position to make a quick decision.

19 So --

20     **THE COURT:**  Well, if it gets going too far sideways,

21 I'll put a stop to it, but reasonable discovery I think is okay

22 because I know what's going to happen.  You're just going to

23 put in the things you want into the administrative record.  So

24 this is kind of a thing that helps keep you honest to show some

25 of the things you don't want the Court to see maybe.

1    And then there will be a separate question of whether it

2  should have been in the administrative record, so I'm going to

3  let them have some discovery on this.

4    But let's go to your broader point about what do you think

5  should be briefed in this case and what should be the schedule?

6    **MR. SHUMATE:**  So, Your Honor, we believe that the

7  Government has a very strong motion to dismiss, and so our view

8  coming into the hearing was that we should be permitted to file

9  a motion to dismiss quickly within 30 days to test the

10  allegations.

11    **THE COURT:**  30 days is not quickly.  It would have to

12  be a lot quicker than that.

13    **MR. SHUMATE:**  In the alternative, Your Honor, we are

14  comfortable with the suggestion that we do cross-motions for

15  summary judgment.  So I do think that the Court could get to

16  final judgment very quickly.

17    So one approach that we've just been considering over here

18  is we could do opening cross-motions for summary judgment due

19  on December 1st, the second brief due January 15th, the third

20  brief due January 29th -- excuse me -- February 15th, and then

21  a fourth brief due sometime in the end of February.

22    **THE COURT:**  No way.  By then the March 5 will have

23  come and gone, and then we would have to almost certainly have

24  to have some kind of preliminary injunction in place.  We can't

25  let the program expire without a decision; right?

1    Maybe you win.  Maybe you win totally.  I don't know what

2    the answer is on the merits, but I don't like the idea that

3    we're fiddling while Rome burns and then suddenly the program

4    is expired.  I think we've got to have a decision well in

5    advance of March 5 so that this can go to the Court of Appeals.

6         Maybe you win and go to the Court of Appeals.  Maybe you

7    lose and go to the Court of Appeals.  I don't know that yet,

8    but this is -- see, you-all are approaching this like big law

9    firms and long-winded.

10         You can do this on a fast basis.  You can work hard and

11    get it done to get this briefed and well briefed in time, then,

12    to put the burden on me.  I have to go through it all, but I'm

13    worried about the people involved.  The DACA people are looking

14    for a decision.  They don't want to wait till March 5.

15         **MR. DAVIDSON:**  Your Honor, our suggestion was for a

16    quicker schedule that I think would be acceptable to the

17    Government while still leaving some breathing room for the

18    legislature, which I don't want to pass up.

19         But we were thinking of filing a preliminary injunction

20    motion and motion for summary judgment November 1st.  That may

21    seem slower than Your Honor would prefer.  There's reasons for

22    it.

23         **THE COURT:**  Give me your schedule.

24         **MR. DAVIDSON:**  Okay.  Our opening brief November 1st,

25    the Federal Government's response December 6th.

1    **THE COURT:**  That's a Wednesday; right?

2    **MR. DAVIDSON:**  That is a Wednesday.

3    **THE COURT:**  Okay, Wednesday.

4    All right.  And their response when?

5    **MR. DAVIDSON:**  December 6th.

6    **THE COURT:**  That's too far out.

7    **MR. DAVIDSON:**  That was their request.  We're happy

8    for that to be as short as possible.

9    **THE COURT:**  Then what?

10   **MR. DAVIDSON:**  And then our reply December 20th.

11   **THE COURT:**  Too far out.  And then the poor judge gets

12   on Christmas Eve -- you want me and my staff to be going

13   through all of your paperwork over the Christmas holidays while

14   you-all go off to have fun.

15   See, did you think about that?  I mean, I will be here

16   working on a lot of things, but December 20 all the briefing is

17   done; right?

18   **MR. DAVIDSON:**  Your Honor, we certainly were not

19   expecting the Court or its staff to be working over Christmas.

20   **THE COURT:**  We will work on it, but we're going to

21   have a more compact schedule than that.

22   **MR. DAVIDSON:**  We're happy to have that, Your Honor.

23   **THE COURT:**  All right.  Okay.  I've got -- I'm going

24   to give each of you a chance to say one more thing, and then I

25   want to hear from some of the lawyers, and then you'll come

1  back and I'll let you have more to say.  So you get to say one

2  more thing, please, on case management.

3        **MR. DAVIDSON:**  This is -- there are some claims in

4  this case which relate to due process in the context of

5  information sharing.  So under the DACA program, applicants

6  were assured that the information they provided in support of

7  their applications would not be used in connection with

8  immigration enforcement; that is, the Government would not use

9  that information to deport them or their families.

10      In the order rescinding the DACA program, there were some

11  changes made to the language that the Government used to

12  describe the circumstances under which information would be

13  shared with the enforcement arms of the Government.

14      We have asked the Government about that in the context of

15  our meet-and-confer discussions, and they were able to confirm

16  this morning that their understanding is that the policy

17  related to the use of information provided with applications

18  has not changed.  And that representation, we think, is

19  important to put on the record.

20        **THE COURT:**  Is that true?

21        **MR. SHUMATE:**  That's correct, Your Honor.  Our

22  understanding is that the information-sharing policies remain

23  the same.  They have not changed, but I would just want to be

24  very clear that even the old policy said clearly that it could

25  be changed, suspended, or revoked at any time.  So I just want

1  to make sure that's clear on the record.

2      **THE COURT:**  Are you trying to say that they are

3  changing it now, or do you -- what is the policy of the

4  Government now with respect to when that information can be

5  shared with other law enforcement agencies?

6      **MR. SHUMATE:**  I want to be very precise, so if I can

7  get my notebook, I can point the Court to precisely where that

8  is.

9      But questions 19 and 20 on USCIS's website, it's archived,

10  it explains clearly when information can be shared but it's

11  very clear in saying these policies can be changed/revoked at

12  any time.  It doesn't create any --

13      **THE COURT:**  But it hasn't been revoked yet?

14      **MR. SHUMATE:**  No.  It is our understanding that it has

15  not been revoked and that the current Administration is

16  following the same policy as the prior Administration.

17      **THE COURT:**  All right.  Does that satisfy you?

18      **MR. DAVIDSON:**  It does, Your Honor.

19      **THE COURT:**  All right.  Thank you.

20      Okay.  Let's hear -- you get to say one more thing.

21      **MR. SHUMATE:**  Thank you, Your Honor.

22      Just we would want to make sure that however much time the

23  plaintiffs have to file an opening brief, we would have an

24  equal amount of time for the Government.

25      And the other thing I would just say is, since we do have

1   four sets of plaintiffs, that we're concerned about duplicative

2   briefing.  We think it makes a lot of sense for the --

3       **THE COURT:**  Maybe we'll have joint briefing of some

4   sort, but I don't know about -- okay.  All right.  We'll come

5   to a schedule.

6       All right.  Who would like to speak next, please?

7       **MR. ZAHRADKA:**  Good morning, Your Honor.  James

8   Zahradka representing the states of California, Maryland,

9   Maine, and Minnesota.

10      **THE COURT:**  Great.  Go ahead.  What's your view?

11      **MR. ZAHRADKA:**  Your Honor, we share your desire to

12  have this decided in a prompt manner.  Clearly there is a lot

13  of uncertainty out there that's really causing possibly

14  unnecessary grief.

15      We do share both -- the counsel for UC's belief that there

16  should be some possibility for the legislative process to go

17  forth.  We obviously share your view that that is something you

18  cannot rely on nor take to the bank in any way.

19      And our view is that having this case resolved in an

20  expeditious manner while allowing some time for that process to

21  play out is -- there's an appropriate balance to be struck

22  there, and we think that having some time not getting a

23  decision -- not getting a ruling before year's end is important

24  to allow that process to play out.

25      So we're amenable to the vehicle that you discussed,

1  cross-summary judgment motions --

2          THE COURT:  I suspect that if we did anything close to

3  the schedule I just heard, the decision would be in January,

4  maybe even February, but I doubt that it would be by year's

5  end --

6          MR. ZAHRADKA:  That seems appropriate.

7          THE COURT:  -- unless it was a request for provisional

8  relief.  Then I might have to act more promptly.

9          MR. ZAHRADKA:  Right.  That seems appropriate to us,

10  Your Honor.

11      And let me just -- I think this -- I hope this is clear,

12  that the very first issue that was brought up and the term

13  "TRO" was used, not a term you favor, but that specific issue

14  is for a very discrete group of folks.  So that anything that

15  came out of that would not apply --

16          THE COURT:  As we talked about it, I think I

17  understood that.  Even then, I think you could cast it in terms

18  of a preliminary injunction motion on that limited issue.

19          MR. ZAHRADKA:  I'll also say -- may I speak to

20  discovery briefly?

21          THE COURT:  Of course.

22          MR. ZAHRADKA:  So we agree with the idea of helping to

23  craft what the administrative record looks like and/or

24  additional documents pertinent that may not have made their way

25  into that record via some discovery requests.  We also think

1   that it may well be necessary for us to probe further into the

2   administrative record, or what was not in the administrative

3   record, with some other discovery mechanisms -- you know,

4   requests for admissions, interrogatories, requests for

5   production, and possibly depositions.

6       Because of some of the issues at play here, which involve

7   some issues of what the decision-makers were reviewing when

8   they made the decision, how they reviewed those materials,

9   those are decisions that could not be reflected in the

10  administrative record but are important to determine whether a

11  claim that the decision was arbitrary and capricious would

12  succeed or not.

13      So as we make this schedule, we think it's important to

14  consider that that may be necessary.  It's very hard for us to

15  say at this point without having an administrative record, but

16  we want to leave that possibility open.

17          **THE COURT:**  Okay.  Thank you.

18          **MR. ZAHRADKA:**  And with that, I think for now that's

19  all I'd like to say.  Thank you.

20          **THE COURT:**  All right.  Who's next?

21          **MS. FINEMAN:**  Good morning, Your Honor.

22  Nancy Fineman.

23      I wasn't sure when you made the comment about large firms,

24  you were including Cotchett, Pitre & McCarthy.  We like to

25  think of ourselves as large in stature but we're small in

1  numbers.

2        **THE COURT:**  You're getting larger and larger --

3        **MS. FINEMAN:**  We are, Your Honor.

4        **THE COURT:**  -- but you don't use all those

5  bone-crushing instructions and bone-crushing definitions, I

6  hope.

7        **MS. FINEMAN:**  I think what -- we spent yesterday with

8  the plaintiffs' group getting together, and I can represent to

9  the Court it's a group that's committed to working quickly to

10  solve the problems that the decision has created.

11        I think from our viewpoint, and San Jose especially, we

12  need the administrative record to see what it is.  And we are

13  going on from yesterday and the November 1st schedule on an

14  October 13th date; and today when we were talking -- we met

15  with the defendants this morning, so we've talked out many of

16  these issues to try to make this more efficient, and I think

17  we'll be able to work very cooperatively with the Government.

18        That October 6th date will help, but we want to make sure

19  that we have enough time between the time we get the

20  administrative record and any first filing that we don't have

21  to say, "Your Honor, hold off.  We have kind of the issue."  So

22  we thought about a three-week time before we filed would be

23  fine.  So the November 1st date we thought was a realistic

24  efficient date.

25        And then I know the problem is Thanksgiving, which isn't a

1   problem for lawyers, but if you have something that's due

2   either right before or right after, it really does affect the

3   staffs of the attorneys and it's a little bit harder to ask

4   them to give up their Thanksgiving holiday.  So that's why we

5   were reasonable with the December date, but I think that can be

6   crunched to get it done.

7       But the last thing to consider is there is a lot of work

8   through a lot of the groups involved in this case with the

9   legislative solution and pointing that, and we don't want

10  Congress to be able to say, "Well, Judge Alsup is resolving

11  that.  We don't have to do anything."

12      So making sure --

13      **THE COURT:**  Well, I had thought about that very

14  problem, honestly.  I don't like being in the position where

15  somebody could blame me and say, "Well, now it's in the courts.

16  Let's just let the courts decide it."  Okay.  I have worried

17  about that.

18      **MS. FINEMAN:**  And that's --

19      **THE COURT:**  But here's the flip side of that:  If we

20  go slow somehow because for that reason, then we could easily

21  wind up with a March 5 deadline coming and going with no

22  decision because it's not a foregone conclusion that you would

23  get a preliminary injunction.  You have to earn it and show

24  that you're entitled to it.

25      So I don't like being in that position either, so we've

1    got to -- I think a prudent thing to do is to get this case

2    decided before March 5 comes, and then let the legislature do

3    whatever it's going to do.

4         You know, the problem is broader.  As I understand it,

5    you-all are trying to reinstate the DACA program, but the DACA

6    program doesn't even apply to everybody who is in that

7    category.  There are date problems, there are date deadlines;

8    and if you're not a certain age at a certain time, you don't

9    even qualify for the program you're trying to save.  So there's

10   a broader legislative problem than just -- as important as DACA

11   is, there's a broader legislative problem.  So maybe they'll

12   look at this in a broader context.

13        Anyway, I see what you're saying on that, but my view is I

14   didn't ask for this case, but I got it and I'm going to move it

15   along so that I think I do my job, which is to get a decision

16   before the program expires.

17        **MS. FINEMAN:**  The City of San Jose thanks you for

18   that, and I and my firm and the rest of the plaintiffs'

19   counsel, I think the Government, are committed to do whatever.

20        I think we were thinking preliminary injunction first,

21   though I think we've been writing notes and the plaintiffs'

22   side is thinking that your idea of a summary judgment and

23   preliminary injunction together is a good idea.

24        **THE COURT:**  I think that's the way to go because you

25   can imagine a scenario where it could be that under the law,

1    you lose.

2         **MS. FINEMAN:**  Absolutely.  We've thought about that.

3         **THE COURT:**  It could be under the law, you have raised

4    a fact question where you would win if it was a certain

5    scenario, but we don't know what, so that we have to get more

6    discovery and maybe even have a trial, but in the meantime

7    possibly there would be a preliminary injunction because you

8    might meet the standard.

9         But you've got to meet the standard, and we don't have any

10   of that now.  So my thinking is that you would get the

11   administrative record and move for summary judgment and/or in

12   the alternative for preliminary injunction on some schedule

13   reasonably close to what you-all told me.  I'll give you some

14   dates in a minute.  And so that I -- with enough time for me to

15   decide well before March 5 and with some discovery in the

16   meantime.

17        **MS. FINEMAN:**  Thank you, Your Honor.  San Jose

18   completely agrees with you.

19        **THE COURT:**  All right.  Let's hear from -- who else is

20   over -- wait.  Wait.  Wait.  The Government gets to respond to

21   what I just heard.  I'm sorry.

22        **MR. SHUMATE:**  Thank you, Your Honor.  Just one quick

23   thing.

24        The Government is happy to move as quickly as the Court

25   would like, but since you did raise the idea of discovery, I

think that is inconsistent with the Court's goal of moving quickly here.

And what the plaintiffs are basically alleging is that the Government is presumed to act in good faith in preparing the administrative record, and we need discovery to test and make sure the Government puts what's --

THE COURT: My own experience has been exactly that, that the Government maybe in good faith leaves out things that they should have put in there.

MR. SHUMATE: And we can address that after the fact, and the plaintiffs --

THE COURT: No, no. After the fact will be too late. I think they ought to get some discovery along the way, and then when you're sitting there saying, "Does this go in the administrative record? No. Well, I don't know. Maybe not. Well, they might ask for it, so let's put it in there anyway," so I think it's better to let them have I'm not saying bone-crushing discovery; I'm saying limited, narrowly directed, reasonable discovery is, I think, in order here.

MR. SHUMATE: Your Honor, I think we can accomplish that goal by allowing the plaintiffs just to offer precise suggestions about what they think should be in the administrative record by letter, and we proposed that to them.

THE COURT: And you would reject their suggestions.

MR. SHUMATE: We're happy to consider them.

1          **THE COURT:**  Yeah, you would consider them.  Yeah,

2     that's worth something, but it's not as good as they get the

3     document to show me and say, "Look what they left out."

4          Look, I've just had too much experience in the real world.

5     I think limited reasonable discovery keeps both sides honest,

6     and we're going to do it.  So you're not going to talk me out

7     of that.

8               **MR. SHUMATE:**  Thank you, Your Honor.

9               **THE COURT:**  All right.  Who's next?

10              **MR. DETTMER:**  Thank you, Your Honor.  Ethan Dettmer.

11     I'm at Gibson Dunn.  I'm a partner at a large law firm, but I

12     do promise --

13              **THE COURT:**  Yeah, that firm, I've heard of them.

14              **MR. DETTMER:**  But, Your Honor, I will say I'm not a

15     fan of bone-crushing discovery, and I think that Your Honor is

16     exactly right, that limited and focused discovery in this case

17     makes a lot of sense.

18          And I will give as an excuse for what I'm about to say

19     that we've only been in this case since January -- I'm sorry,

20     January -- Monday -- I've been thinking about these issues

21     since January.  But what Your Honor said this morning reminded

22     me very much of what your former colleague Judge Walker said at

23     the beginning of the Prop. 8 trial when we filed that complaint

24     and all thought we would have a PI motion, and he said

25     something very similar to what Your Honor said this morning,

1  which is, "Why not develop a real record so that when this

2  matter goes up on appeal, the Court of Appeal has the full

3  benefit of a full record?"

4      So I think -- and I've conferred with some of my

5  colleagues as we were talking this morning -- but I think --

6  and the UC is, I think, on board with this, as is San Jose --

7  perhaps what we do is have, as Your Honor says, focused

8  discovery following the completion of the administrative record

9  on October 6th and then have a summary judgment slash PI

10  briefing schedule.

11     And what I was going to propose was November 1st for an

12  opening brief or set of opening briefs, which we will keep as

13  focused as possible; November 22 for an opposition, which is

14  the day before Thanksgiving; and December 8 for a reply, which

15  gives us a couple extra days just given the holiday; and a

16  hearing, if it's amenable to Your Honor's calendar, on

17  December 15th.

18     And then if there are fact issues -- and that would

19  resolve, I think, the APA claims.

20     And if there are fact issues and our case --

21     **THE COURT:**  But, wait.  I thought you were talking

22  about every -- no way.  So that would just be for the APA

23  statutory?  It would not be the remaining claims?

24     **MR. DETTMER:**  Well, I guess what I would say,

25  Your Honor, is the APA claims, I believe -- I don't believe you

have trials on APA matters, and so I think the APA claims would have to be resolved via some sort of briefing. I think the other claims may or may not be depending on what the parties think is appropriate on those claims.

THE COURT: What do we do about the other claims?

MR. DETTMER: Well, Your Honor, I was going to propose that if there are limited fact issues that remain -- and, frankly, our case is -- in many ways is a reliance case, our own plaintiffs, our own clients' reliance on what the Government has told them over the years and what the Government has promised them. If live testimony makes sense, we have a short bench trial at some point in late January or early February if there are issues that remain to be resolved following the completion of the briefing and the hearing.

THE COURT: So give me one example. Are you one of the plaintiffs that have constitutional claims? I can't remember.

MR. DETTMER: My clients, yes, they are the individual dreamers and they are raising due process and equal protection claims.

THE COURT: Are each of them already signed up under DACA?

MR. DETTMER: Yes, Your Honor.

THE COURT: So they're registered now?

MR. DETTMER: Correct.

1    **THE COURT:**  Okay.  So just take one of your claims,

2  constitutional claims, and in a paragraph tell me how it would

3  work.  The constitutional claims is what I'm interested in, and

4  just pick one.  You don't have to pick them all.

5    **MR. DETTMER:**  Sure.  So my clients, each one of them,

6  has changed the way they're living their lives.  They have

7  gotten clients.  One of them's a lawyer.  They are working on

8  getting a medical degree and having medical -- you know, having

9  patients.  Some of them are teachers and have changed their

10  lives to teach their students in underprivileged areas.  And

11  they've taken all these steps.  They've gotten these licenses.

12  They've borrowed money.  They've taken all sorts of steps in

13  order to carry out those careers.

14    And if DACA is revoked and if their reliance on it --

15  their reliance on what the Government has told them over the

16  years is disappointed, they will not be able to do those

17  things.  They will -- their reliance interests will be

18  frustrated by the Government's rescission of this program.

19    **THE COURT:**  That would violate what part of the

20  Constitution?

21    **MR. DETTMER:**  The due process clause of the

22  Fifth Amendment.

23    **THE COURT:**  Okay.  And it's not a class action.  You

24  have six individuals; right?

25    **MR. DETTMER:**  Correct, Your Honor.

1      **THE COURT:** All right. So I would like to hear what

2  the Government says to the -- what's your view going to be on

3  the enrollment? Is that substantive due process or procedural?

4  I don't know, but one of those two. What do you say on that

5  issue?

6      **MR. SHUMATE:** So our position on the constitutional

7  claims, Your Honor, is that they fail on their face and that

8  they're subject to dismissal on a motion to dismiss. So we

9  would like to test the allegations in the complaint and move to

10  dismiss.

11    I think --

12      **THE COURT:** You can do that on your summary judgment

13  motion.

14      **MR. SHUMATE:** Right, Your Honor.

15    And in the schedule -- what was the date for the reply? I

16  didn't catch that.

17      **MR. DETTMER:** December 8th.

18      **MR. SHUMATE:** So we are comfortable with the schedule

19  that the plaintiffs have proposed with one tweak, Your Honor,

20  is that we would like to cross-move for summary judgment. So

21  under the proposed schedule, we would only get one brief. We

22  would like two briefs so we would have the last word on a reply

23  to your opposition to our --

24      **THE COURT:** My thought is that on the opening day,

25  whatever it was -- November 1? -- November 1, each side would

1  file a motion, and so we would have two different sets of

2  motions going at once.

3      **MR. SHUMATE:**  I think that makes sense.

4      **THE COURT:**  So then you'd get the last word on your

5  motion.

6      **MR. SHUMATE:**  I think that makes sense.

7      **THE COURT:**  All right.  But what do you say -- but why

8  does the constitutional claim fail on its face?  I mean, all

9  these people have relied on what the Government has said, so

10  now the Government is going to say something different.  So

11  what do you -- how do you answer that?

12      **MR. SHUMATE:**  So I understand the claim that's being

13  raised is a due process claim.  It was very clear in 2012 when

14  Secretary Napolitano created the program at the very end of

15  that memorandum creating the program and said, "This memorandum

16  does not create any substantive right in any individual."

17      So what I anticipate we will argue in opposition to the

18  constitutional claim is that there is no due process right and,

19  therefore, the claim fails on its face.

20      **THE COURT:**  Okay.  Hang on a minute.

21      I've got the June 15th, 2012, right here, signed by Janet

22  Napolitano.

23      **MR. SHUMATE:**  Look at page 3, Your Honor, right above

24  the signature.

25      **THE COURT:**  All right.  Read it out loud.

1    **MR. SHUMATE:** (reading)

2         "This memorandum confers no substantive right,

3    immigration status, or pathway to citizenship. Only the

4    Congress acting through its legislative authority can

5    confer these rights."

6    **THE COURT:** Okay. So I guess your key sentence is

7    "This memorandum confers no substantive right..." Let's just

8    stop there.

9    So what is your answer to the caveat that

10   Secretary Napolitano put in the memorandum that you rely on?

11   **MR. DETTMER:** Your Honor, in our complaint we quote

12   high Government officials of both parties that have over the

13   years said over and over again that the dreamers, as my clients

14   are typically referred to in the media, can rely on this

15   program and that they should rely on this program.

16   I will point you to paragraphs 41 through 47 of our

17   complaint, and --

18   **THE COURT:** I'm interested. I haven't read it yet.

19   I've read a lot of this stuff but not that. Read out loud for

20   everyone's benefit one of the key people's statements to that

21   effect.

22   **MR. DETTMER:** The most recent one is paragraph 47 in

23   our complaint, and I'll quote (reading):

24        "On April 21, 2017, President Trump said that his

25    Administration is," quote, "'not after the dreamers' and

suggested that," quote, "'the dreamers should rest easy.'
When he was asked if the policy of his Administration is
to allow the dreamers to stay, President Trump answered
yes."

That's the most recent of these statements, and there are
a number of them both in writing and orally and in tweets.  And
I'll give you an example.  One of my clients, who is a lawyer
down in San Diego, she has been expanding her practice.
Earlier this year, based in large part upon these types of
representations that she's heard from President Trump and Paul
Ryan, Senator Lindsey Graham, and others, and as well as the
memorandum that Secretary Kelly issued earlier this year which
rescinded all immigration policies of the Obama Administration,
except for DACA, she took out a five-year lease on a new office
space because she was expanding her business and she thought,
"I don't have anything to worry about.  This program is going
to keep continuing."

So that's a very specific example of the type of reliance
that we're talking about based on the representations of high
Government officials in our Government.

And our position is that it just can't be that the
Government can make promises like that to people who live in
this country and then yank the rug out without warning and
without reason.

MR. SHUMATE:  Your Honor, the plaintiffs' due process

claim is really an *estoppel* claim, that once the Government established the policy, they can never change it because people tend to rely on the established policy.

    We all know the *estoppel* does not generally run against the Government; and so, you know, if the plaintiffs are right, that the Government --

        **THE COURT:**  But "generally" is not the same thing as "always."  So --

        **MR. SHUMATE:**  Well, I hope they can cite a case where *estoppel* runs against the Government from ever changing a policy.  I don't think they'll be able to do that.  And if they're right, the Government could never change course, it could never change policy if it's true that they have a due process right on the continuation of a Government policy and that it can never change.  That just can't possibly be right, and we're prepared to brief that, Your Honor.

        **THE COURT:**  Okay.  What do you say to the point that if you're right, then the Government can never change a policy?

        **MR. DETTMER:**  Your Honor, I can't cite a case to you right now.  I will be able to.  There is doctrine that says if the Government says something -- if the Government treats something as a right, then it is a right regardless of the label they apply to it.

    And this is not to say that the Government can't ever change its policies, but it certainly can't change its policies

1  as to the people who have relied upon that policy to change

2  their whole living situation, their whole lives.

3      **THE COURT:**  All right.  Well, these are -- this is a

4  preview of things to come.

5      But let's continue to pause over the -- what -- again, on

6  the constitutional issues, are they going to be part of the

7  briefing that you-all want to do starting November 1 or is that

8  for later?  I think you answered that already, but I can't

9  remember your answer.

10     **MR. DETTMER:**  And, Your Honor, it was -- and I'm sorry

11  for this -- a somewhat of a hedging answer.  I don't know yet.

12  It's going to depend somewhat on the record we have and what we

13  can develop in the next six weeks or so to determine what exact

14  claims we'd move for summary judgment on.

15     **THE COURT:**  Well, consider this possibility:  Let's

16  say we had a whole thing going on the administrative record and

17  just the statutory claim under the APA and did not deal with

18  the constitutional issues.  And let's assume the worst case for

19  you and you lose on the APA claims, no preliminary injunction,

20  no nothing.  So then where are we on the constitutional claims?

21  Will that be impossible to decide in the time before March 5?

22     **MR. DETTMER:**  Your Honor, I think we're going to

23  have -- and, again, this is something where, you know, I think

24  we're all sort of talking about this and we have been talking

25  about it for the past couple of days and working through how

1  this is going to get presented; but I think there would be,

2  after all that briefing is done and Your Honor has looked at it

3  and made a decision, presumably at some point in January, then

4  I think there could be a limited trial on specific issues to

5  the extent Your Honor has left things open where there are

6  factual issues that need to be resolved.

7  I don't know that there will be any; but if there are, you

8  know, we could have a limited bench trial, have a few witnesses

9  come in, if that is appropriate based on Your Honor's summary

10  judgment argument -- I'm sorry -- ruling.

11  **THE COURT:**  Honestly, I don't know what the law here

12  is on whether or not that your theory that somebody who relies

13  on statements of Lindsey Graham on the TV, whether or not

14  that's good enough to create a right when the document says it

15  doesn't create rights.  I don't know the answer to this, but

16  I've got to get educated on it and tee up.  If we get to that

17  point where the constitutional claims matter, I don't want to

18  have to do it on a hurry-up basis.

19  **MR. DETTMER:**  So, Your Honor, I think we -- I think it

20  is likely that we would bring those claims as a part of that

21  briefing.  And, you know, I just don't want to say that

22  conclusively given where we are right now, but I think it is

23  likely we would bring those claims in that briefing.

24  Your Honor would be fully informed about the law and the facts

25  related to that in that summary judgment briefing and then

1   could hear argument on it in December and decide it shortly

2   thereafter.

3       **THE COURT:** Is your thought on the summary judgment

4   motion that you want to bring on the Government's side that it

5   would include all claims including constitutional claims?  That

6   you would be moving for summary judgment in your favor on all

7   of that?

8       **MR. SHUMATE:** I think it's kind of a hybrid motion for

9   summary judgment/motion to dismiss.  I think we would want to

10  in our first brief raise all of the arguments we have why these

11  claims should be dismissed under either a 12(b) --

12      **THE COURT:** Of course, you could -- I mean, if you're

13  entitled to dismissal -- I don't know.  But you could do it as

14  a hybrid motion; but, nevertheless, would you be addressing the

15  constitutional claims?

16      **MR. SHUMATE:** Yes, I think we would, Your Honor.

17      **THE COURT:** All right.  So if we got to the end of it

18  and let's say that I thought that it should not be dismissed, a

19  constitutional claim should not be dismissed, that's not the

20  same as plaintiffs win on the merits.  It just means they live

21  to fight another day.

22      So I am worried that maybe what we need is whatever the

23  most good faith motion that the plaintiffs' side could bring on

24  the constitutional claims running in parallel to the

25  administrative claims on this same schedule.  And it could

easily be that at the end it's impossible to decide on that

record, but you would have to make a record.  You would have to

put in your declarations by your -- they would have to be

subject to cross-examination at depositions about their law

practice and what -- you know, the reliance, and then -- and

all other things that you would be relying on, the Government

could take depositions to try to poke holes in that story.

All right.  Here, I think we ought to be looking at this

schedule -- wait a minute.  Have I given everyone their chance

to talk?  I've lost track.  There's so many lawyers.  Who has

not had a chance to talk?

**MR. ZAHRADKA:**  I've spoken, Your Honor, but I did want

to address a couple points very briefly, if that's okay, on

this.

**THE COURT:**  All right.  Go ahead.

**MR. ZAHRADKA:**  I'll just say -- and, again, this is

all preview -- but just to say that boilerplate in the memo, in

the Napolitano memo, is just that.

**THE COURT:**  Lawyers always call it boilerplate

whenever they don't like it.  Whenever they do like it, it's

the centerpiece.

**MR. ZAHRADKA:**  Of course.

**THE COURT:**  All right.  But this doesn't say it's

boilerplate.

**MR. ZAHRADKA:**  Right.  The D. C. Circuit has a strong

line of cases, though, that that type of boilerplate does not

determine whether it creates a right or not.  So just to say

that.

        **THE COURT:**  All right.

        **MR. ZAHRADKA:**  And then the other preview is that on

the *estoppel* issue, the Ninth Circuit does have a very strong

strand of case law saying that *estoppel* against the federal

government in the immigration context is permissible.

        **THE COURT:**  What's the name of that decision?

        **MR. ZAHRADKA:**  I don't have it in front of me,

Your Honor, but I can --

        **THE COURT:**  All right.

        **MR. ZAHRADKA:**  There are a number of cases and we will

brief them fully, but just to say, again, previewing that.

Thank you.

        **THE COURT:**  So you're saying that the Ninth Circuit

has said that the normal rule is *estoppel* against the

Government does not apply?

        **MR. ZAHRADKA:**  That's correct.

        **THE COURT:**  There's a long-standing Supreme Court

decision on that point?

        **MR. ZAHRADKA:**  That's correct.

        **THE COURT:**  And you're saying the Ninth Circuit has an

exception in immigration cases that you think applies in this

case?

1    **MR. ZAHRADKA:** I would say -- I would couch it in

2  terms of following Supreme Court law, which does not rule out

3  entirely the possibility of *estoppel* against the federal

4  government in finding that in immigration contexts, given the

5  incredible stakes, that they will recognize as appropriateness.

6    **THE COURT:** By maybe tomorrow send me a letter, no

7  argument, just send me the citation to that decision.  I'd like

8  to read it.

9    **MR. ZAHRADKA:** Yes, Your Honor.  It may be multiple

10  citations.  There's a few cases on point.

11    **THE COURT:** Well, you said there --

12    **MR. ZAHRADKA:** A line of cases.  Sorry.

13    **THE COURT:** All right.  Give me one or two along that

14  line of cases, but make sure -- you said Court of Appeals;

15  right?

16    **MR. ZAHRADKA:** Yes, sir.

17    **THE COURT:** All right.  Yeah.

18    **MR. ZAHRADKA:** Very well.  I will, Your Honor.  Thank

19  you.

20    **THE COURT:** By the way, I'm going to appoint

21  Judge Sallie Kim to be your discovery referee and cut in half

22  the time for responses on all discovery.

23    And both sides are subject to discovery.  Like the six

24  individuals, they've got to stand for deposition.  It could be

25  that Janet Napolitano, she was present at the creation, she

1    might be subject to deposition too if they want to take her

2    deposition.  So both sides are subject to possible depositions

3    and discovery.  I think that ought to be evenhanded, but the

4    time for response is cut in half, and Sallie Kim will be your

5    discovery master.

6         October 6 is the administrative record date.  Both sides

7    can move for summary judgment and/or preliminary injunction

8    and/or to dismiss on November 1; reply -- I'm sorry --

9    oppositions, November 22; December 8th, reply.  That only gives

10   me a week with the materials.

11        We'll tentatively put it down for December 15th, but it

12   may wind up being December 22 because your schedule only gives

13   me a week to look at it.  But possibly I'll want -- so don't

14   make plans for December 22, but we'll see if we can do it on

15   the 15th.

16        I think that we should have at least these tracks.  Can

17   the plaintiffs do this on a joint basis, or do you need -- can

18   we do one joint brief?

19        **MR. DAVIDSON:**  I think the plaintiffs have somewhat

20   different claims from each other.  I can certainly say that our

21   intention is to file a joint brief and we will make best

22   efforts to do it, and we can commit to not having overlapping

23   arguments.

24        **THE COURT:**  Well, I want you to do more than not have

25   overlapping.  I want you to have one joint brief and then if

1    you each have unique arguments in addition, then you can

2    supplement with that.

3           **MR. DAVIDSON:** Like a Supreme Court opinion.

4           **THE COURT:** What?

5           **MR. DAVIDSON:** Like a Supreme Court opinion, we join

6    as to --

7           **THE COURT:** Is that the way they do it?

8           **MR. DAVIDSON:** Yeah.

9           **THE COURT:** Okay. Well, then that's the way we need

10   to do it. I see what you mean. Yes, that's what we need to

11   do. Majority opinion, then you can have concurring opinions.

12       All right. But one thread is the statutory arguments

13   under the APA, and then a second set is the constitutional

14   arguments. Each can be styled as a motion for summary judgment

15   and/or preliminary injunction.

16       Please try to honor the page limits. I will be generous

17   on giving you more, but please try your best. But each of

18   those have it. So you get 25 pages on the constitutional one,

19   25 pages on the statutory one.

20       Then there will be the opposition to both of those. So

21   you'd be -- over on the Government's side, you'd be doing two

22   sets of oppositions. If you wanted to file a single one, that

23   would be okay.

24       Then we come to the replies would follow the same format.

25   You would have the constitutional reply, then the statutory

1   reply.

2       Meanwhile, the Government -- I'm sorry.  You go ahead and

3   whisper in his ear.  I want to make sure you understand.

4       Meanwhile, the Government has got its own thread going and

5   you file your motion to dismiss and/or summary judgment.

6       And I know what he was about to say.  He wants 50 pages on

7   your one brief; right?  That's what you were about to whisper

8   in his ear because they're going to get 50 pages.  I will just

9   be generous to you because I think you should get the same

10  number of pages as the other side gets on both the statutory

11  and the constitutional issues.

12      Is that what you were trying to tell him or is it

13  something else?

14      **MR. ROSENBERG:**  It's Brad Rosenberg, Your Honor, from

15  the Department of Justice.

16      Just to make sure that I understand, because we have four

17  sets of plaintiffs and each set of plaintiffs except for the

18  City of San Jose has multiple plaintiffs, that however the

19  Court sets up its briefing with the number of pages, that we

20  have a like number of pages to respond.  So if there are a

21  total number of 50 pages allowed for the plaintiffs, then the

22  Government would receive 50 pages in response, or would it be

23  100?

24      **THE COURT:**  In opposition.  Yeah, so I was thinking

25  that -- let's just go back to the opening motions by the

1   plaintiff.  They're going to have one motion hopefully.  In the

2   best of all worlds, there would be one brief that's 25 pages

3   long that they all subscribe to, all plaintiffs 25 pages.  Then

4   on your side, you get 25 pages to oppose that one motion.

5   Then, meanwhile, they get another 25 pages for their

6   opening motion on the constitutional issues; and then you get

7   another 25 pages, for a total of 50, to oppose that one.

8   **MR. ROSENBERG:**  Consolidated amongst all of the

9   plaintiffs 50 pages total, in other words?

10  **THE COURT:**  That's what I'm asking for, but I also

11  said I would give them concurring opinions, and I'm going to be

12  generous in giving more pages if they need it just like I'll

13  give you more pages if you need it.

14  But I want you-all to remember, you've got a lot of

15  lawyers there and I've got a small team, and I don't have the

16  luxury, so the fewer pages the better; but, on the other hand,

17  this is important, and I don't want to -- I don't want anyone

18  to miss out on an argument that they feel they've got to make.

19  Do you understand what I'm saying?

20  **MR. ROSENBERG:**  Understood and I appreciate that,

21  Your Honor.

22  **THE COURT:**  Okay.  Good.

23  So in the meanwhile, in addition to all of those pages, on

24  your own motion you get to open -- you get your 25 pages to

25  move to dismiss and/or for summary judgment.  And what I'm

1   asking you is since that one motion is probably going to cover

2   both constitutional and statutory -- see what I'm saying? --

3   your opening motion, maybe you get 50 pages if you really

4   feel -- I'll just tell you now, if you need up to 50, I will

5   give it to you, but I honestly think you could do it in less

6   than -- I think you could do it probably in 25, but whatever

7   you take, they're going to get in opposition.  So there will be

8   some duplicative briefing here.  All right?

9        Go ahead.

10       **MR. ROSENBERG:**  I did have one additional question

11  and/or thought going back to the issue of discovery.

12       **THE COURT:**  Sure.

13       **MR. ROSENBERG:**  In the interests of streamlining the

14  discovery process, as well as ensuring that there's equality on

15  all sides, including for any affirmative discovery that the

16  Government might serve, you know, we have four sets of

17  plaintiffs again and the Government on the other side, and the

18  federal rules provide for a limited number of interrogatories

19  that the parties can serve.  And I was wondering if the Court

20  might consider reducing that number for both sides, as well as

21  imposing limits to the number of requests for admissions,

22  requests for the production of documents.  So that in light of

23  the limited amount of time that the parties have, the parties

24  have an understanding as to the limited scope of discovery that

25  may be necessary.

1      **THE COURT:**  All right.  That's a fair point to
2  consider.
3      Let's say take all of you on the plaintiffs' side as a
4  group, can you live with 20 document requests and 20
5  interrogatories?  I don't know how many depositions.  It
6  wouldn't be 20.  It would be a lot fewer than 20, but maybe
7  even none, but how about 10 -- 20 and 20 for interrogatories
8  and document requests?
9      **MR. DAVIDSON:**  Your Honor, I see nods at our table, so
10  that will be fine, Your Honor.
11      **THE COURT:**  All right.  So they like that number.  How
12  about on your side 20 and 20?
13      **MR. ROSENBERG:**  I think that would work, Your Honor,
14  without -- obviously the parties could reserve the right to
15  seek leave of the Court but, yes.
16      **THE COURT:**  All right.  You can seek more, but I do
17  want to make it clear that you are entitled to take depositions
18  too and I think every single plaintiff can be deposed.  That,
19  to me, is just a normal thing.  So the plaintiffs -- if you
20  wanted to.  You don't have to, but there you are.
21      **MR. ROSENBERG:**  No, we appreciate that, Your Honor,
22  and we'll give that some thought.  I stepped aside to think for
23  a moment.  I'd lost track of just how many plaintiffs there
24  are.
25      **THE COURT:**  We've got six individuals, we've got the

University, we've got four or five states, and we've got the
City of San Jose; right?  Something like that.  So there's a
number of -- you can go above 10 if that's what you're worried
about.

      **MR. ROSENBERG:**  All right.

      **THE COURT:**  Okay.

      **MR. ROSENBERG:**  Thank you.

      **THE COURT:**  All right.  Now I've lost track of where I
was.

    Okay.  Now, if we did need to have a trial, put down
February 5 as the trial date.  I don't know if that's likely,
but we'd have to have a final pretrial conference that I would
figure out a date for.

    Please, on the plaintiffs' side, coordinate your discovery
requests.  I'm not -- unless you want me to, my thought is that
we would not, quote, "consolidate" the cases *per se* but we
would just keep them on -- four cases on a parallel track, but
they might get consolidated -- they certainly would get
consolidated for trial if we get that far, and they would be
consolidated maybe for purposes of summary judgment and/or the
big motion that's coming up in December.  But between now and
then, I just don't see the need to do any formal consolidation,
and we'll just roll along with four related cases.  Is that
okay?

    Nevertheless, on your side, please coordinate your

1  discovery requests and your briefing so that it has the benefit

2  of consolidation.

3      **MR. ROSENBAUM:**  Mark Rosenbaum on behalf of the Garcia

4  plaintiffs.

5      Your Honor, if there are discovery disputes either as to

6  conducting depositions or with respect to particular claims

7  that are made, withholding documents, responding, taking

8  privilege claims, I think the schedule that Your Honor has set

9  out says we ought to have an expedited process to get those

10 disputes resolved.  So I think all parties would appreciate a

11 matter so we can get it in front of the Court rapidly, have a

12 quick meet and confer.  If that doesn't work, get these matters

13 resolved very quickly so that the schedule doesn't get delayed.

14     **THE COURT:**  Yeah.  I agree with that and Judge Sallie

15 Kim is going to do that.  Normally I would keep the discovery

16 disputes for myself, but right now starting right in the middle

17 of all this I have a huge trial, the Waymo v. Uber trial, so I

18 would not have as much time to resolve your disputes so she's

19 going to help me on this.  Sallie Kim is going to help me on

20 the discovery, and I will ask her to do it on an expedited

21 basis.

22     **MR. ROSENBAUM:**  Certainly.  Thank you, Your Honor.

23     **THE COURT:**  All right.  Oh, one other thing I should

24 have mentioned right at the outset.  Have you done your initial

25 disclosures under Rule 26?  I doubt it, but don't you need to

1  do that promptly?

2        **MR. DAVIDSON:** We have not done it, Your Honor. We

3  had been thinking that in the interest of time and because

4  everything's moving so quickly and discovery requests are going

5  to go out, that maybe the 26 disclosures would be swept in, but

6  we're also happy to put them together.

7        **THE COURT:** Oh, no. You've got to do it. The rule

8  says you've got to have a Rule 26 disclosure unless everybody

9  agreed to just waive Rule 26 disclosures. I'll let you do it,

10  but everybody would have to agree to that.

11        **MR. ROSENBERG:** You know, I'd need to think about

12  that, Your Honor, but one possibility, I think from the

13  Government's perspective, the submission of the administrative

14  record would probably be the equivalent of Rule 26 disclosures.

15        **THE COURT:** Yeah, but how about on the constitutional

16  claims, though? That's not -- I mean, if you want to rest on

17  that, but I have a feeling later on you would say, no, there's

18  more you want to put in.

19        **MR. ROSENBERG:** I suppose if the Court were to set --

20  we would be open probably to discussing with plaintiffs whether

21  or not it makes sense to waive the requirement for Rule 26

22  disclosures. I think that's something we need to think about

23  and it's a fair point.

24        Alternatively to the extent that the Court were to set a

25  deadline, we would suggest that the Court set the same deadline

1  as for the submission of the administrative record.

2       **THE COURT:**  October 6th.  I'm going to say October 6th

3  is when your Rule 26 disclosures are due on both sides.

4       **MR. DAVIDSON:**  Very well, Your Honor.

5       **THE COURT:**  Okay.  That's initial disclosures.

6  Initial disclosures.  All right?

7     And please follow the rule and do it the way the rule

8  specifies, Rule 26, not my rule, the big rule.  Okay?

9       **MR. DAVIDSON:**  Understood.  Very well.

10       **THE COURT:**  You're looking quizzical.

11       **MR. DAVIDSON:**  I wasn't trying to be quizzical.  We've

12  heard in advance the Court's approach to Rule 26 disclosures

13  and vigorously enforcing those.

14       **THE COURT:**  Okay.  Good.

15     All right.  Let me look at my notes.  I think I'm done but

16  if anyone else has more to bring up, we'll let you do it.

17       **MR. ROSENBAUM:**  Your Honor, one other matter.

18       **THE COURT:**  Sure.

19       **MR. ROSENBAUM:**  I know there will be requests on both

20  sides for the submission of *amicus* briefs.  Does the Court want

21  to suggest some dates so we can tell the parties?

22       **THE COURT:**  Well, here's the problem with the *amicus*

23  briefs:  If they come in, they should come in at the same time

24  as the side they're supporting so that the other side can then

25  respond, otherwise they don't get a chance to respond.  You

know, the Supreme Court has a very practical rule on that.  So
you've got -- if somebody is going to submit an *amicus* brief,
they're due on the same day as the brief that they're
supporting.

        **MR. ROSENBAUM:**  That's perfect.

        **THE COURT:**  All right.

        **MR. DAVIDSON:**  One more -- one more matter,
Your Honor.

    On behalf of the University of California, it is likely
that we'll want to amend our complaint to add some additional
individual plaintiffs, and we had been thinking October 6th
would be a reasonable target for doing that.

    One issue that has come up --

        **THE COURT:**  Why shouldn't you do it sooner than that?

        **MR. DAVIDSON:**  The reason is we've been speaking with
a number of individuals who may want to join.  A principal
concern that they have expressed is that by publicly joining
the lawsuit, they would be subject or their families would be
subject to retaliation and immigration consequences.  So one
thing they would hope to be able to do is to proceed under a
pseudonym, and we've been discussing that possibility with
everyone.

        **THE COURT:**  You know, I have allowed pseudonyms on
rare occasion, but we are a public institution and the public
has a right to know who it is that's seeking the relief of the

1    court.  I won't say no to it, but that's not an automatic

2    grant.  I feel very strongly that we are a public institution

3    and all those people out there have the right to know what goes

4    on here and who it is it wants the court to do something.

5         So if they join in the case, they might have to do -- I

6    don't know.  Did the -- let me ask the Cotchett firm.

7         Aren't you -- who is the one that has the six people?

8              **MS. FINEMAN:**  Not us.

9              **MR. DETTMER:**  That's us, Your Honor.

10             **THE COURT:**  Okay.  Did you name your six people?

11             **MR. DETTMER:**  Yes.

12             **THE COURT:**  So they're out there taking that risk

13   right now.  So I don't know.  I won't say no, but that's not a

14   clear-cut winner for you.

15             **MR. DAVIDSON:**  We understand the hurdles.  I mean, to

16   be concrete about it, they're worried that if they join this

17   lawsuit and seek the relief that we think they're entitled to

18   under the law, that the Government will retaliate by deporting

19   their parents.  So if we --

20             **THE COURT:**  People file lawsuits all the time and they

21   have to worry about that.  They're not alone.  And so I just

22   cannot say yes to that now, and you take that into account.  I

23   won't say no to it either.  You can make a formal motion to

24   that effect.

25        Now, you're not thinking about amending to add new -- are

1  you thinking that you would add substantive new claims into

2  your complaint?

3      MR. DAVIDSON:  We're not expecting that right now,

4  Your Honor.  There are other claims that have been raised in

5  the other cases and it's possible we would want to be able to

6  assert those as well, but we're not anticipating that right

7  now.

8      THE COURT:  No, you can't do this to me.  We can't

9  have a -- we're off and running on a whole set of many -- a

10 long list of claims, and here you are making it muddying the

11 waters, and I don't know what the claims are going to be.  I

12 don't even have your final pleading yet.

13     So I would say October 6 is pretty late to be doing that.

14 You should be doing it sooner than that.  I'd say by the end of

15 this month you should have whatever additional pleading you're

16 going to have ready to propose.  So that's my -- I won't say

17 never.  I'll just say that's my recommendation to you.

18     Okay?

19     MR. DAVIDSON:  Very well.

20     THE COURT:  All right.  I have one other thought that

21 you might think is a little odd, but I do it in other kinds of

22 cases.  It's kind of like a tutorial.  I know a little bit

23 about immigration law and immigration procedure but not a lot.

24 It's what I've picked up over the years on immigration cases,

25 and I wouldn't mind having a session sometime in the next month

1 on a date we could find that works for maybe a two-hour session

2 where both sides get to help educate me without argument.

3 You know, it's not to give me argument. It's just to

4 explain to me, for example, the history of deferred action, the

5 history of how deportation works, and what the difference is

6 between deportation and removal, for example, but the main

7 points of the immigration process that have any bearing on this

8 case, but it would not be an opportunity to argue. It's

9 background kind of to help me get into the law.

10 Is that something you would be interested in doing?

11 **MR. DETTMER:** Yes, Your Honor.

12 **MS. FINEMAN:** Yes.

13 **MR. ZAHRADKA:** Yeah.

14 **THE COURT:** Ms. Winslow, you're not saying much?

15 **MR. SHUMATE:** The one question we had, Your Honor, is

16 are you expecting testimony, or --

17 **THE COURT:** No, no, no. It would just be the lawyers

18 presenting it. The lawyers would present it. You could have

19 cartoons that would help me understand the process; you know,

20 step one, step two, step three.

21 I'm telling you, I learn a lot in these tutorials and if I

22 have to sift through it all -- if I have to go through

23 voluminous briefing and it's all on a crunch basis and then in

24 addition I've got to learn the immigration, you can see the

25 problem. I would rather learn a little bit as we go so it

1  would help me.  I'm just suggesting sometime in the next three

2  weeks, four weeks we might have such a session.

3      **MR. DETTMER:**  Your Honor, Ethan Dettmer.

4      I think that's a great idea.  I just wanted to ask:  What

5  sort of format would be best?  Would you like a PowerPoint and

6  somebody just sort of going through the process and explaining

7  it, or what --

8      **THE COURT:**  No, no.  A limited number of PowerPoints

9  would be great, like five.  Not -- you know, I don't know if

10 you do patent cases.  In the patent cases they just overwhelm

11 me with 42 slides.  I don't want that.

12     It would be three or four slides, maybe a big poster board

13 where you would lay out here's the step one in the process,

14 step two.  You could -- another one would be how the DACA

15 program itself has been -- I bet you, you both would almost

16 stipulate to that, but I don't -- you-all know it.  I don't

17 know it yet.  So how the DACA program has been implemented.

18     I'd come up with a list, and I think it could all be done

19 in an hour and maybe each side does five to seven or eight

20 slides and poster boards, and it would be tutorial in nature,

21 not argument.  It would not be part of the argument on the

22 case, and you'd show each other what you're going to present

23 beforehand so that if somebody had an objection, maybe you

24 could work it out.

25     **MR. DETTMER:**  We'd welcome the opportunity,

1    Your Honor.

2          **THE COURT:**  What do you think of the idea lawyers

3    doing it?

4          **MR. SHUMATE:**  I think it's a good idea, Your Honor.

5          **THE COURT:**  Okay.  Good.

6          **MR. DETTMER:**  Do you have a date in mind, Your Honor?

7          **THE COURT:**  It depends a bit on the things that I

8    don't want to get into right now but, yeah, it would be around

9    three to four weeks from now.  It would be roughly about -- a

10   little bit before your first brief is due.

11         **MR. DETTMER:**  Okay.  Do you want to just send us an

12   order on the date?

13         **THE COURT:**  Yeah.  I would give you an order on that.

14         **MR. DETTMER:**  Okay.

15         **MR. ROSENBAUM:**  You know what might be helpful,

16   Your Honor?  If the Court had specific questions --

17         **THE COURT:**  You've got to come up here.  The court

18   reporters can't -- yeah, it would be helpful if I knew what the

19   specific questions were, but I don't yet know.

20         **MR. ROSENBAUM:**  Well, if you develop questions about

21   the questions and present it to us, that would also help us

22   focus.

23         **THE COURT:**  Of course.  I will definitely do that.

24   I've been reading up on immigration law in the last couple of

25   days trying to -- for example, one of the questions I have:

1  What was the origin of the phrase "deferred action"?  Well, it

2  has a history, and I'm still trying to learn that history.

3  It's not the -- this is not the only kind of situation where

4  the former INS has used deferred action.

5      But there are other phrases like that.  I can't remember

6  what it was.  I had another one that had me going for a while.

7  So I will give you a list of some things, but in general it's

8  how the immigration process, the removal process, the -- here's

9  another one I had.

10     Is it true -- somewhere I read that someone like a dreamer

11  who is in this country, if they got deported, they couldn't

12  come back for 10 years.  Is that right?  Is that the way it

13  works?  See, I don't -- but that's what it seemed to be saying.

14     **MR. ROSENBAUM:**  So we'll present the information as we

15  think will be instructive to the Court, but any questions that

16  Your Honor has along the way, we'd be pleased to answer as well

17  as that.

18     **THE COURT:**  Okay.  Does anyone even know the answer to

19  that thing that I just said?  If a dreamer were to be deported

20  today --

21     **MR. ROSENBAUM:**  That's correct; Your Honor.

22     **THE COURT:**  What?

23     **MR. ROSENBAUM:**  That's correct.

24     **THE COURT:**  It would be a 10-year bar; is that right?

25  Does the Government know?

1          **MR. SHUMATE:**  I can't speak to that, Your Honor.

2          **THE COURT:**  All right.

3          **MR. ROSENBAUM:**  Your Honor is correct.

4          **THE COURT:**  Okay.  I read that, but I said that's

5     pretty harsh.  Maybe -- but it didn't say "dreamer."  It just

6     said -- it was a neutral statement.

7          Okay.  So we might have a tutorial.

8          All right.  I think I've done all the damage I can do for

9     today, and I'll get out an order that summarizes what we've

10    done.  Good luck to both sides.  Thank you very much.

11         **ALL:**  Thank you, Your Honor.

12              (Proceedings adjourned at 11:52 a.m.)

13                        ---oOo---

14

15                  **CERTIFICATE OF REPORTER**

16         I certify that the foregoing is a correct transcript

17    from the record of proceedings in the above-entitled matter.

18

19    DATE:   Friday, September 22, 2017

20

21

22

23    _____

24         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

25

**OCTOBER 16, 2017 TRANSCRIPT OF PROCEEDINGS, DKT. NO. 78**

**Pages 1 - 63**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

REGENTS OF UNIVERSITY OF      )
CALIFORNIA, ET AL.,           )
                              )
         Plaintiffs,          )
                              )
  VS.                         )      **NO. CV 17-05211-WHA**
                              )
UNITED STATES DEPARTMENT OF   )
HOMELAND SECURITY, ET AL.,    )
                              )
         Defendants.          )
_____)
STATE OF CALIFORNIA, ET AL.,  )
                              )
         Plaintiffs,          )
                              )
  VS.                         )      **NO. CV 17-05235-WHA**
                              )
DEPARTMENT OF HOMELAND        )
SECURITY, ET AL.,             )
                              )
         Defendants.          )
_____)
CITY OF SAN JOSE,             )
                              )
         Plaintiff,           )
                              )
  VS.                         )      **NO. CV 17-05329-WHA**
                              )
DONALD J. TRUMP, PRESIDENT OF )
THE UNITED STATES, IN HIS     )
OFFICIAL CAPACITY, ET AL.,    )
                              )
         Defendants.          )
_____)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

DULCE GARCIA, ET AL.,           )
                                )
          Plaintiffs,           )
                                )
   VS.                          )      **NO. CV 17-05380-WHA**
                                )
UNITED STATES OF AMERICA, ET    )
AL,                             )
                                )
          Defendants.           )
_____ )


San Francisco, California
Monday, October 16, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs in CV 17-05211-WHA:
                    COVINGTON & BURLING LLP
                    One Front Street -- 35th Floor
                    San Francisco, CA 94111
          **BY:  JEFFREY M. DAVIDSON, ESQUIRE**

For Plaintiffs in CV 17-05235-WHA:
                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street
                    San Francisco, CA  94105
          **BY:  KEVIN YEH, ESQUIRE**

For Plaintiff in CV 17-05329-WHA:
                    COTCHETT, PITRE & MCCARTHY, LLP
                    840 Malcolm Road
                    Burlingame, CA  94010
          **BY:  NANCY L. FINEMAN, ESQUIRE**



Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

APPEARANCES CONTINUED:

For Plaintiffs in 17-05380-WHA:
                        OFFICE OF THE ATTORNEY GENERAL
                        State of California
                        Department of Justice
                        1515 Clay Street - Suite 2000
                        Oakland, CA  94612
              BY:  **JAMES ZAHRADKA**
                   **DEPUTY ATTORNEY GENERAL**

For Defendants:
                        U.S. DEPARTMENT OF JUSTICE
                        Civil Division
                        20 Massachusetts Avenue, N.W.
                        Washington, DC  20001
              BY:  **BRAD P. ROSENBERG, ESQUIRE**

1   <u>**Monday - October 16, 2017**</u>                    **11:00 a.m.**

2                      **P R O C E E D I N G S**

3                          **---oOo---**

4        **THE CLERK:**  Calling In Re:  DACA cases; CV 17-5211, CV

5   17-5235, CV 17-5329, and CV 17-5380.

6        Counsel, please approach the podium and state your

7   appearances for the record.

8        **MR. DAVIDSON:**  Good morning, Your Honor.  Jeffrey

9   Davidson, Covington & Burling, on behalf of the plaintiff,

10  University of California.

11       **THE COURT:**  Thank you.  Welcome.

12       **MR. ZAHRADKA:**  Good morning, Your Honor.  James

13  Zahradka for the Attorney General's Office, representing the

14  states of California, Maine, Maryland, and Minnesota.

15       **THE COURT:**  Great.  Welcome to you, too.

16       **MS. FINEMAN:**  Good morning, Your Honor.  Nancy

17  Fineman -- Cotchett, Pitre & McCarthy -- for plaintiff, City of

18  San Jose.

19       **MR. WEISSGLASS:**  Good morning, Your Honor.  Jonathan

20  Weisglass from Altshuler Berzon.  I'm counsel for the

21  plaintiffs in the Santa Clara cases which we are seeking to

22  relate to these cases.

23       **THE COURT:**  I'm going to relate them.  I thought I

24  already had, but maybe the time hasn't run for that.

25       You are the fifth case; right?

1          **MR. WEISSGLASS:**  Yes, Your Honor.  I'm really just

2     here to observe today and make sure that we can fit in

3     efficiently.

4          **THE COURT:**  Thank you.

5        There is a fourth case that somebody is not here on.  Who

6     is the fourth case?  Anybody remember?

7          **MR. YEH:**  Judge, this is Kevin Yeh from Gibson Dunn.

8     I have not appeared in the case.  I'm just here to observe.

9          **THE COURT:**  But your firm is in the fourth case;

10    right?

11         **MR. YEH:**  Yes.

12         **THE COURT:**  Why doesn't somebody from your firm appear

13    at the counsel table?

14         **MR. YEH:**  The partner is in Washington for an

15    unexpected deposition.

16         **THE COURT:**  Why don't you come up here anyway.  Maybe

17    you can be of use at due course.

18       What is your name again?

19         **MR. YEH:**  Kevin Yeh, Y-E-H.

20         **THE COURT:**  Okay.  So now you have appeared.

21         **MR. YEH:**  Thank you.

22         **THE COURT:**  All right.  On their side.

23         **MR. ROSENBERG:**  Good morning, Your Honor.  Brad

24    Rosenberg from the Department of Justice, Civil Division,

25    Federal Programs Branch, on behalf of all defendants.

1          **THE COURT:**  Thank you.

2          All right.  We are here on an issue that concerns the

3     Administrative Record and more or less an emergency motion by

4     most of or all of the plaintiffs to augment, supplement, the

5     Administrative Record that was filed by the agency just a few

6     days ago.

7          So as a first matter, I had sent out an order asking the

8     Department of Justice to supply me with materials that are set

9     forth in the October 10 order.  And at least for present

10    purposes, you can do this on an *ex parte* -- not *ex parte* -- but

11    on an *in camera* basis, but I can't promise you that I won't

12    order it to be produced.  I might in fact order it to be

13    produced, but until I see it I can't -- but I do need for you

14    to hand that up.  It looks like that's it right over there.

15         **MR. ROSENBERG:**  Your Honor, these are the documents.

16    I would ask and, if necessary, move that before the Court

17    considers releasing the documents, that it stay that order so

18    that we can have an opportunity to seek appellate relief.

19         **THE COURT:**  I'll consider that.  Time is of the

20    essence in this case, but that's a legitimate request.  I will

21    consider that.  I can't promise anything anymore, but I will

22    consider it.

23         **MR. ROSENBERG:**  Thank you.

24         **THE COURT:**  Please hand it to the clerk.

25         I have no idea what's in there.  Just for the record, it

looks like about -- what would you all say?  Three inches, four

inches worth of materials in a big brown envelope; right?

**MR. ROSENBERG:**  It is about three inches of materials

in a sealed brown envelope.

We take the position that we are under the order of this

court to provide those materials.  We have moved -- if the

Court were to release those materials or consider releasing

those materials or otherwise make them a part of the public

docket, that would effectively be a move that could not be

undone by this Court because once those materials are out in

the public domain, they could not be retrieved back.

We view these materials as being very sensitive,

reflecting numerous privileges, and so as reflected in our

colloquy a few minutes ago, we do move that if the Court does

consider releasing these materials, that it provide us with

time to seek appellate review in consultation with the

Solicitor General's office on an expedited basis.

**THE COURT:**  That's a reasonable request.  Without

looking at them, there may be reasonable reasons not to do so,

but I understand your point.  I will try to honor that, if I

can.

Okay.  I don't have time to look at these materials now,

so I'm going to proceed with the rest of the hearing without

knowing what's in this package because we're here on an

expedited basis at the request of the plaintiffs.  I'm here to

1    listen to what you have to say and just to start off by saying

2    what would be of most benefit to the Court at this hearing at

3    some point soon would be to hone in on very specific types of

4    documents or materials that you feel ought to be in the

5    Administrative Record as opposed to generalized blather,

6    meaning if you just give me platitudes, I don't know how that

7    translates to anything.  If I'm going to give you an order in

8    your favor, I need to say very specific categories of documents

9    ought to be included, and so at some point, we need to zero in

10   on that issue.

11        But you can begin any way you wish.

12        State your name again please.

13        **MR. DAVIDSON:**  Jeffrey Davidson, Covington & Burling

14   on behalf of the Regents of the University of California.

15        **THE COURT:**  Go ahead.

16        **MR. DAVIDSON:**  Your Honor, if I might start where this

17   began, which is the contents of that mysterious envelope that

18   is on the bench, we do have serious concerns about whether the

19   government complied with the order about what they were to

20   bring to the hearing.

21        The Court's order was that the government was to bring to

22   the hearing -- and I quote -- "hard copies of all emails,

23   internal memoranda, and communications with the Justice

24   Department on the subject of rescinding DACA," unquote.

25        From the Government's papers, we derived that what they've

1  chosen to put in that envelope is only documents in the

2  possession of the Secretary of Homeland Security and that they

3  would not have included, for example, emails with -- lower down

4  within the Department of Homeland Security, emails between the

5  Department of Homeland Security and the Department of Justice,

6  or other documents that were not physically and personally

7  possessed by the Secretary of Homeland Security.

8       **THE COURT:** When I read that part of the brief, I

9  paused over that and wondered if it was in compliance with the

10  way they had -- I had before me my order, but read to me the

11  language from the Justice Department's brief that makes us

12  wonder whether or not they complied.

13     Here comes some -- you need to be prepared next time.  I

14  have very little time this morning, about an hour, so we

15  need -- you need to have this at the ready next time.

16     Okay.  Your counsel has rescued you.  Go ahead.  Read it

17  please.

18       **MR. DAVIDSON:** Thank you, Your Honor.  It's on page 4,

19  beginning line 2, of the Government's opposition.

20       **THE COURT:** All right.

21       **MR. DAVIDSON:** It said, "In addition, defendants will

22  bring hard copies of those documents identified in the

23  Privilege Log to the October 16th hearing."

24     And if the Court were to go to the Government's

25  certification about what's included in the Privilege Log, which

1    I do have at the ready, they say -- and this is the eight-line

2    certification which is at this Court's Docket No. 64.  It says,

3    "The Administrative Record attached to this filing as Exhibit 1

4    is a true, correct, and complete copy of the non-privileged

5    documents that were actually considered by Elaine C. Duke, the

6    acting Secretary of Homeland Security."

7         And so --

8              **THE COURT:**  I don't know what that means.

9         This is what I wanted to be in this envelope:  Anything in

10   the world that the agency has on the subject of rescinding

11   DACA, whether it was with the Justice Department or not.

12        It couldn't be clearer, "all copies of emails, internal

13   memoranda and communications with the Justice Department on the

14   subject of rescinding DACA."

15        So if there is an email within DHS that says, "We're going

16   to rescind DACA" or "here are the reasons" or "here are not the

17   reasons" or "here is why we should or should not do it" -- that

18   email, even from somebody four levels down, would have to be

19   included.

20        Same thing with internal memos because people don't always

21   communicate by email; sometimes there is a memo.  Or

22   communications with the Justice Department.  All of those are

23   meant to be included here.

24        Now, that doesn't mean they get put into the

25   Administrative Record.  That just means I get to look at it to

1  see if I think it should be in the Administrative Record

2  because it's hard for me to imagine all the possibilities.

3      Now, let me just ask flatout to the government, did you

4  follow what I just said or did you -- is it truncated?

5      **MR. ROSENBERG:**  Your Honor, we did not interpret the

6  order in the way that you're expressing it now.  What is

7  reflected in that envelope are the documents that were in the

8  Privilege Log that we provided.  There are two reasons why we

9  provided the documents in this form.

10      First, I would direct the Court to the numerous

11  declarations that we provided with our opposition brief.  We

12  have been working around the clock, and there have been -- we

13  have collected in the neighborhood of hundreds of thousands, if

14  not millions, of emails that we have to sort through, sift, and

15  collect, to figure out what would or would not be responsive to

16  the request as plaintiffs have put it in terms of the scope of

17  the Administrative Record.

18      **THE COURT:**  There can't possibly be a million emails

19  on rescinding DACA.

20      **MR. ROSENBERG:**  No, it's not -- and I apologize,

21  Your Honor.  It's not a question of whether there are a million

22  emails, but in order to respond to plaintiffs' position as to

23  what needs to be in the Administrative Record, both DHS and

24  DOJ, even though we do not think that DOJ is responsible for an

25  Administrative Record because it's not the relevant agency

1    here, have to first identify all relevant custodians who might

2    have any potentially responsive records.  Then those documents

3    need to be retrieved in a forensically sound manner and

4    processed.

5         There are -- we have this in the declarations so I don't

6    want to misspeak as to the volume, but it is literally

7    enormous, and so it would have been impossible for us to

8    provide all of those documents, and we believe that that is

9    well-supported by the declarations we provided.

10        **THE COURT:**  All right.  It's one thing to say I asked

11   you to do the impossible.  It's another thing to say you're not

12   going to do it.

13        Now, if what I hear you saying is you will do what I

14   ordered you to do but you need more time, then I will be

15   reasonable and give you more time, if that's -- in my

16   assessment of this, this is such a recent event that I'm --

17   this is a guess -- that there are less than a thousand relevant

18   emails, less than 20 relevant internal memos that would be

19   covered by this, and that you could do computer searches and

20   probably find a pretty good -- with 90 percent assurance that

21   you got all the materials from your email database.  Then you'd

22   have to process them to get those one thousand emails and go

23   through and say okay, we're going to assert privilege over

24   these, not over those.  Nevertheless, all of them have to be

25   produced to me so that I can do my job of sorting through there

1    to see which ones should or should not have been in the

2    Administrative Record.

3        So we'll come back to -- I think you fell short in

4    complying with my order.  But if the reason is that it was

5    physically impossible, then I'm sympathetic.  If it was that

6    you just disagree with my authority to do what I'm ordering you

7    to do, then we have a problem.

8        Which is it?

9        **MR. ROSENBERG:**  We certainly do not disagree with your

10   authority on that, Your Honor.  That is why I came here with

11   the envelope.

12       But we also do think that our interpretation of the order

13   was certainly a reasonable one in light of the fact that we are

14   here today on plaintiffs' motion on which this Court has not

15   yet ruled.

16       We have provided those documents that we do not think are

17   part of an Administrative Record because we don't think that

18   privileged documents constitute a part of an Administrative

19   Record.  We recognize that plaintiffs disagree with that

20   position.  But we've, nevertheless, provided those documents

21   that we've identified that were relevant or at least that were

22   as part of the acting Secretary's DACA file, so to speak, and

23   so we have provided the documents that we had prepared in

24   conjunction with the Administrative Record that we provided to

25   the Court.

1    Now, if this Court were to order relief of some sort that

2  expands the scope of what would constitute the Administrative

3  Record, then we would have to potentially search for and

4  identify additional documents.

5    But we are here scratching our heads, as perhaps the Court

6  is, wondering what is it that should in fact be in this

7  Administrative Record.

8    Because this is not a typical case in which, you know, you

9  have an agency rule-making, for example, and there are many

10 comments, there are hundreds of thousands of comments that are

11 submitted by the public, and those comments may or may not

12 filter up to the ultimate decision-maker, nor is this a case of

13 an APA formal rule making where there might be an adjudicatory

14 proceeding and those type of indirect materials to which

15 plaintiffs have referenced in their motion would actually be

16 indirectly part of the record, even if not directly considered

17 by the decision-maker.

18    **THE COURT:** Well, right now it's what -- the Ninth

19 Circuit standard is whatever was directly or indirectly

20 considered by the agency at the time that they made this

21 decision.

22    And then we may have to scratch our heads -- after we get

23 to see what the full deck of cards is, we may scratch our heads

24 as to whether or not any of those cards make any difference,

25 but I think you've got the cart before the horse.  You're

trying to say well, since this is a legal issue, then nothing really matters except what the judges say. That's one way to look at it.

But what if, for example, there are memos in there saying this -- what we're about to do is illegal or this is incorrect, it's an incorrect -- and it would just totally undercut your position that the agency made a reasonable decision and just reversed its legal -- you know, the legal interpretation used to be the exact opposite of what you're espousing now.

So I don't know what's in there. I think we have to see what's in there first before we can assess what its impact should be on the ultimate decision under the arbitrary and capricious standard.

So I -- no. We get to see the evidence first. Then we'll decide.

Now, what I want to do is go through some specific categories. I want to get -- you can stay right there, please. We've got two lecterns.

Let's go through some specific categories of things that you think ought to be in the Administrative Record that you, on the plaintiffs' side, could help me identify. I'll just give you a hint for the first one to give you an example of what would be useful to me.

In February of this year, as I understand the history, then Secretary of Homeland Security -- was it Kelly?

1          **MR. DAVIDSON:**  Yes.

2          **THE COURT:**  -- Kelly affirmatively issued an

3   announcement saying that the DACA program would be continued.

4   Am I right about that or not?  Is that true?

5          **MR. DAVIDSON:**  He did.  He did.

6          **THE COURT:**  Okay.  So one thing you could be arguing

7   for is that since these are the same agency, the same question

8   close in time, that that reversal of that initial position

9   should be part of the Administrative Record.  That's a cogent

10  concept that I can -- that's the kind of example of a

11  collection of materials that we should have available to us to

12  consider that I can understand.

13      All right.  Now, I tend to agree that that ought to be in

14  there.  Why isn't that in there?

15      Now, returning to the government, why isn't Secretary

16  Kelly's decision and whatever he relied upon and -- indirectly

17  or directly, why isn't that also part of this record?

18          **MR. ROSENBERG:**  Well, a couple of things, Your Honor.

19  I mean, first I do want to draw the Court's attention to the

20  Administrative Record because the memo is in the record at

21  page --

22          **THE COURT:**  The decision memo --

23          **MR. ROSENBERG:**  The February decision memo to which

24  the Court is referring.

25      He did not affirmatively take a position on DACA.  He

simply excluded it from the modification of the agency's update

to its guidance. So I think it is overstating it --

THE COURT: That's possibly a good point. Let me see

if I can find that in this very -- which --

MR. ROSENBERG: It's page 230 of the Administrative

Record, ECF 64-1 at 230.

THE COURT: All right. 230. What I have only goes up

to page 125 or so -- oh, wait. Here's the second part. 230.

All right. I'm at 230.

MR. ROSENBERG: If you look the at top paragraph, that

sets forth the extent to which the memo addresses the DACA

program.

THE COURT: I'm sorry. This is page -- do you agree,

Mr. Davidson, that page 230 is where I should be looking?

MR. DAVIDSON: Yes, Your Honor. Very beginning of the

page starting with the language "With the exception of the

June 15th, 2012 memorandum."

THE COURT: All right. So it says, "With the

exception of the June 15, 2012 memorandum entitled *Exercising*

*Prosecutorial Discretion with Respect to Individuals Who Came*

*to the United States as Children*, and the November 20, 2014

memorandum entitled *Exercising Prosecutorial Discretion with*

*Respect to Individuals Who Came to the United States as*

*Children and with Respect to Certain Individuals Who Are the*

*Parents of U.S. Citizens or Permanent Residents,* all existing

1    conflicting directives, memoranda, or field guidance regarding

2    the enforcement of our immigration laws and priorities for

3    removal are hereby immediately rescinded -- to the extent of

4    the conflict -- including, but not limited to, the November 20,

5    2014, memorandum entitled *Policies for the Apprehension,*

6    *Detention and Removal of Undocumented Immigrants and Secure*

7    *Communities."*

8         What that is saying is a lot of things got revoked on

9    February of this year, but the DACA memorandum did not get

10   revoked.

11        **MR. ROSENBERG:**  It was carved out, essentially.

12        **THE COURT:**  It was carved out.  Okay.  All right.  So

13   your point is it wasn't affirmatively re-validated.  It was

14   just left out of the revocation for the time being.  That's

15   your spin on it; right?

16        **MR. ROSENBERG:**  That's the way that I read that

17   document, Your Honor.

18        **THE COURT:**  Your spin on it is what, Mr. Davidson?

19        **MR. DAVIDSON:**  Well, I don't know if it's spin.

20        There was a conscious decision at the time to rescind all

21   guidance about prioritization for removal except for the DACA

22   program.  So there was a deliberate and explicit choice to

23   leave the DACA program in place in February.

24        **THE COURT:**  Well, that's true.  That is true.  That's

25   the way I read it, too.  But it also left in place the one

1  about --

2  **MR. DAVIDSON:**  It's called DAPA.

3  **THE COURT:**  -- the one about parents.  But the one

4  about parents the Fifth Circuit invalidated; right?

5  **MR. DAVIDSON:**  They did, Your Honor.

6  **THE COURT:**  All right.  But that was before.  That

7  happened before this; correct?

8  **MR. DAVIDSON:**  It did, Your Honor, and if you look at

9  Footnote 1 at the bottom of the page, it says, "The November

10  20th, 2014 memorandum will be addressed in future guidance."

11  The November 20th is the memorandum that relates to the

12  parents.  So it's leaving out DACA.  It's not --

13  **THE COURT:**  So maybe what that means is that DACA will

14  survive, but parents will not, in light of the Fifth Circuit

15  decision.

16  **MR. DAVIDSON:**  It may be, Your Honor.

17  The only point we're making is that there was a process

18  that occurred at the Department of Homeland Security prior to

19  this memorandum being issued, and there had to be -- and I

20  don't hear the government denying that there was --

21  consideration about whether to include the DACA program in this

22  memorandum or not.

23  **THE COURT:**  That's a fair point.  Here it is, February

24  of this year, the Secretary of Homeland Security makes a

25  conscious decision to carve out, as you put it, the DACA

program, and that's in the face of and in the teeth of the
Fifth Circuit decision, and I've just got to believe that
somewhere within the agency, there was memoranda, emails, that
discuss the advisability of that or the non-advisability of
that and which then in turn bear upon the very subject of the
thing that brings us here today, which is the eventual
revocation or rescission, I should call it.

Shouldn't that be in the Administrative Record being so
close in time, so close on subject, same agency?

**MR. ROSENBERG:** Well, I guess I would say a couple of
things, if I may, Your Honor, on that.

First, I think the proper way to review this issue and
decide what should be in the Administrative Record is to look
at the decision itself rather than start by looking at
documents or potential documents and try to construct
something, because that's the opposite of what the APA provides
for and what Supreme Court precedent and D.C. Circuit precedent
provide for.

So I would direct the Court -- and bear with me on this --
but I would direct the Court to the actual rescission decision
itself, which is on page 255 of the Administrative Record that
we have provided.

**THE COURT:** All right. Let's look at that. I'm going
to bear with you for a minute and see where that leads us. All
right. 255. All right.

1      **MR. ROSENBERG:**  Now, while you're looking for that, I

2   think an important piece of context here is that the February

3   2017 memo was issued many months before the State of Texas and

4   the fellow plaintiffs in that case threatened to bring a

5   preliminary injunction --

6           **THE COURT:**  You know, I must say about that, was that

7   even in writing?  Was that threat in writing someplace?

8           **MR. ROSENBERG:**  Yes.  That's in our Administrative

9   Record as well, Your Honor --

10          **THE COURT:**  Show me.  I want to see that.  I have

11  never seen the United States Department of Justice back down so

12  quickly as they have backed down in the face of a threat.  To

13  me -- okay.  All right.

14      Show me where that earthshaking threat is.

15          **MR. ROSENBERG:**  I'm looking for it right now.  It's in

16  the Administrative Record starting on page 238.

17          **THE COURT:**  All right.

18          **MR. ROSENBERG:**  Running through page 240.

19          **THE COURT:**  Okay.  This is dated June 29, 2017,

20  addressed to the Attorney General, and it's from, it looks

21  like, Ken Paxton, Attorney General of Texas.

22      And we don't have time to read it all, but I see a key

23  paragraph says, "For these same reasons that DAPA" --

24  D-A-P-A -- now, that's what was decided by the Fifth Circuit

25  was illegal -- "and expanded DACA unilateral Executive Branch

1  conferral of eligibility for lawful presence and work

2  authorization was unlawful, the original June 15th, 2012, DACA

3  memorandum is also unlawful."

4      All right.  So then -- now, that's exactly contrary to

5  what the agency itself had said, but, okay, that's the position

6  of Ken Paxton.

7      And now we go further down.

8      "We respectfully request that the Secretary of Homeland

9  Security phase out the DACA program.  Specifically, we request

10  that Secretary of Homeland Security rescind the June 15, 2012,

11  DACA memorandum and order that the Executive Branch will not

12  renew or issue any new DACA or expanded DACA permits in the

13  future."

14      So they say what the request is.

15      And they say if you do all of that, then the plaintiffs

16  will dismiss their lawsuit; otherwise, the Complaint in that

17  case will be amended to challenge both the DACA program and the

18  remaining expanded DACA permits.

19      All right.  So there's the threat.  Otherwise, they're

20  going to expand their lawsuit.  And then that's the end of the

21  letter, and it's signed by Attorney Generals of Texas, Alabama,

22  Arkansas, Idaho, Governor of Idaho, Attorney General Kansas,

23  Louisiana, Nebraska, South Carolina, Tennessee, West Virginia,

24  so that's 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- 10 states; right?

25          **MR. ROSENBERG:**  It looks like that, Your Honor, yes.

1          **THE COURT:**  So that's the threat?

2          **MR. ROSENBERG:**  Yes.

3          **THE COURT:**  All right.  So in the face of that threat,

4     the Justice Department of the United States rolled over and

5     said "you win"?

6          **MR. ROSENBERG:**  I would disagree with that

7     characterization, Your Honor.  I mean, in the face of that

8     threat --

9          **THE COURT:**  Well, wait a minute.  Just to be fair now,

10    your Justice Department told the prior administration that this

11    was a lawful program; right?  That's in the -- that's probably

12    in here too, somewhere.

13         **MR. ROSENBERG:**  Well, it is in there, and it is, in

14    fact, one of the documents plaintiffs have accused the

15    government of not including any unhelpful documents, but we did

16    include the OLC memo.

17         The OLC memo addressed the legality of the DAPA program,

18    but there is a footnote in the OLC memo that acknowledges that

19    OLC did verbally opine on the legality of the DACA program, but

20    of course that opinion effectively was superseded by the

21    actions of the Southern District of Texas, the Fifth Circuit

22    and a 4/4 divided Supreme Court that upheld the preliminary

23    injunction against the DAPA program.

24         **THE COURT:**  The original OLC memo that I remember

25    reading the first time you were here, it actually did say that

1    the DAPA program was probably not legal; right?

2         **MR. ROSENBERG:** I think it depended on -- there were a

3    couple of particular permutations of that program that they

4    were opining on, and it depended on -- I would have to take a

5    closer look at that memo.

6         **THE COURT:** I believe it said that the DAPA program

7    was -- for different reasons was illegal, but that the program

8    for the DACA, the children program, was legal, so the Fifth

9    Circuit agreed with the DAPA, D-A-P-A, part of that memo and

10   did not reach the DACA part. So to me, it looks like these

11   Attorney Generals had every right -- if they wanted to litigate

12   the issue of the DACA program, God bless them, that's fine.

13        But I don't understand why the Justice Department just so

14   suddenly decided that its OLC memo was incorrect.

15        **MR. ROSENBERG:** Well, I want to take a step back, and

16   this, in effect, brings us back to where I originally wanted to

17   take the Court, which was page 255 of the Administrative

18   Record.

19        And to be clear, it's not the Justice Department that is

20   the ultimate decision-maker here; it's the Department of

21   Homeland Security. The DACA program was created -- or DACA

22   policy, because it's not a program. The DACA policy was

23   created by the Department of Homeland Security. It was

24   administered by the Department of Homeland Security and it was

25   rescinded by the Department of Homeland Security. So it's

1   ultimately a DHS decision, which is one of the issues that goes

2   to the scope of what the Administrative Record should be.

3        But if the Court -- I don't know if the Court has page 255

4   of the AR in front of it.

5        **THE COURT:**  Yes, I do.  You were making a point on

6   that page, and I probably interrupted you.  So go ahead.

7        **MR. ROSENBERG:**  This is an important point because I

8   think this does help to define what the scope of the

9   Administrative Record should be because the record that exists

10  should be that which is consistent with or would support or

11  include documents that might not support the actual decision.

12       And here on page 255 under the title "Rescission of the

13  June 15th, 2012 DACA Memorandum," the memo says, "Taking into

14  consideration the Supreme Court's and the Fifth Circuit's

15  ruling in the ongoing litigation and the September 4, 2017,

16  letter from the Attorney General, it is clear that the

17  June 15th, 2012 DACA program should be terminated."

18       And the rest of the paragraph goes on to say, "In my

19  exercise" -- "In the exercise of my authority in establishing

20  national immigration policies and priorities, except for the

21  purposes explicitly identified below, I hereby rescind the

22  June 15th, 2012 memorandum."

23       That's the decision that's being challenged in this

24  lawsuit.

25       **THE COURT:**  Fair enough.  Fair enough.

1        But nevertheless, it's the exact opposite of the decision

2    by the very same agency in February where they decided to carve

3    out the DACA program from any revocation.

4        So maybe in that decision record, there will be memoranda

5    that either supports or draws into question the arbitrary and

6    capriciousness arguably of the later action.

7        To me it just sound like you want to put into the record

8    the things that help you and leave out the things that might

9    hurt you.  It could be that putting in the complete record

10   would actually help you.  I don't know.  But until we see the

11   complete record, I just have to take your word for it that this

12   is the complete record, but there are all these events out

13   there that seem so related, they should be in there.

14       **MR. ROSENBERG:**  I think, Your Honor -- I think

15   respectfully that puts the process backwards.  The Court should

16   look at what the ultimate decision was that was made by the

17   agency and use that to define what the appropriate scope of the

18   record should be rather than searching for documents, and

19   plaintiffs have never identified what specific documents they

20   think should be in this record.  They've only identified

21   general categories.

22       But identify the specific -- rather identify specific

23   documents and then try to build a record from the ground up

24   because then this Court would be usurping the role of the

25   agency, a co-equal branch of government, in trying to define

what the basis for the decision is.

    **THE COURT:**  Well, see, this -- let's follow your logic
through, though.  If I were to decide that the agency did have
authority, despite the Fifth Circuit decision to continue the
DACA program, then I guess you would just, at that point, roll
over and say the judge has decided the legal question; the
agency was wrong as a matter of law, so it's not in accordance
with law under the APA, and therefore plaintiffs win.

    Now, would you accept that?

    **MR. ROSENBERG:**  That's not for me to accept, as this
Court knows, Your Honor.

    **THE COURT:**  Well, I think that is -- one scenario
they're looking for on the other side, is that exact scenario.
So I have a feeling that what you're going to back up to before
this is over is, *Well, Judge, it doesn't matter whether what
you think.  What matters is whether the head of the agency
could reasonably, even if incorrect, could reasonably have
drawn this conclusion.*

    Okay.  Once you retreat to that position, all of this
stuff that was in the file becomes highly relevant because it
could undercut the reasonableness of coming to the conclusion
that they didn't have the authority to do it, to do DACA.

    So I think you're trying to have it both ways here.  I
think we need a complete record of what led up to this
conclusion that DACA should be terminated because of the letter

1    from the Attorney General and the Fifth Circuit's rulings.  And

2    then we get to decide whether or not it was a reasonable

3    decision or -- so -- all right.

4        I understand your position.  Time is running out here.

5    Give me -- I'm not making a ruling yet on this, but give me

6    another example of some cogent, concrete category that we can

7    possibly order to be included in the Administrative Record.

8        **MR. DAVIDSON:**  Your Honor, on the rationale leading up

9    to the February decision, I would just point the -- point

10   Your Honor to the case law that we cite in our brief saying

11   that when an agency reverses a decision that they've had

12   before, that that's the -- that you have to take into account

13   what it was that justified the original decision --

14       **THE COURT:**  Well, tell me -- give me the name -- I

15   missed that in your papers.

16       **MR. DAVIDSON:**  So let me give you one citation.  All

17   of this comes from a D.C. Circuit case called *Fox*

18   *Communications*.  Let me give up one I have handy which is

19   *Public Citizen vs. Heckler*, 653 F.Supp 1229, and that's from

20   the district court for the District of Columbia, 1986.

21       But that will point the Court to *Fox Communications* and a

22   number of other cases that say that when the agency reverses

23   course, they have to consider the things that motivated the

24   original decision and provide an explanation for why things

25   have changed.

1        **THE COURT:**  I'll look at that.  Let's go to a

2   different category.  We've already discussed -- give me a

3   different category of documents that you think should be in the

4   Administrative Record.

5        **MR. DAVIDSON:**  Next category is documents that were

6   considered by subordinates to the Secretary of Homeland

7   Security.

8        The government takes the position that only documents in

9   the literal possession of the acting Secretary of Homeland

10  Security are part of the Administrative Record.

11       At a high level, that's inconsistent with *Thompson*

12  *Portland Audubon*, which are the core Ninth Circuit cases about

13  the content of the Administrative Record.

14       *Thompson* --

15       **THE COURT:**  That's the indirect or direct?

16       **MR. DAVIDSON:**  It says indirect or direct and it says,

17  "The full Administrative Record before the agency when it made

18  its decision."  So it's not limited to the documents that are

19  in front of one particular decision-maker.  And it's easy to

20  understand why.

21       Number one, that's not how agency decision-making works.

22  It's not that there is a pile of documents in front of the

23  acting Secretary and she makes the decision and it all happens

24  in a day.  There's a process.  There is a way by which the

25  Department of Homeland Security uses its policymaking apparatus

1    to digest the information and come to a conclusion.

2         **THE COURT:**  But how far down do you go -- how many

3    layers down do you go in the bureaucracy to require production

4    of, let's say, emails, just emails between people four levels

5    down and the agency over whether DACA should be rescinded?  Are

6    you really saying that we've got to go that deep?

7         **MR. DAVIDSON:**  There's a limiting principle, but the

8    limiting principle is more than zero.  You have to go into the

9    policymaking apparatus to figure out what feeds up to the

10   Secretary of Homeland Security.

11       In this case, from the Privilege Log, we know the people

12   that the Secretary was in communication with as she made her

13   decision.

14        **THE COURT:**  Who are those people?

15        **MR. DAVIDSON:**  Well, if you look at the Privilege Log,

16   it identifies several dozen -- several dozen people.

17        **THE COURT:**  Several dozen like 24, 36?

18        **MR. DAVIDSON:**  It's in that neighborhood, Your Honor.

19   I haven't counted them.

20        **THE COURT:**  She had communications with, say, 24 to 36

21   agency personnel on this subject?

22        **MR. DAVIDSON:**  Yes.

23        **THE COURT:**  All right.  Now, pause there for a second.

24        Let me ask the government.  In my experience, a lot of it

25   is done on paperwork, that's true, but there are also verbal

communications made to the Secretary.  I would be surprised

if -- so were there, in this case -- or tell me if you know one

way or the other -- did the Secretary receive any verbal input

on this decision?

**MR. ROSENBERG:**  I would be surprised if she did not.

**THE COURT:**  So what if that was important to the

Secretary in deciding how to make a decision, the verbal input?

**MR. ROSENBERG:**  Again, that's not typically part of an

Administrative Record.  And on this issue as well, I think

there are a couple of points that are critically important.

One is plaintiffs here still have not identified what the

limiting principle for how far down the government would need

to go to create the Administrative Record.  Is it DHS

headquarters only?  Is it USCIS and DHS headquarters?  It is

the potential impacts within Customs and Border Protection and

ICE as well?

Plaintiffs, based on what they filed with the Court as

well as the letter that they sent to us in advance of our

filing of the Administrative Record seemed to think that the

Administrative Record should include any document that opines

on the legality of DACA that's within, initially they said,

anywhere in the Executive Branch but now appear to take the

position anywhere within DHS or the Department of Justice.

Now, again, there can be no Administrative Record within

the Department of Justice because the Department of Justice did

1  not issue a decision in the context of the APA regarding this

2  program.

3      So I think that there -- to the extent that the Court is

4  inclined to provide any form of relief, you know, we do need to

5  identify what the limiting principle is so we know what it is

6  that we're required to search for.

7      I would also remind the Court that plaintiffs in this

8  case, as well as in the New York case, have had the opportunity

9  to serve discovery.  Now, the government vehemently objects to

10 any discovery taking place in this case and thinks that

11 discovery is inappropriate, but we are where we are, and

12 depositions in fact have already begun here as well as --

13      **THE COURT:**  Is there a deposition for this acting

14 secretary scheduled?

15      **MR. DAVIDSON:**  We've asked for it and the government

16 has declined to provide --

17      **THE COURT:**  I think you should give that just because

18 what if she says, just as you indicate is probably the case,

19 that she got verbal input?  That would be good to know what the

20 verbal input was that was given to her before she made her

21 decision.  That alone would justify the deposition, I think.

22      **MR. ROSENBERG:**  So under the apex doctrine,

23 Your Honor, we think that any depositions of senior Cabinet

24 officials is wholly inappropriate.

25      **THE COURT:**  Apex is a loser with em.  I overrule that

1   all the time.  This is too important, even under the apex

2   doctrine.

3       By the way, it's not a doctrine.  That's just what people

4   say when they want to uphold it.  It's just an idea that some

5   judge had somewhere.  Apex doctrine.  The Supreme Court has

6   never validated that rule.

7       In any event, it's not going to fly with me.  That would

8   be a legitimate question to ask the acting Secretary.

9       **MR. ROSENBERG:**  Let me address one other point on

10  that, though, Your Honor.  It relates to the scope of discovery

11  in this case, as well as plaintiffs' request of relief

12  regarding the Administrative Record.

13      This is not a situation in which -- when courts refer to

14  information indirectly considered by the decision-maker,

15  typically what they are referring to in a rule-making context

16  or even a formal rule-making context is factual information.

17      Each and every one of the cases that plaintiffs have cited

18  involves a type of factual information, be it a letter that was

19  before an administrative law judge that ultimately was before a

20  secretary who was the decision-maker or factual reports or

21  studies that are created or developed in the context of a

22  rule-making process or some other process where it's necessary

23  for the Court to be able to evaluate the same factual

24  information that the agency did in reaching its decision in

25  order to determine whether the decision was arbitrary and

1    capricious.

2         That's not what plaintiffs are seeking here.  Virtually

3    all of the categories of information that plaintiffs want are

4    going to be covered by one of several different privileges, be

5    it the work product doctrine because of the pending litigation

6    in the Texas case, the attorney-client privilege because many

7    of these issues involve the seeking or provision of legal

8    advice, the deliberative process privilege because these are

9    internal agency deliberations about how to develop and

10   ultimately rescind a policy, and depending on the

11   circumstances, executive privilege as well.

12        So it's not factual information that plaintiffs want here.

13   What they want to do is go straight to the privileged

14   information that the government possesses.

15        We think that's not properly part of an Administrative

16   Record any more than a law clerk's bench memo is part of a

17   record that a court develops when issuing its decision and

18   Findings of Fact and Conclusions of Law.

19        But it's particularly inappropriate here in light of the

20   fact that these are core decisions that the agencies are

21   making.  And the Court has spoken on its view on the apex

22   doctrine, but that is something I will say that the government

23   feels very strongly about.

24        **THE COURT:**  Well, if it's up to me, I would  --

25   this is, in the first instance, up to the magistrate judge,

Sally Kim, but my own view is I would order that deposition

pronto.

Let me address the point that you made about privilege.

Here, you wrap the entire decision as based on legal

advice, and when you -- at least in my experience, when anyone

decides that they're going to rely on advice of counsel, they

open up that opinion to all of the underlying pros and cons,

everything that was communicated by that lawyer to that client,

including contrary legal advice becomes -- even though it might

have been otherwise privileged, it is now waived, W-A-I-V-E-D,

waived.  And that -- I think that's a serious problem we've got

in this case.

Let me give you an example.  What if there were memos to

the Secretary that said -- that were not produced here or let's

say there -- make it more realistic, they were memos that

didn't go to the Secretary but went to whoever it was that

verbally briefed her.  And the memos said you know, this is a

close call.  Maybe the Fifth Circuit decision doesn't even

apply to DACA.  The Fifth Circuit itself said it didn't apply

to DACA, so maybe we ought to just stick with this, but on the

other hand for political reasons, let's take the position that

it is a legal problem and that there was no authority.  Then

we'll throw it back to Congress and see what Congress does with

it and this is the best way to get to the bottom of it.

Even if this is done for the benevolent purposes of

helping all the children, it does seem to me that that would
undercut your position that this was a reasonable legal
rationale.

Now, maybe that kind of document doesn't exist.  Who knows
until we actually see whether such a document exists?  But that
counsels in favor of a waiver.  In any other kind of case it
would be waiver black and white.  It wouldn't even be close to
question it would be a waiver.  Now, because we're dealing with
the government here, does that same principle apply?  I'm
inclined to think that it does.

So I want to give the government a chance to explain why
the ordinary principle about reliance on advice of counsel, a
waiver of that in circumstances like this, should not apply.
So please answer that question.

**MR. ROSENBERG:**  Well, I think there's a very
straightforward answer and then there is a somewhat more
complicated answer.

The straightforward answer is that the government wouldn't
be able to function if that were the case.  The government is
sued constantly.  In fact, we feel a little bit whiplashed in
this lawsuit because obviously the Justice Department defended
DACA in the Texas case and here we are defending the rescission
of DACA.

So Department of Justice and the government generally has
to make decisions based on litigation risks all of the time.

1    And unlike the *La Raza* case that plaintiffs cited where there

2    was found to be a waiver of deliberative process privilege

3    because the government had explicitly incorporated the analysis

4    of an OLC memo into its ultimate policy, here the only issue is

5    whether it was irrational for the Secretary, acting Secretary

6    of Homeland Security, to decide that there was substantial

7    litigation risks such that DACA should be rescinded.

8        And we did not, the government did not, the Secretary of

9    Homeland Security did not cite any specific studies or analyses

10   on that issue.  And so there is -- unlike the *La Raza* case that

11   plaintiffs cite in their brief, the Second Circuit case, there

12   is no incorporation of those analyses into the government's

13   decision and therefore there's no waiver.

14       **MR. DAVIDSON:**  Your Honor, if I may be heard on that,

15   I mean that's a stunning argument.  They're saying the

16   litigation risk -- the risk of the Texas litigation is what

17   drove the decision.  Well, what if there is a memo there saying

18   but if we rescind DACA, then the State of California, Maine,

19   Maryland, Minnesota, they're going to come sue us.  What about

20   that litigation risk?

21       Or what about the assessment of well, there's a litigation

22   risk so should we just back down and deport 800,000 children

23   who have grown up in the United States and will now be -- isn't

24   it worth fighting for that over a little bit of litigation

25   risk?  How can we assess the veracity or the reasonableness of

1    the government's litigation risk argument without having the

2    other documents that were considered within the Department of

3    Justice?

4             **MR. ROSENBERG:**  Your Honor --

5          **MR. DAVIDSON:**  They put it at issue.  They did not

6    have to assert litigation risk as the reason for what they did,

7    but having done that and saying that that's the basis on which

8    this administrative decision should be upheld, that has to be

9    tested with respect to the whole Administrative Record that was

10   before the agency.

11         **MR. ROSENBERG:**  Your Honor, if I could speak to

12   that --

13         **THE COURT:**  Yes.

14         **MR. ROSENBERG:**  -- a couple of things.

15         **THE COURT:**  Go ahead.

16         **MR. ROSENBERG:**  A couple of things on that,

17   Your Honor.

18       As a threshold matter, taking a step back to the very

19   fundamental principles of this lawsuit, the DACA program is

20   effectively a question -- or DACA policy is effectively a

21   question of deferred prosecution, and we don't think that any

22   of these issues are reviewable for the reasons set forth in our

23   brief based on the *Heckler vs. Chaney* case and the *AADC* case.

24   That's a dispositive argument that we intend to make shortly.

25       Assuming, however, that the Court disagrees, plaintiffs

1   here told the Court that we need to be able to test the

2   government's analysis of whether -- of the litigation risk.

3       What is involved in that test?  Does that mean that this

4   Court has to go in and evaluate for the government whether or

5   not the litigation risk was sufficiently substantial such that

6   the DACA policy should be rescinded?  That's not what the APA

7   provides for.

8       **THE COURT:**  I'm not sure you're right about that.

9   Let's say that you have a memo somewhere in your file that

10  was -- the talking points memo that was used by whoever

11  verbally advised the Secretary.  Let's say there is a memo that

12  says we have a 90 percent chance to win the DACA issue, even in

13  the Texas litigation.  We have a 10 percent chance to lose

14  that.

15      Next bullet point:  If we were to cancel the program, it

16  would disrupt the lives of 800,000 people who have signed up

17  for the program, and wreak havoc.  I'm making it somewhat

18  extreme in order to make the point.

19      So nevertheless, for political reasons and in order to

20  force Congress to come clean on the DACA program, this is what

21  we're going to do.  All these are verbal points made to the

22  Secretary.

23      Now, in a case like that, a judge might say look, that was

24  arbitrary and capricious.  Ninety percent chance you would win

25  and you turned your back on that opportunity and you gave in to

1   10 states who signed that letter.  A judge might say that.

2      A judge might agree with you and say look, it's up to the

3   government to run its own agencies.  That's what elections are

4   all about.  The Republicans won.  They can do what they want.

5   The Democrats -- that's another possible answer.  I'm not

6   ruling on the merits of that now.

7      But I am saying it is a plausible claim under the APA that

8   such a course of action would be arbitrary and capricious and

9   maybe even not in accordance with law.

10      So I'm not so sure that you're right when you say that

11   this is -- it's just -- is the judge going to get in the

12   position -- your point was is the judge really going to get in

13   the position of deciding whether something is a legitimate

14   response to litigation risks?  Of course normally judges don't

15   do that.  You're right about that.  But maybe that's because

16   most of the time those are within the realm of not arbitrary,

17   not capricious.  It's a reasoned decision.  But here you're not

18   giving me enough of a record to see whether we can even test

19   that.

20      So I feel like the government wants me to -- you keep

21   falling back to well, it's a legal decision, it's a legal

22   decision.  Yes, in part, it is a legal decision, but I think

23   there is more to it because you then say well, no, it's just

24   assessment of litigation risks.  That's not quite the same as

25   saying that it's a legal decision.

1    **MR. ROSENBERG:**  Well, I mean, Your Honor, what we are

2    saying is the justification for the rescission of the DACA

3    policy is reflected in the rescission memo itself, which the

4    court has just reviewed.  And the only question that this Court

5    need decide is whether or not that litigation risk, as

6    reflected in the rescission memo, is irrational.

7         And the government's argument will be and it is the view

8    of the government that in light of a preliminary injunction

9    that was issued by a judge in the Southern District of Texas on

10   the DAPA program --

11        **THE COURT:**  DAPA program.

12        **MR. ROSENBERG:**  On the DAPA, D-A-P-A, program.

13        The fact that injunction was upheld by the Fifth Circuit

14   and was then upheld on a 4/4 decision by the Supreme Court and

15   that there is no meaningful way to distinguish the DAPA program

16   or DAPA policy from the DACA policy, that litigation risk was

17   quite substantial.

18        **THE COURT:**  Well, but your own Justice Department for

19   whom you work in the OLC memorandum made exactly that

20   distinction.

21        **MR. ROSENBERG:**  And the OLC is -- obviously opines on

22   various issues, and their opinions carry substantial weight

23   within the Government, but it's not the same thing as a

24   decision from a district court judge entering a nationwide

25   preliminary injunction.

1          **THE COURT:**  But that judge in Texas did not even

2     address DACA.  He never addressed DACA, did he?  Am I wrong

3     about that?

4          **MR. ROSENBERG:**  I don't believe that he explicitly

5     addressed DACA.

6          **THE COURT:**  So it would be, as the lawyer said in that

7     ten -- the ten Attorney Generals, they said they were going to

8     expand their lawsuit to try to include DACA in the case that

9     successfully challenged DAPA.  That is a fair point.

10          But merely including it is not the same thing as saying

11     they were going to win that case.  In the face of the OLC memo,

12     I think there is at least a substantial question.

13          Anyway, this rescission memo nowhere even -- where does it

14     say litigation risks?  It doesn't even say that.  It just -- it

15     says, "Taking into consideration the Supreme Court's and Fifth

16     Circuit's rulings in the ongoing litigation and the

17     September 4, 2017 letter from the Attorney General, it is clear

18     that the June 15, 2012 DACA program should be terminated."

19          **MR. DAVIDSON:**  Your Honor --

20          **THE COURT:**  Does she even mention litigation risks?

21          **MR. ROSENBERG:**  I don't believe it uses those terms,

22     but I think it's implicit in what is stated right there.

23          **THE COURT:**  Did the Attorney General -- let's look at

24     his letter.  Where can I find that in here?  September 4.

25          **MR. ROSENBERG:**  That would be page 251 of the

1    Administrative Record.

2         THE COURT:  Maybe he used that term.  That's one page,

3    September --

4         MR. ROSENBERG:  And the relevant analysis toward the

5    middle of the letter.

6         THE COURT:  Well, the closest on point after going

7    through the Texas litigation, "Because the DACA policy has the

8    same legal and constitutional defects that the Court recognized

9    as to DAPA, it is likely that potentially imminent litigation

10   would yield similar results with respect to DACA."

11       Okay.  So that's a fair point that at least that one

12   sentence says that there is a litigation risk that the -- but

13   on the other hand, it's based on his opinion that the DACA

14   policy has the same legal and constitutional defects that the

15   Court recognized as to DAPA.

16       MR. DAVIDSON:  Your Honor, I'd point you to the top of

17   that paragraph because it's an important point.  Litigation

18   risk is not what this memo is about.  In the --

19       THE COURT:  Which one are you looking at?

20       MR. DAVIDSON:  I'm looking at the second paragraph in

21   the middle of the page.

22       THE COURT:  This is the Sessions letter?

23       MR. DAVIDSON:  This is the Sessions letter.  It starts

24   by saying, "DACA was effectuated by the previous administration

25   through executive action without proper statutory authority and

1    with no established end date after Congress's repeated

2    rejection of proposed legislation that would have accomplished

3    a similar result."

4        Then it says, "Such an open-ended intervention of

5    immigration laws was an unconstitutional exercise of authority

6    by the Executive Branch."

7        He is not saying litigation risk.  He is saying the DACA

8    is illegal.

9        **THE COURT:**  You're right.  That is -- that's true

10   there.  That part is not -- you're right about that.  But the

11   last sentence can be spun to be litigation risks I guess.

12       **MR. DAVIDSON:**  And, Your Honor, I think this points to

13   why there needs to be a complete Administrative Record here --

14       **THE COURT:**  But what is your limiting principle on how

15   far down and how many offices?  Do we go to the regional

16   offices, the district offices?  I can't make them do that.

17   That would be unworkable.

18       There has to be a limiting principle that makes it

19   practical to be able to compile the Administrative Record.  And

20   there you have failed me.  You haven't given me -- you've given

21   me some platitudes, but you haven't given me much help on how

22   to frame an order.

23       **MR. DAVIDSON:**  Until we got the Privilege Log, we did

24   not know, because the government did not say, who else was

25   involved in the policymaking process.  Now that we have the

1    Privilege Log, we know.  We know who is generating the

2    documents that fed into this process, and so those are the

3    people --

4              THE COURT:  Tell me who they are.

5              MR. DAVIDSON:  For instance, there's -- let me get to

6    the Privilege Log.  All right.  So there is Chad Wolf at the

7    Department of Homeland Security.  There is Frank Wuco at the

8    Department of Homeland Security.

9              THE COURT:  How do you spell that last name?

10             MR. DAVIDSON:  W-U-C-O.

11        There is John Mashburn at the White House.  There's

12   Matthew Flynn at the White House.  There's Anthony Paranzino --

13   Paranzino at the White House.

14             THE COURT:  Paranzino.

15             MR. DAVIDSON:  Yes.  There is Kevin McAleenan at the

16   Department of Homeland Security.

17             THE COURT:  Wait.  Now, were these -- let's go back to

18   the first one at the White House.  Who was that?

19             MR. DAVIDSON:  That is John Mashburn at the White

20   House.

21             THE COURT:  Okay.  Now, what makes you think that he

22   wrote any memo that went to someone close to the Secretary at

23   DHS?

24             MR. DAVIDSON:  All of these documents, the only

25   documents that the government logged were documents in the

1 possession and custody of the acting Secretary.

2      **THE COURT:** Is that true?

3      **MR. ROSENBERG:** Yes. I mean, if the documents were

4 either collected electronically from the Secretary or

5 physically from her office.

6      **THE COURT:** All right. So we're not talking about

7 some regional office. We're talking about right there at her

8 office; right?

9      **MR. ROSENBERG:** Physically in the acting Secretary's

10 office.

11      **THE COURT:** Let's just focus on -- is it Mashburn?

12 M-A-S-H?

13      **MR. DAVIDSON:** Correct.

14      **THE COURT:** Explain what the log says about the --

15 what can you glean and how many instances and so forth from

16 him?

17      **MR. DAVIDSON:** Well, he's the recipient of an email

18 from Frank Wuco at Department of Homeland Security. The

19 subject of the email that the government's provided or the

20 description is "email regarding cabinet report containing

21 deliberations on DACA." That's what their log says. And it's

22 August 31st, 2017, so six days before the rescission memo was

23 issued.

24      **THE COURT:** Read it to me again. It went by me too

25 fast.

1    **MR. DAVIDSON:**  Sure, the description of the document

2    is "Email regarding cabinet report."

3        **THE COURT:**  Cabinet report?

4        **MR. DAVIDSON:**  Cabinet, capital C.  "Containing

5    deliberations on DACA."  The date is August 31st, 2017, which

6    is six days before the rescission was announced.  The document

7    was authored, it appears, by Frank Wuco at the Department of

8    Homeland Security.  It copies Elizabeth Newman at the

9    Department of Homeland Security and Chad Wolf at the Department

10   of Homeland Security, and it's addressed to three White House

11   officials.  That's what we know from the Privilege Log entry.

12       **THE COURT:**  Give me one more example, one that

13   involves the White House.

14       **MR. DAVIDSON:**  Your Honor, I think that is the only

15   document that identifies White House personnel.  I would say

16   that their Privilege Log for a majority of the entries does not

17   include any information about who authored, sent, or received

18   the document.

19       **THE COURT:**  Why is that?

20       **MR. ROSENBERG:**  A couple of things, Your Honor.  I

21   mean, some of the documents -- my understanding is that some of

22   the documents, a substantial number, were physically retrieved

23   from the Secretary's office and so there is not going to be a

24   "To"  or a "From" that is associated with that document, unlike

25   an electronic document.

1    The Privilege Log is lengthy.  I don't have the exact

2    number of documents on it, but I believe it's somewhere within

3    the range of a hundred and it was prepared in two days.

4         **THE COURT:**  The two days part I can forgive, but

5    memos, somebody -- some wrote the memo.  Does it even say that,

6    you know, XYZ wrote this memo and it physically wound up in her

7    office?

8         **MR. ROSENBERG:**  I think it depends on the document.  I

9    don't want to speak to the specifics of a document because I

10   don't have them in front of me.  Actually, the Court now has

11   them, although, you know --

12        **THE COURT:**  Are these the ones that -- do I have --

13   all of the ones that are in your privileged log are in this

14   folder?

15        **MR. ROSENBERG:**  The documents that are in the

16   Privilege Log that we filed with the Court are in the envelope

17   that we provided to the Court earlier today.

18        **THE COURT:**  So there's at least a potential solution

19   there that I can review them myself?

20        **MR. DAVIDSON:**  Yes, Your Honor.

21        **THE COURT:**  All right.  So let's -- the time we've got

22   left over, give me another category of material that -- so let

23   me give you a potential limiting factor and you tell me what's

24   wrong with it.

25        I'm not saying this is what I'm going to do.  I'm just

1  trying to figure out how we could get to the -- so any written
2  material that went to the acting Secretary on DACA, I think
3  even the government is saying that that would be produced as
4  part of the Administrative Record; correct?  Written material
5  that was before the Secretary, whether she relied on it or not;
6  right?  That that would be in the Administrative Record?
7       **MR. ROSENBERG:**  Yeah.  I think we would take issue
8  with the inclusion of privileged documents in the
9  Administrative Record.  That's a legal issue.
10      But effectively, that's what we have.
11      **THE COURT:**  Okay.  Wait a minute.  So you would
12 subtract out privilege.  Would you subtract out anything else?
13      **MR. ROSENBERG:**  I believe that there may have been a
14 few documents that were excluded from the Administrative Record
15 because they're not -- they're relatively inconsequential
16 documents that are not typically included as part of an
17 Administrative Record.
18      **THE COURT:**  You mean inconsequential --
19      **MR. ROSENBERG:**  Maybe newspaper clippings, other
20 documents that are not --
21      **THE COURT:**  Why wouldn't those be in there?
22      **MR. ROSENBERG:**  Because that's not something the
23 decision-maker would have relied on.  The agency typically --
24      **THE COURT:**  Even you admit it's not relied upon.  It's
25 considered; right?  Anything that she considered.  So if she

1    glanced at it, read the headline even, that ought to be

2    produced; right?

3            MR. ROSENBERG:  I think it depends on the document,

4    Your Honor.

5            THE COURT:  If it's -- what if it was a newspaper

6    story saying something like "DACA is loaded with criminals."

7    Headline, DACA -- and then it goes on and that's -- it's in her

8    possession.  Of course that would be something everyone should

9    know.

10       I'm inventing that for purposes of example only.  I have

11   no idea whether -- but I think the newspaper stories that she

12   had before her when she made her decision or had read coming up

13   to it or even glanced at part of it, even just seeing the

14   headlines, I think that's enough that it should have been

15   produced as part of the Administrative Record.  You ought to

16   supplement on that.

17       All right.  What else --

18           MR. ROSENBERG:  I'm not saying that there are

19   necessarily those documents --

20           THE COURT:  You said maybe there were.  You said two

21   or three -- all right.  So if the -- what else are you

22   hiding -- not hiding but holding back?

23           MR. DAVIDSON:  May I say --

24           THE COURT:  Wait.  I want the government --

25           MR. ROSENBERG:  I'm not --

1        **THE COURT:**  Privileged newspaper stories.  What else?

2        **MR. ROSENBERG:**  Let me be clear, I'm not aware of any

3   specific newspaper stories.  In fact, I believe that there may

4   be some that are reflected in the envelope that I gave you.

5        **THE COURT:**  But if there are some, you need to produce

6   them.

7        **MR. ROSENBERG:**  Okay.

8        **THE COURT:**  Anyway, is there anything else?

9        **MR. ROSENBERG:**  Not that I'm aware of.

10       **THE COURT:**  Okay.  So now it seems to me that the --

11  she gets memos from people immediately below her, somewhere in

12  the organization, which go to her, and that one limiting

13  principle ought to be that the material that was available and

14  considered by -- pro or con by the people who wrote those memos

15  or emails should be in the Administrative Record.  So that

16  would be one level down.  It wouldn't -- it would be a limiting

17  principle, one level down.

18       So if it was two levels down and we somehow missed it,

19  okay, as a concession to the shortness of life, we've got to

20  draw the line somewhere.

21       But the things that were considered by the people who

22  wrote the emails and things she -- to me, that ought to be

23  included.

24       And same thing for the people who gave her verbal advice.

25  Whatever they considered in giving them verbal advice to the

1  Secretary -- I say acting secretary -- should be turned over.

2  That's a limiting principle that wouldn't be hard to live with.

3      I'm almost out of time.  I will give each of you one

4  last -- I don't have an order for you yet, but I will try to

5  get something out pronto this week.

6      I will give each of you a few minutes to wind up your

7  presentation.  Plaintiffs get to go first.

8          MR. DAVIDSON:  Your Honor, three -- three quick items.

9      First, we know from the public documentation of the

10 decision.  The Department of Justice was intimately involved in

11 making the decision.  The Sessions' letter was given as a

12 partial basis for the decision.  And yet the government has

13 excluded all materials from the Department of Justice from the

14 Administrative Record.

15     So we think --

16         THE COURT:  Well, no, that's not quite true.  The OLC

17 memo is in there; right?

18         MR. ROSENBERG:  Yes.

19         MR. DAVIDSON:  To be more precise, Department of

20 Justice materials in connection with the rescission as opposed

21 to the original --

22         THE COURT:  That's a fair point.

23         MR. DAVIDSON:  Second issue --

24         THE COURT:  Do you have authority that -- in your

25 brief that whenever the DOJ does give advice, that the

1    Administrative Record should include the Department of Justice

2    deliberations, too?

3        **MR. DAVIDSON:**  So I think that point is a little more

4    specific than what we have authority for.  What we show is

5    indirectly or directly considered and so of course that would

6    have to include from other agencies, and then we cite several

7    decisions --

8        **THE COURT:**  No.  You say of course it would, but to me

9    it's not clear it would have to.  I could imagine the Supreme

10   Court going either way on that issue or the Ninth Circuit going

11   either way.

12       So it would be good to know if there is a decision on

13   point that says the DOJ itself has got to have an

14   Administrative Record.

15       **MR. DAVIDSON:**  So there are two district court

16   decisions from other judges in this district.  One I would

17   point the Court to is the *Lockyer* case, and it's page 4 of the

18   Westlaw citation.  And there the government was ordered to

19   produce, among other things, interagency reviews and email

20   exchanges or other correspondence between and among the

21   agencies and/or others involved in the process.

22       So there Magistrate Judge Laporte ordered --

23       **THE COURT:**  But what does "and others involved in

24   the" -- see, the interagency communications, that would just

25   pick up the things that DOJ sent to the Secretary or the

1   agency, but it wouldn't pick up the internal DOJ materials.

2            **MR. DAVIDSON:**  That's right, Your Honor.

3            **THE COURT:**  Unless that phrase -- okay.  So we've got

4   Magistrate Judge Laporte.  I highly respect her.

5       Do you have anything at the Court of Appeals level?

6            **MR. DAVIDSON:**  The Court of Appeals has said is

7   directly or indirectly considered, and to give the Court a

8   roadmap, I mean, let's remember what we're doing here.  The

9   Court has to conduct a thorough, probing, in-depth review of

10  the agency decision.  That's from *Overton Park*.  And in order

11  to do that, the Court needs, quote, the whole record.  That's

12  right out of the APA, section --

13           **THE COURT:**  That's true.  It does say that.

14      Let me give you a hypothetical.  Let's say that the

15  agency, the acting Secretary, only got the Sessions' memo from

16  the Justice Department and the OLC memo and nothing else.

17  Let's say that's the only thing that came to the Secretary or

18  to any of the people below the Secretary.  Let's say that --

19  and the Secretary considered what came from the DOJ, just those

20  limited materials.  And that you get the benefit of any

21  communications that came to the underlings at the agency from

22  DOJ.

23      So let's say that part is solved in your favor.  But let's

24  say in addition, there is a treasure trove at DOJ of dramatic

25  documents that never got sent to anybody, documents that said,

1    "Oh, this is awful.  This is illegal, this is -- what we're

2    about to do.  We should never give this -- people resigned in

3    protest," let's say.

4    But it never -- those never went over to the agency and it

5    was a secret within DOJ.  So do we -- do you really get your

6    hands on that treasure trove of material?  Even though it's

7    relevant, is it nevertheless -- it wasn't relied upon.  It

8    wasn't even considered by the agency.  So why would you get

9    your hands on that treasure trove?

10    **MR. DAVIDSON:**  Well, I would say it's indirectly

11    considered because it fed into the documents that were

12    considered.  That would be the first thing.

13    Second of all, it's not clear to us that the

14    decision-maker here should be thought of to be the Department

15    of Homeland Security and the Department of Homeland Security

16    alone.  The decision to rescind DACA was publicly announced by

17    the Attorney General.  He gave a press conference announcing

18    the decision.

19    The basis for the rescission that's articulated in the

20    Secretary's memorandum is the letter that she received from the

21    Attorney General.  And so in our view, the decision-making

22    agency may well be the Department of Justice.

23    **THE COURT:**  I did see -- tell me if I'm right about

24    this.  In doing my homework on this case a few weeks back, I

25    read the statute.  Shock that a judge would go to the trouble

1   to read the statute.

2       But somewhere in there, I saw an arcane provision that

3   said something like on questions of law, the opinion of the

4   Attorney General shall be final.  And this was on immigration

5   law.

6       Am I remembering incorrectly?  Is there something like

7   that?

8           **MR. DAVIDSON:**  I think in general, memoranda from the

9   Office of Legal Counsel are binding on the Government so --

10          **THE COURT:**  No, no.  But am I right that there is such

11  a provision in the Immigration Act as amended that says the --

12  the Department of Homeland Security now must treat as final any

13  opinion by the Attorney General, something like that?  I'm

14  pretty sure I'm right about that.

15          **MR. DAVIDSON:**  I don't know, Your Honor, but we will

16  be studiously looking --

17          **THE COURT:**  You look into that.

18      What do you think?  You should know the answer --

19          **MR. ROSENBERG:**  I don't know the answer off the top of

20  my head on that, Your Honor, but I suspect that -- because the

21  Department of Homeland Security is a relatively young agency

22  and many of its functions were originally DOJ functions, those

23  functions were transferred over to the Department of Homeland

24  Security, so I don't know if all of those provisions have

25  necessarily --

1    **THE COURT:**  That's a good point.  It may be a

2    historical artifact and it could be that provision was -- it

3    seemed like I was reading even the pocket parts, but that

4    may -- maybe it's -- maybe it's an artifact that doesn't apply

5    anymore.  You two ought to look at that and help me in the

6    future understand what it means.

7        You get one last word and then I've got to bring it to a

8    close.

9        **MR. ROSENBERG:**  A couple of points, Your Honor, and I

10   will try to be brief.

11       On the issue of the Department of Justice being a

12   decesion-maker, it was not.  We are not aware of a case where

13   an agency that does not administer a program and is not

14   responsible for the decision has to compile an Administrative

15   Record, and plaintiffs have cited none in their brief, and we

16   think that would --

17       **THE COURT:**  What do you say to the point that counsel

18   made that the Attorney General himself was the one who

19   announced this?

20       **MR. ROSENBERG:**  If you look at the letter that he

21   sent, it actually -- it actually directs -- it doesn't even

22   direct.  It simply notes that DHS should consider an orderly

23   and efficient wind down of the program and the Department of

24   Justice stands ready to assist and continue to support DHS in

25   these efforts.

1      This is a DHS program, and they are the only agency that

2    can have an Administrative Record in this case.

3           **THE COURT:**  Wait a second.  What page do I look at to

4    see that?

5           **MR. ROSENBERG:**  Page 251 at the bottom.

6           **THE COURT:**  All right.

7      Nevertheless, is it true that the Attorney General was the

8    one who announced this rescission?

9           **MR. ROSENBERG:**  I believe that he did make an

10   announcement about it.

11          **MR. DAVIDSON:**  And, Your Honor --

12          **THE COURT:**  Before the acting Secretary?

13          **MR. ROSENBERG:**  I don't know the exact timeline off

14   the top of my head.

15          **THE COURT:**  Do you know the timeline?

16          **MR. DAVIDSON:**  I don't believe that the acting

17   Secretary made any kind of public statement along with the

18   rescission.  She issued the memorandum, but the statement was

19   made by the Attorney General.

20          **THE COURT:**  Which came first?

21          **MR. DAVIDSON:**  That I don't know.  It was within a

22   matter of a very short --

23          **THE COURT:**  All right.

24          **MR. ROSENBERG:**  One or two other points that are

25   critically important here.

1    As the Court is contemplating fashioning relief, it's

2    important that it do not so in a vacuum.  At the initial status

3    conference, the Court did, of course, allow discovery.  Again,

4    we object to that discovery, but we are currently proceeding

5    with it.  It noted that there should not be bone-crushing big

6    firm discovery in this case.

7    Plaintiffs have moved to supplement or complete the

8    Administrative Record, but in the government's view, this

9    motion is essentially a motion to complete masquerading -- it's

10   a motion that really is more properly viewed as a discovery

11   motion.

12   **THE COURT:**  There is something -- I want you to know,

13   at some point, that's what it does become, and I also want to

14   say that the -- it is -- puts the judge in an uncomfortable

15   position when the plaintiffs are asking that I require the

16   Department of Justice, as well as the White House, to scour

17   their records and possibly invade deliberative privileged

18   material, possibly privileged materials.

19   If we go down that path, it may be we can't get a decision

20   in this case for a long time.  It would take a long -- it would

21   take a considerable amount of time to collect the documents

22   that the plaintiffs want me to require.

23   And I am troubled first about the burden and the breadth

24   of it, but more than that, I'm troubled by the -- how much --

25   to what extent does the Judicial Branch intrude on the

1    Executive Branch beyond what they say is the Administrative

2    Record to make them -- it would be a tenfold, twentyfold

3    increase in the size -- maybe a hundredfold increase in the

4    size of the Administrative Record.

5         So the limiting -- there needs to be some kind of a

6    limiting principle to balance all these competing interests, in

7    my view, and I am sorting it out.  All right.

8              MR. ROSENBERG:  But on that point --

9              THE COURT:  Your last point.

10             MR. ROSENBERG:  On that point, Your Honor, just so the

11   Court is aware, plaintiffs have served discovery requests,

12   document requests, and the very first request is literally for

13   "any and all documents or communications considered or created

14   by DHS or DOJ as part of the process of determining whether to

15   continue, modify, or rescind DACA."

16        They are seeking the same information through discovery.

17   Now, we haven't had an opportunity to serve our objections or

18   responses to that yet so the issue is not yet ripe, but the

19   Court should be aware that that is one of nine very extensive

20   sets of documents requests.

21             THE COURT:  I'm not going comment on that.

22        There are two different issues.  One is to what extent

23   does the Administrative Record have to be augmented.  That's

24   one thing.

25        Another one is over and above the Administrative Record,

to what extent do the plaintiffs get additional discovery to try to make some of their points. That's a fair point, too. I think those are separate.

Your point is that they're trying to get as much as they can in the Administrative Record route so that they don't have to rely on discovery and that maybe some of these things should be more properly viewed as a discovery request. Well, okay.

I see the concept. It's a fair concept maybe.

On the other hand, I do think this Administrative Record is a little thin so I feel like some relief is in order and now -- and I don't know. I can't tell you what the answer is right now. I'm going to go back and think about it and try to get you a decision this week.

Now, you need -- if I rule in favor of any relief at all, the DOJ needs to be in a position to move promptly -- if you are going to seek mandamus, for example, God bless you, that's good, but you got to be ready to go in a hurry. You can't go crying crocodile tears to the Court of Appeals and say you want to hold up the case because -- now I have one last thought.

We have a very good schedule in place. If it turns out that we are still fighting over documents and the administrative -- I hope we're not. Please help the poor judge in this case. But if we're fighting that battle, then it's going to lean more towards the provisional relief side than it will towards the final side.

1     I'm not changing the scope of the briefing at all now.

2  You brief it just the way we set it up and with the documents

3  you got, and you on the plaintiffs side, don't start crying

4  crocodile tears to me saying you haven't gotten every document

5  you've demanded.  You do have some things to work with you and

6  ought to work with what you got and file your briefs

7  accordingly and then say at the end "and by the way, they

8  stonewalled us on all these documents."

9     **MR. DAVIDSON:**  May I say one more word, Your Honor.

10  The government has essentially blocked all communications --

11  all discovery into communications within the agency about the

12  decision on deliberative process grounds.

13     **THE COURT:**  Which agency?

14     **MR. DAVIDSON:**  Within the Department of Homeland

15  Security.

16     And the deliberative process privilege doesn't shield

17  segregable factual material, for example, that would be in

18  memos or meetings, and it's also a qualified privilege that can

19  be overcome by a showing of need.

20     And so --

21     **THE COURT:**  See, I would say the ones at that level

22  that I told you everything that the people who wrote the emails

23  and the memos that went to the Secretary, even if the Secretary

24  didn't see the -- everything they saw, the balance ought to be

25  struck in terms of turning it over.

1    But I wouldn't go below that because I just think as a

2  concession to the shortness of life, we got to draw the line

3  somewhere, and your side has been unhelpful in giving me a

4  limiting principle.  You just want the moon.  This is big firm

5  practice at its worst.  You want everything.  You can't get

6  everything in the real world.  We want a hurry-up schedule, we

7  want to get it done before March 5, and we don't have the

8  luxury to get everything.

9    So I'm trying to think of a limiting principle that is

10  fair to both sides that will work on the facts and

11  circumstances of this case.

12    My friends, I thank you for the excellent lawyering.

13  You're all great, both sides, even though you're out numbered

14  like ten to one.  You did a great job, you did a great job, and

15  I will see you back here soon, I suppose, but I need to bring

16  it to a close.  So I'll try to get an order out this week.  All

17  right.  Thank you.

18        **MR. ROSENBERG:**  Thank you, Your Honor.

19        **MR. DAVIDSON:**  Thank you, Your Honor.

20          (Proceedings adjourned at 12:23 p.m)

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4              I certify that the foregoing is a correct transcript

5        from the record of proceedings in the above-entitled matter.

6

7        DATE:   Tuesday, October 17, 2017

8

9        *Pamela A. Batalo*

10       _____
         Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11       U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA, et al.,

*Petitioners*,

v.

UNITED STATES DISTRICT COURT FOR
THE NORTHERN OF DISTRICT OF
CALIFORNIA, SAN FRANCISCO,
*Respondent*,

REGENTS OF THE UNIVERSITY OF
CALIFORNIA, et al.,
*Real Parties in Interest*.

**DECLARATION OF ETHAN D. DETTMER
IN OPPOSITION TO DEFENDANTS'
PETITION FOR A WRIT OF MANDAMUS
TO THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF CALIFORNIA AND EMERGENCY
MOTION FOR STAY PENDING
CONSIDERATION OF THIS PETITION**

**DECLARATION OF ETHAN D. DETTMER**

I, Ethan D. Dettmer, declare and state as follows:

1.      I am an attorney at law and member of the bar of this Court.  I am a partner with

the law firm of Gibson, Dunn & Crutcher LLP, attorneys of record for Dulce Garcia, Miriam

Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut

Latthivongskorn, plaintiffs in the action *Garcia, et al. v. United States of America, et al.*, No. 17-

cv 05380-WHA (the "Garcia Action"), filed in the United States District Court for the Northern

District of California on September 18, 2017.  I make this declaration of my own personal

knowledge and, if called upon to do so, I could and would testify to the matters stated herein.

2.      On October 6, 2017, Defendants in the Garcia Action served their Initial

Disclosures on Plaintiffs.  A true and correct copy of the Initial Disclosures is attached hereto as

Exhibit A.

3.      On October 17, 2017, James McCament, Acting Director of U.S. Citizenship and Immigration Services, was deposed in the Garcia Action.  A true and correct copy of an excerpt from his deposition transcript is attached hereto as Exhibit B.

4.      On October 20, 2017, Gene Hamilton, Senior Counselor to Acting Secretary of Homeland Security Elaine Duke, was deposed in the Garcia Action.  A true and correct copy of an excerpt from his deposition transcript is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed at San Francisco, California, on October 24, 2017.


       **/s/ Ethan D. Dettmer**

       **Ethan D. Dettmer**

**DETTMER EXHIBIT A**

CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
BRETT A. SHUMATE
Deputy Assistant Attorney General
JENNIFER D. RICKETTS
Branch Director
JOHN. R. TYLER
Assistant Branch Director
BRAD P. ROSENBERG
Senior Trial Counsel
STEPHEN M. PEZZI
Trial Attorney
KATE BAILEY (MD Bar No. 1601270001)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone: (202) 514-9239
Facsimile: (202) 616-8470
E-mail: kate.bailey@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, | No. 3:17-cv-05211-WHA |
| Plaintiffs, | |
| v. | **INITIAL DISCLOSURES** |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants. | |

1

2

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

No. 3:17-cv-05235-WHA

Plaintiffs,

**INITIAL DISCLOSURES**

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security, and the UNITED
STATES OF AMERICA,

Defendants.

CITY OF SAN JOSE, a municipal corporation,

Plaintiff,

No. 3:17-cv-05329-WHA

v.

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

**INITIAL DISCLOSURES**

Defendants.

DULCE GARCIA, MIRIAM GONZALEZ
AVILA, SAUL JIMENEZ SUAREZ,
VIRIDIANA CHABOLLA MENDOZA,
NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN,

No. 3:17-cv-05380-WHA

Plaintiffs,

**INITIAL DISCLOSURES**

v.

UNITED STATES OF AMERICA, DONALD
J. TRUMP, in his official capacity as President
of the United States, U.S. DEPARTMENT OF
HOMELAND SECURITY, and ELAINE
DUKE, in her official capacity as Acting
Secretary of Homeland Security,

Defendants.

## DEFENDANTS' RULE 26(a)(1) INITIAL DISCLOSURES

Defendants in the above-captioned actions ("Defendants") hereby provide the following

initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.  Defendants

provide these disclosures subject to their general objection to any discovery taking place in this

litigation. These disclosures are based on information reasonably available to Defendants at the

current time.  Defendants reserve their rights to supplement these disclosures pursuant to Federal

Rule of Civil Procedure 26(e).

**1. Rule 26(a)(1)(A)(i):**

The following individuals are likely to have discoverable information that Defendants may

use to support their defenses, unless solely for impeachment. Unless otherwise noted, these

individuals are employees of the Department of Homeland Security and may be reached through

undersigned counsel.

   a. Mr. Dougherty is the Assistant Secretary of Border, Immigration and Trade in the Office
      of Policy. He testified before Congress regarding DACA on October 3, 2017, and likely
      has discoverable information about certain aspects of the rescission.

   b. Philip T. Miller is the Deputy Executive Associate Director, Office of Enforcement and
      Removal Operations, Immigration and Customs Enforcement ("ICE"). He likely has
      discoverable information about the claims that pertain to ICE.

   c. James McCament is the Acting Director of U.S. Citizenship and Immigration Services, a
      component of DHS. He testified before Congress regarding DACA on October 3, 2017,
      and likely has discoverable information about certain aspects of the rescission of DACA.

Defendants also identify any individuals who will be deposed in these cases, as well as all individuals identified in Plaintiffs' initial disclosures.

Defendants will supplement these disclosures as appropriate.

## 2. Rule 26(a)(1)(A)(ii):

The following documents, electronically stored information, and tangible things in Defendants' possession, custody, or control may be used to support their defenses, unless solely for impeachment.

a. Documents that are included in the administrative record regarding the DHS Acting Secretary's decision to rescind DACA

b. Documents that are publicly available on DHS, USCIS, ICE and/or CBP websites, including, but not limited to:

   o Documents regarding the DACA policy

   o Documents regarding the initial and renewal request process for DACA for the period from June 15, 2012 until September 5, 2017

   o Documents regarding the rescission of DACA

   o Documents regarding the renewal request process, and the October 5, 2017 deadline for properly filing renewal requests that must be accepted by October 5, 2017, for DACA that expires between September 5, 2017 and March 5, 2018

   o Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Form I-821D Instructions

   o Form I-765, Application for Employment Authorization, and Form I-765 Instructions

   o Form I-131, Application for Travel Document

   o Applications Request Forms and instructions related to DACA policy

c. Correspondence with, testimony before, and responses to any questions for the record from Congress regarding the rescission of DACA

d. Documents identified or produced by Plaintiffs

Defendants will supplement these disclosures as appropriate.

**3.     Rule 26(a)(1)(A)(iii):**

Defendants have no claimed damages.

**4.     Rule 26(a)(1)(A)(iv):**

Not applicable.


Dated: October 6, 2017                    Respectfully submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General

                                          BRIAN STRETCH
                                          United States Attorney

                                          BRETT A. SHUMATE
                                          Deputy Assistant Attorney General

                                          JENNIFER D. RICKETTS
                                          Branch Director

                                          JOHN R. TYLER
                                          Assistant Branch Director

                                          BRAD P. ROSENBERG
                                          Senior Trial Counsel

                                          STEPHEN M. PEZZI
                                          Trial Attorney

                                          */s/    Kate Bailey*
                                          KATE BAILEY
                                          Trial Attorney
                                          United States Department of Justice
                                          Civil Division, Federal Programs Branch
                                          20 Massachusetts Avenue NW
                                          Washington, DC 20530
                                          Phone: (202) 514-9239
                                          Fax: (202) 616-8470

Email: kate.bailey@usdoj.gov
MD Bar No. 1601270001

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2017, I served the foregoing DEFENDANTS' RULE 26(a)(1) INITIAL DISCLOSURES via e-mail upon:

| | |
|---|---|
| Mark H. Lynch | mlynch@cov.com |
| Jeffrey M. Davidson | jdavidson@cov.com |
| Alexander A. Berengaut | aberengaut@cov.com |
| Megan A. Crowley | mcrowley@cov.com |
| James Zahradka | james.zahradka@doj.ca.gov |
| Ronald Lee | ronald.lee@doj.ca.gov |
| Nancy Fineman | nfineman@cpmlegal.com |
| Brian Danitz | bdanitz@cpmlegal.com |
| Tamarah Prevost | tprevost@cpmlegal.com |
| Peter Luc | pluc@cpmlegal.com |
| Ethan Dettmer | edettmer@gibsondunn.com |
| Jesse Gabriel | jgabriel@gibsondunn.com |
| Katie Marquart | kmarquart@gibsondunn.com |
| Kelsey Helland | khelland@gibsondunn.com |
| Mark Rosenbaum | mrosenbaum@publiccounsel.org |

*/s/ Kate Bailey*
KATE BAILEY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-9323
Fax: (202) 616-8470
Email: kate.bailey@usdoj.gov
MD Bar No. 1601270001

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380)**
 **Initial Disclosures**

**DETTMER EXHIBIT B**

1             UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

THE REGENTS OF THE UNIVERSITY OF   ) Case No.

5  CALIFORNIA and JANET NAPOLITANO,   ) 17-CV-05211-WHA

in her official capacity as      )

6  President of the University of    )

California,                   )

7                          )

          Plaintiffs,        )

8                          )

     v.                    )

9                          )

U.S. DEPARTMENT OF HOMELAND       )

10  SECURITY and ELAINE DUKE, in her   )

official capacity as Acting      )

11  Secretary of the Department of    )

Homeland Security,          )

12                          )

          Defendants.        )

13  -----------------------------------)

AND RELATED CASES.         )

14  -----------------------------------)

15                   - - -

16           Tuesday, October 17, 2017

17                   - - -

18

19     Videotaped deposition of JAMES McCAMENT,

20  taken at the offices of Gibson, Dunn & Crutcher,

21  1050 Connecticut Avenue NW, Washington, D.C.,

22  beginning at 9:14 a.m., before Nancy J. Martin, a

23  Registered Merit Reporter, Certified Shorthand

24  Reporter.

25

1    A P P E A R A N C E S :

2

3              STATE OF CALIFORNIA
              DEPARTMENT OF JUSTICE
4              OFFICE OF THE ATTORNEY GENERAL
              BUREAU OF CHILDREN'S JUSTICE
5              BY:  RONALD H. LEE, ESQ.
              1515 Clay Street
6              Suite 2100
              Oakland, California    94612
7              (510) 879-0094
              ronald.lee@doj.ca.gov
8              Representing State of California

9

10             COVINGTON & BURLING LLP
              BY:  MEGAN CROWLEY, ATTORNEY AT LAW
11             One City Center
              850 Tenth Street NW
12             Washington, D.C.    20001
              (202) 662-5367
13             aberengaut@cov.com
              kstietz@cov.com
14             mcrowley@cov.com
              Representing Regents of the University of
15             California and Janet Napolitano

16

17             GIBSON, DUNN & CRUTCHER LLP
              BY:  ETHAN DETTMER, ESQ.
18                 HALEY MORRISSON, ATTORNEY AT LAW
              1050 Connecticut Avenue, N.W.
19             Washington, D.C.    20036
              (202) 955-8500
20             edettmer@gibsondunn.com
              hmorrisson@gibsondunn.com
21             Representing the Garcia Plaintiffs

22

23

24

25

1   A P P E A R A N C E S :   (CONTINUED)
2
3
            NATIONAL IMMIGRATION LAW CENTER
4           BY:   JOSHUA ROSENTHAL, ESQ.
                  KAREN TUMLIN, ATTORNEY AT LAW
5           1121 14th Street, N.W.
            Suite 200
6           Washington, D.C.   20005
            (202) 470-6412
7           rosenthal@nilc.org
            ktumlin@nilc.org
8           Representing Batalla Vidal Plaintiffs
9
10          STATE OF NEW YORK
            OFFICE OF THE ATTORNEY GENERAL
11          BY:   SANIA W. KHAN, ASSIST. ATTORNEY GENERAL
            CIVIL RIGHTS BUREAU
12          120 Broadway
            New York, New York   10271
13          (212) 416-8534
            sania.khan@ag.ny.gov
14          Representing plaintiff states and New York,
            et al. v. Trump, et al.
15
16
            U.S. DEPARTMENT OF HOMELAND SECURITY
17          OFFICE OF THE GENERAL COUNSEL
            BY:   REID COX, ASST. GEN. COUNSEL
18          Washington, D.C.   20528
            (202) 447-3891
19          rene.browne@hq.dhs.gov
            reid.cox@hq.dhs.gov
20
21          U.S. DEPARTMENT OF JUSTICE
            CIVIL DIVISION
22          BY:   JOSHUA E. GARDNER, ASST. DIRECTOR
            20 Massachusetts Avenue N.W.
23          Washington, D.C.   20530
            (202) 305-7583
24          joshua.e.gardner@usdoj.gov
            Representing the U.S. Department of Justice
25          and the Deponent

```
 1   A P P E A R A N C E S :   (CONTINUED)
 2
             U.S. DEPARTMENT OF JUSTICE
 3           CIVIL DIVISION
             FEDERAL PROGRAMS BRANCH
 4           BY:  RACHEL WESTMORELAND, ATTORNEY AT LAW
             20 Massachusetts Avenue NW
 5           Washington, D.C.   20530
             (202) 514-1280
 6           rachel.westmoreland@usdoj.gov
             kate.bailey@usdoj.gov
 7
 8
        ALSO PRESENT:
 9
             DAVID CAMPBELL, Legal Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          I N D E X
                                                     PAGE
2
   TESTIMONY OF JAMES McCAMENT
3
   BY MR. DETTMER                                     9
4
   BY MS. CROWLEY                                     232
5
   BY MR. LEE                                         244
6
   BY MR. ROSENTHAL                                   284
7
   BY MS. KHAN                                        296
8
9                     E X H I B I T S
10  NUMBER       DESCRIPTION                          PAGE
11  Exhibit 6    Statement of Michael Dougherty       16
                 before the United States Senate,
12               Committee on the Judiciary, October
                 3, 2017, 4 pages
13
    Exhibit 7    CQ Congressional Transcripts, 118    16
14               pages
15  Exhibit 8    James McCament, Acting Director,      26
                 U.S. Citizenship and Immigration
16               Services, Experience and
                 Achievements, 1 page
17
    Exhibit 9    U.S. Department of Homeland           53
18               Security Organizational Chart, 25
                 pages
19
    Exhibit 10   Declaration of James W. McCament,     56
20               3 pages
21  Exhibit 11   "How Do I Request Consideration of   137
                 Deferred Action for Childhood
22               Arrivals?" 3 pages
23  Exhibit 12   DACA Overview, 32 pages              151
24  Exhibit 13   "Don't Let Your Work Permit          171
                 Expire," 2 pages
25

1                    E X H I B I T S
2                      (CONTINUED)
3     NUMBER        DESCRIPTION                      PAGE
4     Exhibit 14    DACA Frequently Asked Questions,   174
                    20 pages
5
      Exhibit 15    USCIS Number of Form I-821D,       182
6                   Request by Intake Biometrics and
                    Case Status, 2 pages
7
      Exhibit       Enlarged version of USCIS Number   182
8     15-A          of Form I-821D, Request by Intake
                    Biometrics and Case Status, 2
9                   pages
10    Exhibit 16    I-821D, Consideration of Deferred  189
                    Action for Childhood Arrivals, 4
11                  pages
12    Exhibit 17    National Standard Operating        215
                    Procedures, SOP, Deferred Action
13                  for Childhood Arrivals, DACA.
14    Exhibit 18    Department of Homeland Security,    217
                    statement from Acting Secretary
15                  Duke on rescission of deferred
                    action for childhood arrivals,
16                  release date is September 5, 2017
17    Exhibit 19    Letter dated July 21, 2017 from     257
                    the Office of the Attorney General
18                  of the State of California to the
                    President of the United States
19
      Exhibit 20    Email string, DHS 7 - 9, 3 pages    287
20
      Exhibit 21    Question #20, DACA Adjurations      292
21                  3, 2 pages
22
                       EXHIBITS PREVIOUSLY MARKED
23
                    NUMBER                             PAGE
24
                    Exhibit 3                           193
25

1  WASHINGTON, D.C., TUESDAY, OCTOBER 17, 2017; 9:14 A.M.

2                      -OoO-

3           THE VIDEOGRAPHER:  Good morning.  We are

4  going on the record at 9:14 on October 17, 2017.

5  Please note that the microphones are sensitive and may

6  pick up whispering and private conversations.  Please

7  turn off all cell phones or place them away from the

8  microphones as they may interfere with the deposition

9  audio.  Audio and video recording will continue to

10 take place unless all parties agree to go off the

11 record.

12          This is Media Unit 1 of the video recorded

13 deposition of James McCament in the matter of the

14 Regents of the University of California and Janet

15 Napolitano, in her official capacity as president of

16 the University of California, V. United States

17 Department of Homeland Security and Elaine Duke in her

18 official capacity as acting secretary of the

19 Department of Homeland Security and other related

20 cases.

21          This is in the U.S. District Court, Northern

22 District of California, San Francisco Division.  This

23 deposition is being held at Gibson, Dunn located at

24 1050 Connecticut Avenue, Northwest, Washington, D.C.,

25 20036.  My name is David Campbell from the firm

1   Veritext.  And I'm the videographer.

2          The court reporter is Nancy Martin from the

3   firm Veritext.  I am not authorized to administer an

4   oath.  I'm not related to any party in this action,

5   nor am I financially interested in the outcome.

6          Counsel, will you please identify yourselves

7   for the record.  Then the witness will be sworn in,

8   and we can proceed.

9          MR. DETTMER:  Ethan Dettmer from Gibson, Dunn

10  on behalf of the plaintiffs in the Garcia action.

11         MS. MORRISON:  Haley Morrisson from Gibson,

12  Dunn on behalf of the Garcia plaintiffs.

13         MS. CROWLEY:  Megan Crowley from Covington &

14  Burling on behalf of the Regents of the University of

15  California and President Napolitano.

16         MR. LEE:  Ronald Lee with the California

17  Attorney General's office on behalf of the State of

18  California.

19         MR. NEWMAN:  Michael Newman of the California

20  Attorney General's office on behalf of the State of

21  California.

22         MS. KHAN:  Sania Khan from the New York

23  Attorney General's office on behalf of plaintiff

24  states and New York, et al.

25         MR. ROSENTHAL:  Joshua Rosenthal of the

1  National Immigration Law Center on behalf of the

2  plaintiffs, Batalla Vidal.

3          MS. TUMLIN:  Karen Tumlin of the National

4  Immigration Law Center on behalf of the Batalla Vidal

5  plaintiffs.

6          MS. ZENGOTITABENGOA:  Colleen Zengotitabengoa

7  of USCIS.

8          MS. WESTMORELAND:  Rachel Westmoreland of the

9  United States Department of Justice.

10          MR. COX:  Reid Cox, the General Counsel's

11  Office of the Department of Homeland Security.

12          MR. GARDNER:  Josh Gardner of the Department

13  of Justice, and the witness will reserve the right to

14  read and sign.

15

16                  JAMES McCAMENT,

17          having been first duly sworn/affirmed,

18          was examined and testified as follows:

19

20                  EXAMINATION

21  BY MR. DETTMER:

22      Q.  Thanks for being here today, Mr. McCament.

23  We met briefly off the record.  My name is Ethan

24  Dettmer, and I represent the plaintiffs in one of

25  these cases, the Garcia case, which was filed in

1   San Francisco.  So let's start.  Can you give me --
2   give us your full name.
3           A.  Certainly.  James Wesley McCament.
4           Q.  Are you a lawyer?
5           A.  I am.
6           Q.  All right.  Have you ever been deposed
7   before?
8           A.  I have not.
9           Q.  Ever given testimony in a trial or an
10  arbitration?
11          A.  No, I've not.
12          Q.  All right.  Given testimony before Congress;
13  is that right?
14          A.  I have.
15          Q.  On how many occasions?
16          A.  Once.
17          Q.  And that was two weeks ago today, if I'm not
18  mistaken?
19          A.  That's correct.
20          Q.  That was testimony for a hearing on the
21  oversight of the administration's decision to end
22  deferred action for childhood arrivals, and that was
23  before the Senate committee on the judiciary; is that
24  right?
25          A.  Yes to both.

1    had or however you might have -- are you aware of

2    people in the White House who were engaged on this

3    issue on DACA?

4         A.   From those E-mail conversations or --

5         Q.   From any source.

6         A.   Largely, those two sitting in one of the

7    meetings or a meeting, and I remember those names.

8    But I don't recall sort of a reference to an "X"

9    person "wants this."  And generally what I recall is

10   if there was an ask, it was -- it may be "the White

11   House is asking" type of question.  Does that make

12   sense?

13        Q.   Yeah.  So it sounds like, with respect to

14   anything other than in-person -- it sounds like you

15   had one in-person meeting on this issue while you were

16   acting Secretary?

17        A.   That's what I recall.  Acting director.

18        Q.   Sorry.  Acting director.  Thank you.

19        A.   Please clarify.

20        Q.   I gave you a promotion.

21        A.   That's right.

22        Q.   So you remember one meeting while you were

23   acting director with White House people on the topic

24   of DACA?

25        A.   Yes.  I remember one meeting being held in

1  completion on discussion of DACA.

2          Q.   Okay.   That you attended?

3          A.   That I attended.

4          Q.   Okay.   Are you aware of other meetings that

5  you did not attend?

6          A.   I'm not aware of other meetings that I did

7  not attend, but there may well have been.

8          Q.   Okay.

9          A.   I mean that's not unusual.

10         Q.   Understood.   And obviously, I'm, you know,

11  just trying to get what you know.

12         A.   Sure.

13         Q.   Okay.   So let's talk, then, about that

14  meeting.   Do you remember when it happened?

15         A.   I believe it was August 24.

16         Q.   August 24.   Where did it happen?

17         A.   The Roosevelt Room.

18         Q.   Okay.   Which is where?

19         A.   In the White House, west wing.

20         Q.   Okay.   Who was there that you remember?

21         A.   That I recall, Acting Secretary Duke, General

22  Kelly, the chief of staff, the attorney general, Jeff

23  Sessions.   I'm reflecting around the table.   Rachel

24  Brand with Department of Justice.   OMB Director

25  Mulvaney.   Deputy Secretary of State Sullivan.

1  Stephen Miller.  I think Rob Porter.  I believe I have
2  that name right.
3       Q.  What's Mr. Porter's role?
4       A.  He is the staff -- I was going to say
5  executive secretary, but it's that staff secretary
6  or -- I probably have misapplied the title, but, in
7  essence, who handles correspondence, I believe, for
8  the White House, but I may have the title wrong.
9           Don McGhan.  Kierstjen Nielsen, the deputy
10  chief of staff to -- or currently the deputy chief of
11  staff.  I believe John Bash.
12       Q.  Who's John Bash?
13       A.  He's, I think, special counsel, and I believe
14  also -- I have to double-check the title.  I believe
15  special assistant to the President as well.  Marc
16  Short, who is -- I'm sorry.
17       Q.  Who is Mr. Short?
18       A.  The head of the legislative, White House
19  legislative affairs operation.  It may be a more
20  expanded title, but I think that he is the head of
21  legislative affairs.
22       Q.  Anybody else you can remember?
23       A.  Gene Hamilton, the senior counsel to the
24  Secretary.  I believe Chad Wolf.  There may have been
25  a couple of others as well.  I'm just trying to kind

1   matter, the substance of the deliberative nature of

2   that meeting.  So that's correct.

3           MR. DETTMER:  Okay.  I appreciate that.

4   Well, I don't appreciate that.

5           MR. GARDNER:  We're not going to resolve this

6   right here, I imagine, but I appreciate you

7   understanding our position.

8           MR. DETTMER:  Yeah.  And I just want to make

9   sure there's not going to be -- because obviously,

10  this is, you know, going to have to go to the judge.

11          MR. GARDNER:  Of course.  Of course.

12          MR. DETTMER:  You know I just -- in the

13  interest of everybody's time --

14          MR. GARDNER:  I appreciate that.

15          MR. DETTMER:  -- there's not going to be any

16  kind of waiver or argument that you guys are making

17  for me not going through the motions of asking all

18  these questions.

19          MR. GARDNER:  No.  In fact, if you want to

20  ask the ultimate question of what substantively was

21  decided, I can lodge the objections, instruct him not

22  to answer, and you can him if he's going to follow my

23  instruction, and I feel like that will really preserve

24  your ability to bring this up should you choose to do

25  so.

1          MR. DETTMER:  Let us go through that process.

2     Q.  So what was the -- actually, let me ask you a

3  question I think you can answer within the scope of

4  what your lawyer is telling you.

5          Was a decision actually reached at this

6  meeting?

7          MR. GARDNER:  You can answer that with a

8  "yes" or a "no" without going into detail.

9          THE WITNESS:  Not an ultimate decision.  So I

10  guess no to that.

11  BY MR. DETTMER:

12     Q.  Okay.  A tentative decision?

13     A.  In part, yes.

14     Q.  Okay.

15          MR. GARDNER:  It's bigger than a bread box.

16  It's two words.

17          THE WITNESS:  Right.  It's hard.

18          MR. GARDNER:  We're in this together, my

19  friend.

20          THE WITNESS:  All three of us, actually.

21  BY MR. DETTMER:

22     Q.  Okay.  Well, then in order to preserve the

23  fight for judicial resolution, what was the decision

24  that was -- or the partial decision that was

25  eventually reached at this meeting?

1          MR. GARDNER:  Objection.  The disclosure of

2     that information would be subject to the

3     attorney-client privilege, the deliberative process

4     privilege, and potentially the Presidential

5     communications privilege.

6          I instruct the witness not to answer.

7     BY MR. DETTMER:

8          Q.  And sir, are you going to follow your

9     attorney's instruction?

10         A.  Yes.

11         Q.  And just so we're clear, we're going to sort

12    of wrap all of the sub questions into that.

13         MR. GARDNER:  That's perfectly acceptable.  I

14    appreciate your professionalism.

15         MR. DETTMER:  No.  No.  Likewise.  And we'll

16    get this worked out.  See what Judge Alsup wants to

17    do.

18         Q.  So apart from -- I guess the way we got to

19    that whole series of questions and answers and

20    objections was asking you about communications at the

21    White House.  Apart from that meeting that I think

22    we've explored as much as we can today, have you had

23    any communications with -- actually, I'm going to have

24    to clarify that.

25         I understand you've had communications with

1   know I'd say we'd finish, but --

2       A.   Sure.

3       Q.   -- and we'll obviously talk about this after

4   lunch, you also mentioned the AG's letter.  I think

5   you've covered the other points that you mentioned.

6       A.   Uh-huh.

7       Q.   So what about the AG's letter, the U.S. AG's

8   letter as a reason --

9       A.   Certainly.

10      Q.   -- in your mind for the rescission?

11      A.   Certainly.  It definitely was.

12      Q.   And why?  What about it?

13      A.   Because the AG was providing guidance to the

14  Department, that the Department of Justice did not

15  feel that they could defend DACA, as I read the

16  letter, against the Amended Complaint because it had

17  some of the same -- or had the same failings -- that's

18  not the word that was used in the AG's letter, and I

19  apologize, but the same structural lack or lack of

20  constitutionality that was applied to DAPA, the same

21  underpinnings applied to DACA.

22           So therefore, you know, stating to the

23  Secretary and recommending that she rescind the DACA

24  memo of 2012 and implement an orderly and efficient

25  wind-down.  It was also, I think -- I can't speak for

 1    the Secretary but with respect to her memo, indicates

 2    that also was a factor, which certainly seems to tie

 3    with those other points.

 4              MR. DETTMER:  Okay.  All right.  I'm only two

 5    minutes over.  Should we break now, have some food and

 6    then we'll come back in an hour?

 7              MR. GARDNER:  That's fine.

 8              MR. DETTMER:  Want to say 1:30 or 45 minutes.

 9              THE VIDEOGRAPHER:  We're going off the record

10    at 12:35 p.m.

11              (A recess was taken from 12:35 p.m.

12              to 1:38 p.m.)

13              THE VIDEOGRAPHER:  We are back on the record

14    at 1:38 p.m.

15    BY MR. DETTMER:

16         Q.  All right.  Good afternoon.

17         A.  Good afternoon.

18         Q.  You know you're still under oath; right?

19         A.  Yes.

20         Q.  And on the record?

21         A.  Yes.

22         Q.  Are you aware of a meeting on the topic of

23    DACA rescission that happened on August 21?

24         A.  Yes.  If I have the date correct.

25         Q.  Were you at that meeting?

1        A.   Can you specify as far as -- you mean as far

2    as a White House meeting or at DHS?

3        Q.   I'm not sure.   As far as I know, it was a DHS

4    only meeting.   Are you aware --

5        A.   Yes.

6        Q.   -- of that?

7        A.   Yes.

8        Q.   Okay.   And were you at that meeting?

9        A.   Yes.

10        Q.   Who else was at that meeting?

11        A.   As I recall, the acting secretary, the Chief

12    of Staff.   I believe the Deputy Chief of Staff as

13    well.   Gene Hamilton.   Joe Maher.   Nader Baroukh,

14    Dimple Shah, myself, of course.   I believe Kathy

15    Nuebel, Craig Symons, I believe our chief of counsel.

16    I think as well Tom Homan.   I'm trying to look around

17    the room.   I think one of his advisors was there, if I

18    recall correctly, John Feere.   I might be

19    mispronouncing the last name.   I think Kevin McAleenan

20    was there from customs and border protection.   But

21    certainly, it was someone from his team, or two

22    people, I think, from his team.   And, I believe, Kevin

23    was there.   If not, it would have been Ron Vitiello.

24    I'm not remembering exactly.

25              REPORTER MARTIN:   Ron Vitiello?

1           THE WITNESS:  Sorry.  I apologize, Nancy.

2    Ron Vitiello, who was the deputy -- acting Deputy

3    Commissioner.  So if it weren't Kevin, it would be

4    Ron.

5           And also -- those are the names I recall.  I

6    mean I don't recall the two names from CVP, but it

7    might have been Julie Core, who's one of the executive

8    commissioners.  Then probably a couple other people.

9    It was a full room.

10   BY MR. DETTMER:

11        Q.  Okay.  How long did that meeting last?

12        A.  What I recall, it was probably an hour.

13   Somewhere between an hour and two hours.

14        Q.  And where was it?

15        A.  At the DHS headquarters.

16        Q.  Who called that meeting?  Who was the

17   motivator in making that meeting happen?

18        A.  I don't know the motivator, but I think the

19   scheduling invite would have come from the Secretary's

20   office.

21        Q.  Okay.  And did she lead the meeting?

22        A.  Yes.

23        Q.  And, you know, without getting into the

24   substance, the topic was DACA rescission?

25        A.  Yes.

1      Q.   Okay.  Were any decisions made at that

2   meeting?

3      A.   No, not that I recall.

4      Q.   Was it sort of a preparatory-type meeting for

5   the August 24 meeting?

6      A.   So I don't -- no.  As I recall, it was not

7   preparatory for that meeting.  It was to discuss the

8   topic, potential DACA rescission.

9      Q.   Who -- sorry.

10      A.   Sorry.  So as I recollect, it may have been

11   in preparation for a forthcoming meeting.  I don't

12   remember it being set as that date for a meeting on

13   the 24th, but it could have been.

14      Q.   Who were the people who sort of spoke the

15   most at that meeting?  Who were the primary

16   contributors?

17      A.   The Secretary.  I recall Joe Maher, Dimple.

18   I think Nader was there.  If he was, I think he spoke.

19   I'm pretty sure he was.  Myself.  I think Tom Homan

20   spoke.  Again, if I'm not misremembering.  We've had

21   several meetings with the three immigration agencies,

22   non DACA issues over the years, over the months, but I

23   think Kevin McAleenan or his team were there speaking,

24   and I believe Kathy and Craig spoke as well.

25      Q.   Was there anyone there who was not there sort

1   of under the DHS umbrella, from other agencies or --

2       A.  No.  And I think I also -- if I didn't

3   mention, Gene Hamilton was at the meeting, but I think

4   he spoke as well.

5       Q.  What was Gene's role again?

6       A.  He was the senior counsel to the Secretary.

7       Q.  Got you.  Okay.  Do you know Julie Kirchner?

8       A.  Yes.

9       Q.  To your knowledge, did Julie Kirchner have

10  any role in all these discussions that we've been

11  talking about today with respect to the rescission of

12  DACA?

13      A.  I don't recall her being at the meeting.  And

14  if I may ask and answer in a couple points.  So with

15  respect to the decisions we've discussed, she wasn't

16  present.

17      Q.  Okay.  Are you aware of her having any role

18  in the decision-making process on DACA rescission?

19      A.  Excepting her official title and role, I'm

20  not aware of that.

21      Q.  And what do you mean "excepting her official

22  title and role"?

23      A.  So she is a citizenship and immigration

24  services ombudsman.

25      Q.  And so you would expect somebody in that

1  that's -- to the extent it's part of what they provide

2  in their application itself, the DACA requester.

3         MS. KHAN:  I think that's it for me.

4         THE WITNESS:  Okay.  Thank you.

5         MR. DETTMER:  I guess we should just say that

6  obviously, given the disputes that we talked about

7  before, we're going to reserve rights to reopen.

8         MR. GARDNER:  And we understand.  We'll cross

9  that bridge when we get there.

10         MR. DETTMER:  Absolutely.

11         THE VIDEOGRAPHER:  All right.  If that is

12  everything, this concludes today's questioning.  We

13  are going off the record on October 17, 2017 at

14  6:49 p.m.

15         (Witness excused.)

16         (Deposition concluded at 6:49 P.M.)

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I do hereby certify that the aforesaid testimony

3     was taken before me, pursuant to notice, at the time

4     and place indicated; that said deponent was by me duly

5     sworn to tell the truth, the whole truth, and nothing

6     but the truth; that the testimony of said deponent was

7     correctly recorded in machine shorthand by me and

8     thereafter transcribed under my supervision with

9     computer-aided transcription; that the deposition is a

10    true and correct record of the testimony given by the

11    witness; and that I am neither of counsel nor kin to

12    any party in said action, nor interested in the

13    outcome thereof.

14

15    *Nancy J. Martin*

            Nancy J. Martin, RMR, CSR

16

17    Dated:  October 18, 2017

18

19

20

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying shorthand reporter.)

25

**DETTMER EXHIBIT C**

1

```
 1          IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
 2
 3   ------------------------x
                             )
 4   MARTIN JONATHAN BATALLA  )
     VIDAL, et al.,           )
 5                            )
                Plaintiffs,   )
 6                            ) Case Nos.
                v             ) 1:16-CV-04756(NGG)(JO)
 7                            ) 3:17-CV-05211
     ELAINE C. DUKE, Acting   )
 8   Secretary Department of  )
     Homeland Security        )
 9   JEFFERSON BEAUREGARD     )
     SESSION III, Attorney    )
10   General of the United    )
     States,and DONALD J TRUMP,)
11   President of the UNITED  )
     STATES,                  )
12                            )
                Defendants.   )
13                            )
     ------------------------x
14
15          Deposition of GENE HAMILTON
16               Washington, DC
17          Friday, October 20, 2017
18                 9:17 a.m.
19
20   Job No.: 37567
21   Pages: 1 - 233
22   Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

2

```
 1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
 3     ------------------------x
                               )
 4     MARTIN JONATHAN BATALLA   )
       VIDAL, et al.,           )
 5                              )
                 Plaintiffs,   )
 6                              ) Case No.
                 v             ) 1:16-CV-04756(NGG)(JO)
 7                              )
       ELAINE C. DUKE, Acting   )
 8     Secretary Department of  )
       Homeland Security        )
 9     JEFFERSON BEAUREGARD     )
       SESSION III, Attorney    )
10     General of the United    )
       States,and DONALD J TRUMP,)
11     President of the UNITED   )
       STATES,                  )
12                              )
                 Defendants.   )
13                              )
       ------------------------x
14
15            Deposition of GENE HAMILTON, held at US
16     Conference of Mayors, 1620 I Street, NW,
17     Washington 20006 pursuant to Notice, before Donna
18     Marie Lewis, Registered Professional Reporter and
19     Notary Public of and for the District of Columbia.
20
21
22
```

3

```
 1                  A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS:
 3
          NATIONAL IMMIGRATION LAW CENTER
 4        BY: JOSHUA A. ROSENTHAL, ESQUIRE
              KAREN C. TUMLIN, ESQUIRE
 5            TRUDY REBERT, ESQUIRE
          1121 14th Street, NW
 6        Suite 200
          Telephone: (202)216-0261
 7        Email: rosenthal@nilc.org
                 tumlin@nilc.org
 8               rebert@nilc.org
 9
10        MAKE THE ROAD NEW YORK
          BY: ANTONIO ALARCON, ESQUIRE
11            ALEXIA SCHAPICA, ESQUIRE
          92-10 Roosevelt Avenue
12        Jackson Heights, NY 11372
          Emails antonio.alarcon@maketheroadny.org
13
14
          STATE OF CALIFORNIA, DEPT OF JUSTICE
15        OFFICE OF THE ATTORNEY GENERAL
          BUREAU OF CHILDREN'S JUSTICE
16        BY: MICHAEL L. NEWMAN, DIRECTOR
          300 S. Spring Street
17        Suite 1702
          Los Angeles, CA 90013
18        Telephone: 213 897-2642
          Email: michael.newman@doj.ca.gov
19
20
21
22
```

4

```
1   APPEARANCES:  (Continued)

2

3   ON BEHALF OF PLAINTIFFS: (Continued)

4          STATE OF CALIFORNIA, DEPT OF JUSTICE
           OFFICE OF THE ATTORNEY GENERAL
5          CIVIL RIGHTS ENFORCEMENT SECTION
           BY: RONALD H. LEE, DEPUTY ATTORNEY GENERAL
6          1515 Clay Street,
           Suite 2100
7          Oakland, CA 94612-1492
           Telephone: (510) 879-1983
8          Email: ronald.lee@doj.ca.gov

9

10         COVINGTON & BURLING, LLP
           BY:  JONATHAN MINCER,, ESQUIRE
11         One CityCenter
           850 Tenth Street, NW
12         Washington, DC 20001-4956
           Telephone: (202) 662-5781
13         Email: jmincer@cov.com

14

15

16         GIBSON DUNN & CRUTCHER, LLP
           BY:  HALEY MORRISSON, ESQUIRE
17         1050 Connecticut Avenue, NW
           Washington, D C 20036-5306
18         Telephone: (202) 955-8500
           Email: hmorrisson@gibsondunn.com

19

20

21

22
```

5

```
 1    APPEARANCES:  (Continued)
 2    ON BEHALF OF PLAINTIFFS: (Continued)
 3
              STATE OF NEW YORK
 4            OFFICE OF ATTORNEY GENERAL
              CIVIL RIGHTS BUREAU
 5            BY:  ALEX W. FINKELSTEIN, ESQUIRE
              120 Broadway
 6            New York, NY 10271-0332
              Telephone: (212) 416-6129
 7            Email: Alex.Finkelstein@ag.ny.gov
 8
 9            STATE OF NEW YORK
              OFFICE OF ATTORNEY GENERAL
10            CIVIL RIGHTS BUREAU
              BY: DIANE O. LUCAS, ESQUIRE
11            120 Broadway
              New York, NY 10271-0332
12            Telephone: (212) 416-8149
              Email: Diane.Lucas@ag.ny.gov
13
14
15    ON BEHALF OF DEFENDANTS:
16
              U S DEPARTMENT OF HOMELAND SECURITY
17            OFFICE OF THE GENERAL COUNSEL
              BY: RENE E. BROWNE, ESQUIRE
18            Washington, DC 20528
              Telephone: (202) 447-3891
19            Facsimile: (202) 282-9186
              Email: Rene.Browne@dhs.gov
20
21
22
```

6

1    APPEARANCES:  (Continued)

2    ON BEHALF OF DEFENDANTS:

3

            U S DEPARTMENT OF JUSTICE

4            BY: JOHN TYLER, ESQUIRE

                JOSHUA E. GARDNER, ESQUIRE

5            20 Massachusetts Avenue, NW

            Washington, D C 20530

6            Telephone: (202) 305-7583

            Email: joshua.e.gardner@usdoj.gov

7

8    ALSO PRESENT:

9            DAN REIDY, LEGAL VIDEOGRAPHER

10

11

12

13

14

15

16

17

18

19

20

21

22

7

1                           I N D E X

2   WITNESS:

3           GENE HAMILTON

4   EXAMINATION BY:                              PAGE

5       Ms. Tumlin                                12

6

7                        E X H I B I T S

8   HAMILTON

    EXHIBITS:                  DESCRIPTION         PAGE

9

10  No. 28      Notice of Deposition              21

11  No. 29      Email Exchange                    197

12  No. 30      Frequently Asked Questions, 9/15/17  221

13

14  PREVIOUSLY MARKED

    EXHIBITS:

15

16  No.  3      Document                          126

17  No. 19      Letter                            154

18  No. 20      Email Chain                       165

19

20

21

22

8

1                    P-R-O-C-E-E-D-I-N-G-S

2            THE VIDEOGRAPHER:  Good morning.  We are

3    going on the record at 9:00 a.m. on Friday --

4    excuse me, 9:13 a.m. on Friday, October 20, 2017.

5    This is media unit one of the video recorded

6    deposition of Gene Hamilton taken by counsel for

7    the plaintiff in the matter of Martin Jonathan

8    Batalla Vidal, et al., v.  Elaine C. Duke, Acting

9    Secretary of the Department of Homeland Security;

10   Jefferson Beauregard Sessions III, Attorney

11   General of the United States; and Donald J. Trump,

12   President of the United States.

13            This is filed in the United States

14   District Court for the Eastern District of

15   New York.  This deposition is being held at the

16   offices of the Conference of Mayors located at

17   1620 I Street, Northwest, Washington, D C 20006.

18            My name is Dan Reidy from the firm of

19   Veritext Legal Solutions and I'm the videographer.

20   The court reporter this morning is Donna Lewis

21   from the firm Olender Court Reporting.

22            I am not authorized to administer an

1    BY MS. TUMLIN:

2         **Q      Prior to September the 5th was there any**

3    **other draft memorandum regarding DACA circulating**

4    **within components at DHS?**

5              MR. GARDNER:  You can answer that

6    question with a yes or no.

7              THE WITNESS:  Let's really boil down.

8    By what do you mean like other drafts?  I mean

9    clearly a document that goes through an editing

10   process takes various form and depending on who

11   edits it and saves it and emails it back around

12   there are then unique documents created at every

13   single step along the way.  So, yes, there were

14   alternate versions that existed and it eventually

15   became the final version.

16   BY MS. TUMLIN:

17        **Q      So I wasn't speaking about various**

18   **iterations of that draft that was eventually**

19   **signed by Acting Secretary Duke.  But previously**

20   **you had testified that up until the time Acting**

21   **Secretary Duke signed that document on September**

22   **the 5th no final decision on whether to terminate**

1    the DACA program had been made.  Correct?

2         A    That -- that is generally correct,

3    although I will say again, no final decision is

4    ever made until there is ink on paper.  That is

5    the fundamental difference.  There may have been

6    tentative decision, but until a secretary of a

7    cabinet department makes a decision in writing or

8    in whatever method is appropriate for the

9    circumstance the decision is technically not

10   final.

11        **Q    Was there a substantively alternative**

12   **version of a DACA memorandum that was circulating**

13   **prior to September the 5th that could have been**

14   **signed by Acting Secretary Duke?**

15             MR. GARDNER:  Objection.  Calls for

16   disclosure of information subject to deliberative

17   process privilege.  I instruct the witness not to

18   answer.

19   BY MS. TUMLIN:

20        **Q    Okay.  Does DHS have a policy on how to**

21   **deal with litigation risk?**

22

1    A    Do we have a policy on how to deal with

2  litigation risk?

3    **Q    Uh huh.**

4    A    Nothing in writing.

5    **Q    Okay.  So there is -- is there any**

6  **policy on how to deal with threats to sue by state**

7  **or local officials?**

8    A    No.  And that sounds like the craziest

9  policy you could ever have in a department.  You

10  could never do anything if you were always worried

11  about being sued.

12    **Q    Are you familiar with the executive**

13  **order issued by President Trump with respect to**

14  **sanctuary jurisdictions?**

15    A    That -- I believe that is in Executive

16  Order 13768.  I am familiar.

17    **Q    And are you aware that several**

18  **municipalities have sued the federal government on**

19  **the basis of that executive order?**

20    A    In general I am, yes.

21    **Q    Are you aware that some of these**

22  **lawsuits have successfully blocked parts of the**

209

1    executive order?

2         A    On a temporary basis.

3         Q    **And as a result has DHS considered**

4    **rescinding any of that executive order?**

5              MR. GARDNER:  Objection.  Calls for

6    disclosure of information subject to deliberative

7    process privilege, plus the attorney/client

8    privilege.  I instruct the witness not to answer.

9    BY MS. TUMLIN:

10        Q    **Okay.  Have you ever requested that**

11   **anyone within DHS provide metrics or statistics**

12   **about DACA recipients?**

13        A    I have.

14        Q    **And when you ask for information they**

15   **generally give it to you.  Is that correct?**

16        A    Correct.

17        Q    **Did you ever request metrics about how**

18   **many DACA recipients who subsequent to their**

19   **receipt of DACA were arrested, detained or**

20   **removed?**

21             MR. GARDNER:  Objection.  Calls for

22   disclosure of information subject to deliberative

234

1          MR. GARDNER:  Subject to further

2     discussion.

3          MR. NEWMAN:  Absolutely.  Off the

4     record.

5          THE VIDEOGRAPHER:  This concludes

6     today's deposition.  The time on the video is 3:31

7     p.m.  We are off of the record.

8          (Whereupon, at 3:31 p.m., the above

9     proceedings was adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

235

1                    REPORTER'S CERTIFICATE

2             I, DONNA M. LEWIS, RPR, Certified

3    Shorthand Reporter, certify;

4             That the foregoing proceedings were

5    taken before me at the time and place therein set

6    forth, at which time the witness, Gene Hamilton,

7    was put under oath by me;

8             That the testimony of the witness, the

9    questions propounded and all objections and

10   statements made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13            I declare that I am not of counsel to

14   any of the parties, nor in any way interested in

15   the outcome of this action.

16            As witness, my hand and notary seal this

17   22nd day of October, 2017.

18

19            _____

              Donna M. Lewis, RPR

20            Notary Public

21   My Commission expires:

     March 14, 2018

22